**COMMENT: ABSOLUTE JUDICIAL IMMUNITY MAKES ABSOLUTELY NO SENSE: AN ARGUMENT FOR AN EXCEPTION TO JUDICIAL IMMUNITY.*, * Timothy M. Stengel, J.D., Temple University Beasley School of Law, 2012. I thank Professor Robert Reinstein for introducing me to, and guiding me through, the topic of judicial immunity, as well as for his immeasurable contributions to the Temple Law community. I also thank the staff and editors of Temple Law Review for their work in editing this Comment. Finally, I thank my entire family, especially my parents and my wife, Kristan, whose contributions here and elsewhere are proof that nothing in this world gets done alone.**

Summer, 2012

**Reporter**
84 Temp. L. Rev. 1071 *

**Length:** 24591 words

# Text

[*1071]

I. Introduction

With utter disdain for the rule of law, defendants Mark A. Ciavarella, Jr. and Michael T. Conahan, in combination and conspiracy with others … , have collectively perpetrated, through their acts and omissions, what ranks as one of the largest and most serious violations of children's rights in the history of the American legal system… . In choosing to treat children as commodities that could be traded for cash, the defendants have placed an indelible stain on the Luzerne County juvenile justice system. [1]

These were a few of the opening lines of a class action law suit filed by the Juvenile Law Center (JLC) - a public interest law group from Philadelphia - on behalf of dozens of children following the recent "Kids-for-Cash" scandal in

---

[1] Amended Class Action Complaint and Demand for Jury Trial at P 1, H.T. v. Ciavarella, No. 3:09-cv-00357 (M.D. Pa. April 23, 2009) (later consolidated as Wallace v. Powell, No. 3:09-cv-286, 2009 WL 4051974 (M.D. Pa. Nov. 20, 2009)).

84 Temp. L. Rev. 1071, *1071

Pennsylvania state court.  [2] That scandal and the legal measures that followed provide the factual background for this Comment.

 [*1072]  In January 2009, the U.S. Attorney's Office for the Middle District of Pennsylvania filed a criminal information in federal court.  [3] That information charged two Luzerne County, Pennsylvania judges with depriving the citizens of Pennsylvania of their honest services and conspiring to defraud the United States government.  [4] The root of these charges was more than $ 2,600,000 of secret income from a series of deals with the developers of a privately run, for-profit juvenile detention center.  [5] The judges allegedly received that income in exchange for their official acts, which included placing juvenile offenders in the detention center, as well as procuring state funding to house those juveniles.  [6]

Filed on the same day as that information were two plea deals - one for each judge - waiving an indictment by grand jury and pleading guilty to honest services wire fraud and conspiracy to commit tax fraud.  [7] Those plea deals, however, were rejected by Judge Edwin M. Kosik of the Middle District of Pennsylvania due to Judge Kosik's assessment that Judges Conahan and Ciavarella had not accepted responsibility for their conduct.  [8] Judge Kosik gave the two judges the option to either withdraw their guilty pleas or possibly face harsher punishment than was contemplated by their plea agreements.  [9] Both judges withdrew their pleas and a grand jury indictment followed. [10]

---

[2]  See generally Interbranch Commission on Juvenile Justice Report (2010) [hereinafter Interbranch Report] (discussing "Kids-for-Cash" scandal and proposing reforms); Leo Strupczewski & Hank Grezlak, PA Child Care's Lawyers Say Payoffs Were for Case Fixing, Legal Intelligencer, May 5, 2009, at 1 (using term "kids for cash"). The events in Luzerne County initially received only local and regional media attention, but ultimately gained some national attention. See, e.g., Juvenile Convictions Tossed in Kickback Case, L.A. Times, Mar. 27, 2009, at A15 (providing national coverage of events in Luzerne County); Terrie Morgan-Besecker, Feds: Judges Used System to Enrich Selves, The Times Leader, Jan. 27, 2009, http://www.timesleader.com/stories/Feds-Judges-used-system-to-enrich-selves,4688 (providing local media coverage of events in Luzerne County); John Sullivan, Luzerne Judge Broke His Vow to Reform, Philadelphia Inquirer, Jan. 28, 2009, at B01 (providing regional coverage of events in Luzerne County). Despite this widespread media attention, this Comment relies heavily on two sources - one governmental and one print media - to parse out the narrative of what would become known as the "Kids-for-Cash" scandal. The governmental source is a report by the Interbranch Commission on Juvenile Justice ("the Interbranch Commission"). See infra notes 27-29 and accompanying text for a brief discussion of the Interbranch Commission. The media source most relied upon is The Legal Intelligencer, which gave particularly extensive coverage of the events in Luzerne County from the early stages of the controversy. The tireless work of The Legal Intelligencer staff is apparent from the sheer mass of information made available through their publication's website. That information can be found at http://www.law.com/jsp/pa/PubArticlePA.jsp?id=1202 428035822&Luzerne_County_Scandal.

[3]  Interbranch Report, supra note 2, at 9. An "indictment" is one of the two formal charging instruments filed with a trial court, replacing a criminal complaint; an "information" is the other. Yale Kamisar et al., Modern Criminal Procedure: Cases-Comments-Questions 14 (12th ed. 2008). An indictment follows a grand jury determination that the prosecution's evidence is sufficient for the suspect to be formally charged. Id. An information, on the other hand, is used when a grand jury indictment is "either … not required or … waived," and is issued by the prosecutor instead of the grand jury. Id.

[4]  See Interbranch Report, supra note 2, at 9 (discussing criminal charges against two Luzerne County judges); Peter Hall & Leo Strupczewski, Judges' Plea Agreements Cast Pall over Luzerne Court, Legal Intelligencer, Jan. 28, 2009, at 1 (reporting on filing of information).

[5]  Interbranch Report, supra note 2, at 9.

[6]  Id.

[7]  Id.

[8]  Id. at 17.

[9]  Id.

[10]  Id.

84 Temp. L. Rev. 1071, *1072

The grand jury indictment included forty-eight counts. [11] In addition to the charges levied in the information, the indictment included racketeering, bribery, money laundering, and extortion charges. [12] The description of their misdeeds was also expanded. [13] Perhaps the most egregious charge against the two judges was that they had not only guaranteed placement of guilty juveniles in the private detention center but that they were also actively funneling juveniles into that detention center, regardless if their "crimes" warranted such sentences. [14] The detention center, in turn, **[*1073]** received a steady stream of funding from the state, the cost of housing these juvenile offenders. [15] In the wake of the grand jury indictment, Michael Conahan pled guilty and was sentenced to 17.5 years in prison. [16] Mark Ciavarella was convicted on twelve counts and was sentenced to twenty-eight years in prison. [17] Both judges were ordered to pay restitution. [18]

The indictment was not the first time this gross abuse of power had been alleged. [19] Even before the initial charges, the JLC had asked the Pennsylvania Supreme Court to exercise its King's Bench jurisdiction [20] and look into possible irregularities in Judge Ciavarella's courtroom. [21] Although the Pennsylvania Supreme Court initially denied the request of the JLC, [22] the criminal charges elevated the allegations to a point where the court determined the matter was worth another look. [23] As such, the court appointed a Special Master to investigate the allegations. [24] The Special Master's investigation established that the corruption in Judge Ciavarella's courtroom was so pervasive that it could not be said with any certainty that any juvenile appearing before Judge Ciavarella received a fair proceeding. [25] Following the recommendations of the Special Master, the Pennsylvania Supreme

---

[11] See generally Indictment, United States v. Conahan, No. 09-cr-272 (M.D. Pa. Sept. 9, 2009) (charging Luzerne County judges with various crimes).

[12] See Indictment, supra note 11, at 1-28, 45-61 (detailing these criminal charges).

[13] See generally id. (describing factual basis for criminal charges).

[14] See id. at 33-34 ("Accused juvenile offenders were ordered detained by the defendant [Ciavarella] even when Juvenile Probation Officers did not recommend detention and even when detention was unreasonable and unwarranted under the circumstances… . On some occasions, probation officers were pressured to change recommendations of release to recommendations of detention.").

[15] Interbranch Report, supra note 2, at 18-19.

[16] Ben Present, Conahan Gets 17.5 Years for Role in Luzerne Scandal, Legal Intelligencer, Sept. 26, 2011, at 1.

[17] Id.

[18] Id.; Zack Needles, Ciavarella Tells Court He's Broke, Legal Intelligencer Blog (Aug. 18, 2011), http://thelegalintelligencer.typepad.com/tli/2011/08/ciavarella -tells-court-hes-broke.html#tp.

[19] See Interbranch Report, supra note 2, at 8 (discussing history of Kids-for-Cash).

[20] The Pennsylvania Supreme Court's King's Bench jurisdiction empowers the court to exercise superintendence over lower courts even when no matter is pending. Memorandum from Chief Justice Ronald D. Castille, Pennsylvania Supreme Court, to Hon. John M. Cleland, Chair, The Interbranch Commission on Juvenile Justice 4 (Nov. 4, 2009) [hereinafter Castille Letter], available at http://www.pacourts.us/NR/rdonlyr es/FD867CD1-5B51-4190-9ABF-40E85A37CE91/0/ICJJCastilleMemo_091118.pdf.

[21] Interbranch Report, supra note 2, at 8.

[22] The Pennsylvania Supreme Court denied the request because the JLC asked the court to not focus on an individual case but rather to "exercise its plenary authority in order to undertake a far-flung investigation into juvenile cases in Luzerne County." Castille Letter, supra note 20, at 2.

[23] See Interbranch Report, supra note 2, at 10 (discussing Pennsylvania Supreme Court response to criminal charges); Castille Letter, supra note 20, at 4 (discussing Pennsylvania Supreme Court's granting of JLC's motion for reconsideration).

[24] Castille Letter, supra note 20, at 4.

[25] See id. at 11.

84 Temp. L. Rev. 1071, *1073

Court took the extraordinary step of expunging the records of all juveniles appearing before Judge Ciavarella during the time in question. [26]

The Commonwealth of Pennsylvania has undergone extensive self-reflection in order to determine if such abuses were happening elsewhere and to institute reforms to prevent similar abuses from happening again. [27] One example is the Interbranch **[*1074]** Commission on Juvenile Justice ("Interbranch Commission"), an investigatory body comprised of representatives of all three branches of state government. [28] The Interbranch Commission published an extensive account of what transpired in Luzerne County and made suggestions for what should change. Curiously, though, none of those recommendations included measures to compensate the juvenile victims. [29]

Although the extraordinary step of expunging five years worth of juvenile records goes far toward rectifying the harm done to those children unlucky enough to have become mired in the Kids-for-Cash scandal, it is impossible to say those juvenile victims have been made entirely whole. [30] Following the initial charges by the U.S. Attorney, several class action lawsuits were filed, seeking damages against several of the scandal's key parties, including Judges Conahan and Ciavarella. [31] Unfortunately, the doctrine of absolute judicial immunity created a hurdle. [32]

It is well settled that a judge enjoys absolute judicial immunity from a civil suit when (1) that judge has acted within her subject matter jurisdiction and (2) the act in question is a judicial act. [33] Although judicial immunity has been narrowed by a litany of cases defining a "judicial act," [34] the Kids-for-Cash scandal presents a scenario in which an act that falls squarely within the definition of a judicial act has been admitted by at least one of the parties involved [35] and proven beyond a reasonable doubt in a separate criminal proceeding to have been corruptly influenced. [36]

---

[26]  See Interbranch Report, supra note 2, at 10-13; Castille Letter, supra note 20, at 13-14.

[27]  See Kenneth J. Horoho, Jr., Lessons Learned from Luzerne County, Legal Intelligencer, July 27, 2010 (reflection of a member of Interbranch Commission); Leo Strupczewski, Report Urges Sweeping Changes for Juvenile Courts, JCB, Legal Intelligencer, May 28, 2010, at 1 (discussing recommendations to fix problems exposed by Kids-for-Cash scandal).

[28]  The Interbranch Commission was established when Pennsylvania Governor Edward G. Rendell signed into law Act 32 of the Pennsylvania General Assembly, following unanimous approval by the Pennsylvania legislature. Interbranch Report, supra note 2, at 5. The Interbranch Commission was comprised of representatives of all three branches of Pennsylvania state government and conducted an investigation, including eleven days of hearings, to "determine how the Luzerne County juvenile justice system failed, to restore public confidence in the administration of justice and to prevent similar events from occurring in Luzerne County or elsewhere in the Commonwealth." Id.

[29]  See id. at 41-59 (making various recommendations to prevent future scandal and to compensate "original victims"). The term "juvenile victims" is used to describe those juveniles who were victimized by the actions of Judges Conahan and Ciavarella. By contrast, the term "original victims" will be used to describe the victims of any crimes committed by those juveniles who appeared before Judge Ciavarella and later had their records expunged. See id. at 42 (using term "original victims" and recommending measures to rectify their harm).

[30]  See Amaris Elliott-Engel, "Bad Kids': Victims of Luzerne Scam Battle Stigma as They Fight to Reclaim Their Dreams, Legal Intelligencer, May 29, 2009, at 1-5 (describing continued stigmatization felt by some juvenile victims); Hank Grezlak, We All Failed the Kids in Luzerne - And We're All Going to Pay the Price, Legal Intelligencer, Mar. 6, 2009, at 3 (describing lasting effects on two juvenile victims).

[31]  See generally Amended Class Action Complaint and Demand for Jury Trial, supra note 1.

[32]  See Memorandum, Wallace v. Powell, No. 3:09-cv-286 (M.D. Pa. Nov. 20, 2009) (dismissing certain charges against Judges Conahan and Ciavarella due to doctrine of absolute judicial immunity).

[33]  See infra Part II.C for a discussion of the test for absolute judicial immunity.

[34]  See infra notes 86-119 and accompanying text for a discussion of the limits of absolute judicial immunity.

[35]  See Strupczewski & Grezlak, supra note 2, at 2 (reporting on one judge's guilty plea).

[36]  See generally Indictment, supra note 11 (charging Luzerne County judges with various crimes).

84 Temp. L. Rev. 1071, *1074

Case law from the United States Supreme Court, which adopted the English common law rule and then, over time, refined it to the established American legal principle it is today, has never had to answer the question of how immunity [*1075] jurisprudence should react to more than mere allegations of corruption. [37] When faced with the decision in the consolidated class action law suit, Wallace v. Powell, [38] federal district Judge A. Richard Caputo granted immunity to Judges Conahan and Ciavarella for all courtroom activities. [39] Although Judge Caputo most likely interpreted the question of judicial immunity in a way most faithful to the case law, [40] and although the parties named in Wallace may still be held liable for harm caused by nonjudicial acts, [41] this Comment seeks to determine whether the law should change by answering the following question: Should there be an exception to absolute judicial immunity?

Part II of this Comment discusses the evolution of the doctrine of absolute judicial immunity in the United States, as well as the reasons for and the arguments against the doctrine. Part III discusses critically the reasons behind judicial immunity as presented in the case law and attempts to show that when those reasons are sacrificed, judicial immunity makes little sense. Part III also proposes a test for when a judge should lose her immunity; that is, judicial immunity should be placed in doubt upon the filing of criminal charges and should cease where a court determines the reasons for judicial immunity are no longer present.

II. Overview

Judicial immunity, unlike other forms of official immunity in the United States, is almost entirely a creation of the men and women it immunizes. [42] What started as a principle of English common law has been adopted by the United States Supreme Court, survived at least one potential statutory challenge, and has been engrained as a necessary aspect of American jurisprudence. [43] In fact, the Supreme Court has said that the doctrine of absolute judicial immunity should not be disturbed without clear indication that Congress intended it to be altered. [44] The goal of this Comment is not to dispute the validity of the doctrine of absolute judicial immunity but rather to analyze its purposes as relied upon by the Supreme Court. Such analysis shows that the wall of judicial immunity, which uses its purposes as mortar, is not without cracks and under [*1076] certain pressures should crumble.

A. Forming a Test for Judicial Immunity

---

[37] See infra Parts II.A and II.B for a discussion of Supreme Court cases dealing with questions of absolute judicial immunity.

[38] No. 3:09-cv-286 (M.D. Pa. Nov. 20, 2009). This case is the consolidation of several class action suits against the two Luzerne County judges.

[39] See Memorandum, supra note 32, at 19-20 (dismissing certain charges against Judges Conahan and Ciavarella due to doctrine of absolute judicial immunity).

[40] See infra Parts II.A and II.B for a discussion of the case law.

[41] See Memorandum, supra note 32, at 20 (denying motion to dismiss as to nonjudicial acts). At the time this Comment went to print, one of the judges' partners settled with the juveniles for a large sum. See Mericle Settles "Kids-for-Cash" Civil Lawsuits, Verdicts & Settlements, Legal Intelligencer, Dec. 27, 2011, available at http://www.law.com/jsp/pa/PubArticlePA.jsp?id=1202536629296 (settling for $ 17.75 million).

[42] See Jeffrey M. Shaman, Judicial Immunity from Civil and Criminal Liability, 27 San Diego L. Rev. 1, 4 (1990) ("The grant of absolute immunity to judges has often been criticized, especially because it is judges who have granted absolute immunity to themselves.").

[43] See infra Parts II.A and II.B for a discussion of the evolution of absolute judicial immunity.

[44] See Pierson v. Ray, 386 U.S. 547, 554-55 (1967) ("The immunity of judges for acts within the judicial role is equally well established, and we presume that Congress would have specifically so provided had it wished to abolish the doctrine.").

84 Temp. L. Rev. 1071, *1076

 Absolute judicial immunity is a common law doctrine that has been refined incrementally over the last several centuries through a variety of factual settings. As the purpose of this Comment is to test the reasons that underlie judicial immunity, this Section explores those reasons by recounting the evolution of the doctrine.

1. The Early Judicial Immunity Cases

 Although it has practical and historical roots in the English common law, [45] the doctrine of absolute judicial immunity was officially ushered into the American legal system in the case of Randall v. Brigham. [46] In Randall, an attorney was accused of obtaining an agreement from a client that was "unconscionable and extortionate." [47] The trial court, finding the actions of Randall to be "grossly unprofessional," ordered that he be removed from his position as an attorney. [48] In response, Randall sued the judge, Brigham, for unlawful removal. [49]

Justice Field, writing for the Supreme Court, held that "[judges] are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, unless perhaps where the acts … are done maliciously or corruptly." [50] Even if the act in question was done corruptly, the Court allowed that impeachment and **[*1077]** removal from office may be better alternatives than civil liability. [51]

The Court explained that the doctrine of judicial immunity is necessary to preserve the impartiality of the judicial system. [52] Without immunity, judges could be influenced by personal considerations of future litigation against them from any party that could potentially perceive herself as aggrieved. [53] According to the Court, judicial

---

[45] The origin of judicial immunity is debated. Compare Robert J. Reinstein & Harvey A. Silverglate, Legislative Privilege and the Separation of Powers, 86 Harv. L. Rev. 1113, 1122-23 (1973) ("The judicial privilege was a corollary of sovereign immunity: the personal delegates of the King were answerable only to him for their official conduct."), with J. Randolph Block, Stump v. Sparkman and the History of Judicial Immunity, 1980 Duke L.J. 879, 885 & n.28 (asserting judicial immunity "followed naturally from the doctrine of the sanctity of records but was ultimately accepted because it strengthened the appellate system by cutting off collateral attacks on judgments" and denying it was derived from sovereign immunity of the Crown (footnote omitted)). An opinion on this debate and how it affects the legitimacy of judicial immunity in current American legal landscape is beyond the scope of this Comment. Rather, this Comment assumes judicial immunity is necessary, or at least sufficiently engrained, such that questioning its legitimacy is a futile exercise. This Comment is more concerned with gleaning the reasons for judicial immunity from the case law in order to determine the limits of that reasoning. With that in mind, the seminal case in English common law is Floyd v. Barker, [1607] 77 Eng. Rep. 1305, which granted a judge immunity from civil action. Lord Coke, presiding, announced the scope of judicial immunity as limited to acts done by the judge, as a judge. Block, supra, at 887. He then gave four policy reasons for judicial immunity, summarized in the following way:

(1) the need for finality (which … covers [an end of litigation and authoritativeness of the appellate system]); (2) the need for protecting the independence of common law courts from rival courts controlled by the king; (3) the need for maintaining public confidence in the system of justice; and (4) a recognition that independent, conscientious judges would be most subject to prosecutions.

 Id. at 886-87 (footnotes omitted). For further account of the English common law history of judicial immunity, see id. at 881-96.

[46] 74 U.S. 523 (1868). There were, however, a handful of state court decisions that touched on the doctrine of judicial immunity before Randall. See Block, supra note 45, at 897-98 (discussing early state court decisions on judicial immunity).

[47] Randall, 74 U.S. at 525.

[48] Id. at 525-26.

[49] Id. at 526.

[50] Id. at 536 (emphasis added).

[51] See id. at 537 ("If faithless, if corrupt, if dishonest, if partial, if oppressive or arbitrary, they may be called to account by impeachment, and removed from office.").

[52] Id. at 536.

[53] Id.

immunity "is for the sake of the public, and not merely for the protection of the judge." [54] It is worth noting that the language the Court used left room for an exception to judicial immunity; that is, a judge might not enjoy judicial immunity for acts done in excess of jurisdiction if those acts were malicious or corrupt. [55]

That exception, however, was addressed three years later in Bradley v. Fisher. [56] In Bradley, also a case in which a lawyer sued a judge, [57] the Court held that judges enjoy immunity for their judicial acts "even when such acts are in excess of their jurisdiction and are alleged to have been done maliciously or corruptly." [58]

Bradley is important for two reasons. First, Justice Field, again writing for the Court, clarified what it means to act "in excess of jurisdiction" by introducing a distinction between acts done in excess of jurisdiction and acts done in "the clear absence of … jurisdiction." [59] It was the latter condition, met only when a judge knowingly adjudicates a matter without subject matter jurisdiction, that the Bradley Court deemed to fall outside the parameters of judicial immunity. [60] To illustrate the distinction, Justice Field offered the example that a probate court presiding over criminal matters would be acting in the absence of jurisdiction. [61] By contrast, a criminal court acting with general jurisdiction could find an accused guilty of a non-existent crime, yet face no liability, because that court did not act in the absence of jurisdiction, but merely exceeded its jurisdiction. [62] Although this distinction is not entirely clear, it appears that a judge serving on a court of general jurisdiction has virtually no limit to her immunity, so long as she is performing a judicial act.

Second, the Bradley Court asserted that the remedy afforded to one against whom **[*1078]** a judge has acted maliciously or corruptly is "public prosecution in the form of impeachment, or in such other form as may be specially prescribed." [63] Here, the Court argued that allowing any inquiry into a judge's motive would crystallize in the form of "vexatious litigation," which should be avoided in order to protect judicial independence and to promote finality of judgments. [64] Thus, the Bradley Court seemed to say that allegations of malicious or corrupt motives do not push a judicial act out from behind the shield of judicial immunity.

2. The Definition of a Judicial Act

---

[54] Id.

[55] See id. (stating that judges enjoy immunity "unless perhaps where the acts, in excess of jurisdiction, are done maliciously or corruptly"). There is some dispute as to whether judges in the United States were held liable for malicious actions. See Block, supra note 45, at 899-900 (discussing competing opinions on the reach of judicial immunity). Block asserts that "these words of qualification are not surprising" in light of an historical reluctance to extend judicial immunity beyond judges and to justices of the peace. Id. at 900.

[56] 80 U.S. 335 (1871).

[57] Bradley represented John H. Suratt, who was accused in the murder of Abraham Lincoln. Bradley, 80 U.S. at 344. During the trial, Bradley and Fisher, the presiding judge, engaged in a series of insults from the bench. Id. When the jury failed to reach a verdict, the case was discharged, and Fisher entered an order depriving Bradley of the right to practice in the Supreme Court for the District of Columbia. Id.

[58] Id. at 351.

[59] Id.

[60] Id. at 351-52.

[61] Id.

[62] Id.

[63] Id. at 354.

[64] Id.; see Block, supra note 45, at 885-87, 901 (explaining that Justice Field's reasoning in Bradley mirrored that of Lord Coke in Floyd v. Barker, [1607] 77 Eng. Rep. 1305).

84 Temp. L. Rev. 1071, *1078

The test from Bradley has remained: Judges are immune from civil suits for judicial acts done within their subject matter jurisdiction, regardless of their motives. Randall and Bradley, though, did little to actually define a judicial act. The Court, however, has since used the lenses of maliciousness and corruption to shape that definition.

a. Malicious Judicial Acts

In Stump v. Sparkman, [65] a divided Court considered the scope of a judicial act in a malicious context. [66] The petitioner, Judge Harold Stump, granted a petition by a mother to have her "somewhat retarded" [67] fifteen-year-old daughter sterilized to "prevent unfortunate circumstances." [68] A doctor performed a tubal ligation and the daughter was rendered sterile, despite having been told she was entering the hospital to have her appendix removed. [69] Upon learning of the true nature of her procedure, the daughter filed a civil suit against, among others, Judge Stump. [70] The district court granted the judge immunity, [71] but the Seventh Circuit reversed, finding that Judge Stump had not acted within his jurisdiction and "forfeited his immunity "because of his failure to comply with elementary principles of procedural due process.'" [72]

Relying on Bradley, among others, the Supreme Court reversed the court of appeals. The Court could not agree that Judge Stump acted in the clear absence of jurisdiction, as the closest case law on the issue established only that a parent did not have a right to sterilize a minor child. [73] Although that case called into question the correctness of Judge Stump's order, it actually affirmed his jurisdiction, as Judge Stump should have denied the mother's request on the merits, not dismissed it for lack **[*1079]** of jurisdiction. [74]

The Court also took this opportunity to address the attributes of a judicial act, defining it broadly. The Court rejected the daughter's argument that the judge did not act in his judicial capacity because the case was not given a docket number and the petition was not considered in a hearing. [75] Thus, formality is not necessarily indicative of a judicial act. [76] Rather, the factors that make up a judicial act "relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." [77]

The Court also rejected the argument that an act that is "totally devoid of judicial concern for the interests and well-being of the [wronged party]" could not be considered a judicial act. [78] The Court relied on the reasoning from Bradley that occasional unfair rulings are the cost of having an independent judiciary. [79] The Court reasoned that

---

[65]  435 U.S. 349 (1978).

[66]  Sparkman, 435 U.S. at 351.

[67]  Id.

[68]  Id.

[69]  Id. at 353.

[70]  Id.

[71]  Id. at 354-55.

[72]  Id. at 355 (quoting Sparkman v. McFarlin, 552 F.2d 172, 176 (7th Cir. 1977)).

[73]  Id. at 358-59 (citing A.L. v. G.R.H., 325 N.E. 2d 501, 502 (Ind. Ct. App. 1975)).

[74]  Id. at 359.

[75]  Id. at 360.

[76]  Id.

[77]  Id. at 362 (emphasis omitted).

[78]  Id. at 363.

[79]  See id. at 364 (citing Bradley v. Fisher, 80 U.S. 335, 348 (1871)).

disagreement with a judicial act does not justify depriving a judge of his immunity because it is in the interest of justice that a judge "act upon his own convictions." [80] Thus, Judge Stump performed a judicial act within his jurisdiction and was deemed to be immune. [81]

In one of its most recent judicial immunity cases, Mireles v. Waco, [82] the Court again examined whether a malicious act could be considered a judicial act. Mireles, a California Superior Court judge, was angered by the absence of Waco, a public defender, from a scheduled appearance in Judge Mireles's courtroom. [83] Although Waco was representing a client in another courtroom, Judge Mireles directed two police officers to use excessive force in bringing Waco to his courtroom. [84] Despite the judge's unusual actions, the Court had no difficulty in determining that Judge Mireles's act was judicial, as the nature of the function, not the act itself, is determinative. [85] Thus, these cases make clear that a judicial act is one normally performed by a judge where the parties dealt with the judge in her judicial capacity, and it makes no difference if the judge acted without concern for the best interests of the injured.

b. Immunizing Corrupt Judicial Acts While Recognizing a Limit

Sparkman and Waco examined the definition of a judicial act though the lens of maliciousness, and, in granting immunity, the Court slammed the door on one of the **[*1080]** possible exceptions mentioned in Randall. [86] In Dennis v. Sparks, [87] the Court expressly extended that reasoning to include allegations of corruption.

Dennis arose from a scenario in which a Texas state judge enjoined mineral production on oil leases held by the respondents. [88] After an appellate court dissolved the injunction over two years later, the respondents sued the party who obtained the injunction and the judge, among others, claiming the injunction had been the result of bribery. [89] The judge asserted judicial immunity, and the district court dismissed the case against him. [90] The district court further reasoned that, with the dismissal of the judge, the remaining parties could not be said to have conspired "under color of law," a requirement of the law under which the claim was filed. [91] The Fifth Circuit, however, upheld the district court's grant of immunity to the judge but reversed the dismissal of the claims against the private citizens, who had allegedly conspired with the judge. [92] The Supreme Court granted the petition for certiorari to resolve a circuit split. [93]

---

[80]  Id. at 363 (emphasis added) (quoting Bradley, 80 U.S. at 347).

[81]  Id. at 362-63.

[82]  502 U.S. 9 (1991).

[83]  Waco, 502 U.S. at 10.

[84]  Id.

[85]  Id. at 12.

[86]  See supra note 55 and accompanying text for discussion of possible exceptions to judicial immunity from Randall. Although the Bradley Court also rejected the argument that the judge in that case should not be granted immunity because he acted maliciously, the relatively shocking nature of the acts in Sparkman and Waco firmly reinforced that aspect of Bradley.

[87]  449 U.S. 24 (1980).

[88]  Dennis, 449 U.S. at 25.

[89]  Id. at 25-26.

[90]  Id. at 26.

[91]  Id. See infra notes 150-60 for a discussion of what it means to act "under color of law."

[92]  Id.

[93]  Id. at 27.

Relying on Sparkman, the Court had no difficulty in determining that regardless of alleged corruption, "the judge [had] been properly dismissed from the suit on immunity grounds." [94] The Court further held, however, that judicial immunity did not extend to the private parties with whom the judge conspired. [95]

The Court distinguished its holding in Dennis from its holding in Gravel v. United States, [96] in which the Court extended the legislative immunity found in the Speech or Debate Clause to a Senator's aide because legislators rely on aides to perform their legislative duties. [97] By contrast, the private parties in Dennis were in no way performing a judicial act, and the judge in no way relied upon them to perform his judicial duty. [98]

Importantly, the Dennis Court also distinguished Gravel by finding that judges, unlike legislators, can be called upon to testify about their judicial acts, even if judicial immunity had shielded them from liability for those very same acts. [99] In doing so, the Court noted that judicial immunity is not meant to shield judges from all forms of accountability but rather from the "fear of being mulcted for damages should an unsatisfied litigant be able to convince another tribunal that the judge acted not only **[*1081]** mistakenly but with malice and corruption." [100]

c. Narrowing the Definition of a Judicial Act

The Supreme Court found another limit to judicial immunity by narrowing the definition of judicial act from Sparkman. In Forrester v. White, [101] the Supreme Court found that judicial immunity did not extend to the employment decision of a state judge, who fired a probation officer he had previously hired pursuant to his authority under state law. [102]

The Court, in reversing the lower courts' grant of immunity, emphasized that the judicial function inherently tends toward disappointment for at least one of the parties involved in a controversy, and to subject judges to liability would lead to an "avalanche of suits," both frivolous and vexatious. [103] The harm created by summarily dismissing those suits that are not frivolous is balanced by the established mechanisms of review for correcting judicial error. [104] The Court, however, concluded that judicial immunity should not be so sweeping that it extends to acts performed by the judge outside the normal judicial function. [105] Administrative acts, although essential to the function of courts, have not been regarded as judicial acts, [106] and the Court found that the judge acted in his administrative capacity, not his judicial one, when he hired and fired the probation officer. [107] Again, "it was the

---

[94] Id.

[95] Id. at 29.

[96] 408 U.S. 606 (1972).

[97] See generally Reinstein & Silverglate, supra note 45.

[98] Dennis, 449 U.S. at 30.

[99] Id.

[100] Id. at 31 (citing Pierson v. Ray, 386 U.S. 547, 554 (1967);  Bradley v. Fisher, 80 U.S. 335, 348 (1871)).

[101] 484 U.S. 219 (1988).

[102] Forrester, 484 U.S. at 221.

[103] Id. at 226-27.

[104] Id. at 227.

[105] Id.

[106] See Ex parte Virginia, 100 U.S. 339, 348-49 (1879) (finding jury pool selection to be administrative and subject to criminal liability).

[107] Forrester, 484 U.S. at 229.

nature of the function performed, not the identity of the actor who performed it, that informed [the Court's] immunity analysis." [108]

## 3. No Immunity from Injunctive Relief

Following Sparkman and Dennis, the Supreme Court not only narrowed the definition of a judicial act but also limited the type of suits from which judicial immunity shields judges. In Pulliam v. Allen, [109] the Court considered whether judicial immunity bars injunctive and declaratory relief, as well as legal fees associated with gaining that relief. [110] In Pulliam, a county magistrate judge allegedly incarcerated persons for "nonjailable offenses." [111] The plaintiffs claimed this was unconstitutional, and both the district court and the Fourth Circuit agreed, granting the injunction and **[*1082]** awarding costs and attorney's fees to the plaintiffs. [112]

Justice Blackmun, writing for the majority, noted that the question of attorney's fees must follow the more fundamental question of whether a court can enjoin another court from performing a judicial act. [113] Although rarely awarded, the courts of appeals prior to Pulliam generally held that absolute judicial immunity did not bar injunctive relief and, in Pulliam, the Supreme Court agreed. [114] The Court engaged in a lengthy discussion of the common law and determined that injunctive relief was available against judges in England. [115] Similarly, American courts "never have had a rule of absolute judicial immunity from prospective relief." [116] The Court noted that the concerns with granting injunctive relief against a judge were distinct from those alleviated by protecting judges from damages. [117] Further, the Court noted that the hurdles for obtaining equitable relief are sufficiently high to guard against harassment of judges [118] and the chance of compromising judicial independence is lower in the case of injunctions. [119]

## B. Criminal Liability and Civil Immunity Under the Civil Rights Acts

---

[108] Id.

[109]  466 U.S. 522 (1984).

[110]  Pulliam, 466 U.S. at 524.

[111]  Id. at 524-25.

[112] Id.

[113] See id. at 527 (stating that question before Court was whether members of judiciary have immunity from award of attorney's fees when acting in their judicial capacity).

[114] See id. at 525 (affirming refusal to extend immunity to bar injunctive relief).

[115] Id. at 529-36.

[116] Id. at 536.

[117] Id. at 537.

[118] Id. at 537-38.

[119] Id. The Court acknowledged that injunctive relief presents its own problems, such as federal courts being made to serve a constant supervisory role over state courts.  Id. at 539. However, the Court noted that an attack on federalism is not a problem for which the doctrine of judicial immunity is the solution. Id. Pulliam was rejected to some extent by Congress, as the Federal Courts Improvement Act of 1996 (FCIA) "drastically reduced the authority granted by Pulliam." See Hon. Patricia Walther Griffin & Rachel M. Pelegrin, A Look at Judicial Immunity and Its Applicability to Delaware and Pennsylvania Judges, 6 Widener J. Pub. L. 385, 409-412 (1997) (discussing the FCIA and its implications on judicial immunity from attorney's fees in civil rights actions). "The FCIA bars injunctive relief unless declaratory relief is violated or unavailable … [and] precludes awards of costs and attorney's fees against judges" for judicial acts.  Id. at 391. See infra note 122 and accompanying text for the statutory language codifying this portion of the FCIA.

84 Temp. L. Rev. 1071, *1082

As discussed in the preceding Section, judges enjoy civil immunity for a narrow class of judicial acts performed in a judge's official role, so long as those acts were not done in the absence of subject matter jurisdiction. Given this narrow definition of a judicial act, as well as the role a judge plays in our legal system, there is a certain type of harm that will most likely flow from a malicious or corrupt judicial act; that is, a judge, by performing a malicious or corrupt judicial act, will deprive a litigant of her civil rights. As such, a brief discussion of civil rights legislation in the United States, as well as how the doctrine of judicial immunity interacts with that legislation, is worthwhile.

1. Civil Rights Legislation

"The era of Bradley v. Fisher was also the era of Reconstruction," and with the **[*1083]** end of the Civil War, America began attempting to protect civil rights through specific legislation. [120] Since the advent of civil rights legislation, those acting "under color of law" face both criminal and civil liability for depriving another of constitutionally guaranteed rights. [121] Thus, as the test for absolute judicial immunity developed, the Supreme Court had to determine what, if any, effect civil rights legislation would have on the immunity enjoyed by the judiciary.

As the law stands now, it is a crime in the United States for a person acting "under color of law" to violate another's civil rights. 18 U.S.C. § 242 provides that

whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both. [122]

Similarly, 18 U.S.C. § 241 makes it a crime to conspire to violate another person's civil rights. [123] Comparatively, 42 U.S.C. § 1983 establishes a civil liability scheme for the same sort of conduct. That statute provides that

every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. [124]

Aside from obvious differences rooted in the nature of these statutes - two are uniquely criminal and the third is uniquely civil - they proscribe the same kind of acts by the same class of actors. Namely, any person acting "under color of law" shall not deprive any other person of their rights under the Constitution.

The next subsections explore the applicability of judicial immunity to violations of civil rights in both the criminal and civil context. The application of judicial immunity in the criminal context is discussed first to provide background on the application of judicial immunity in the civil context, but also to highlight that judges can be prosecuted for judicial acts.

---

[120] See Block, supra note 45, at 901 (discussing the application of judicial immunity to civil rights legislation).

[121] Although "the study of civil rights enforcement has focused on civil remedies," all seven civil rights statutes passed during the Reconstruction period allowed for criminal remedies, as well. Frederick M. Lawrence, Civil Rights and Criminal Wrongs: The Mens Rea of Federal Civil Rights Crimes, 67 Tul. L. Rev. 2113, 2122-23 (1993).

[122] 18 U.S.C. § 242 (2006).

[123] See id. § 241.

[124] 42 U.S.C. § 1983 (2006).

[*1084]

2. Criminal Liability

It is generally assumed that judges do not enjoy immunity from criminal prosecution, [125] and the language of 18 U.S.C. § 242 appears on its face to include judges. [126] As such, Justice Field's reference in Bradley to "such other form as may be specially prescribed" could include criminal prosecution. [127] Although there is no controlling case directly on point that indicates purely judicial acts can be the source of prosecution under § 242, the Supreme Court showed an early willingness to allow criminal prosecutions of judges under a precursor to § 242. However, at least one lower court did not. The next subsection discusses those cases.

a. Early Criminal Civil Rights Cases

In Ex parte Virginia, [128] the Supreme Court denied the habeas corpus petition of a judge who was indicted for excluding black citizens from a list of potential jurors. [129] In examining whether the criminal provisions of the civil rights legislation were constitutional, the Court looked to the purpose of the Thirteenth and Fourteenth Amendments, and concluded Congress was authorized to enforce those amendments by appropriate legislation. [130] In doing so, the Court found that "the Constitution now expressly gives authority for congressional interference and compulsion in the cases embraced within the Fourteenth Amendment." [131] As such, the Court denied the judge's petition for a writ of habeas corpus. [132]

Although the Court allowed the judge to be prosecuted, it was not forced to determine whether the traditionally civil doctrine of judicial immunity extended to criminal prosecutions since it held that the source of the complaint was not a judicial act. [133] Rather, the Court reasoned that jury pools are selected by county commissioners, supervisors, or even sheriffs, and, as such, must be ministerial in nature. [134] Thus, the Court was able to maintain the balance between "equal protection and judicial independence." [135] This distinction, however, left room for at least one lower court to grant immunity from prosecution where that prosecution arose from a judicial act.

[*1085]  In United States v. Chaplin, [136] a federal district court addressed the question not touched by the facts of Ex parte Virginia - the applicability of judicial immunity to the criminal context. In Chaplin, a judge was indicted for

---

[125]  Shaman, supra note 42, at 18 (stating that judges are not exempt from criminal liability, with the exception of "malfeasance or misfeasance in the performance of judicial tasks undertaken in good faith").

[126]  See supra note 122 and accompanying text for the language of § 242. See also Robert J. Kaczorowski, Congress's Power to Enforce Fourteenth Amendment Rights: Lessons From Federal Remedies the Framers Enacted, 42 Harv. J. on Legis. 187, 231-32 (2005) (explaining that criminal penalties under early civil rights legislation were intended to punish judges who refused to enforce the Civil Rights Acts).

[127]  Bradley v. Fisher, 80 U.S. 335, 354 (1871).

[128]  100 U.S. 339 (1879).

[129]  Ex parte Virginia, 100 U.S. at 340.

[130]  See id. at 344-45 (interpreting purpose of Thirteenth and Fourteenth Amendments as elevating the condition of African Americans in society).

[131]  Id. at 347-48.

[132]  Id. at 349.

[133]  See id. at 348.

[134]  Id.; see also Forrester v. White, 484 U.S. 219, 229 (1988) (refusing to extend judicial immunity to administrative acts of judges).

[135]  Block, supra note 45, at 903.

84 Temp. L. Rev. 1071, *1085

conspiracy to deprive another of his civil rights under color of state law in violation of a precursor to 18 U.S.C. § 242. [137] The court framed the issue as whether a judge could be prosecuted for "acting in his judicial capacity and within his jurisdiction in imposing sentence and probation upon a person charged with an offense in his court to which the defendant has pleaded guilty." [138]

After asserting there was no case on point to guide the court, it engaged in a discussion of the civil immunity enjoyed by judges, citing Randall and Bradley, among others. [139] The court also cited Ex parte Virginia, as well as other cases that demonstrated judges are "held to the same responsibility as any citizen" when that judge commits a crime. [140] Still, the court distinguished Ex parte Virginia, as the acts that gave rise to the indictment in Chaplin were purely judicial. [141] As such, the court in Chaplin granted the judge immunity from criminal prosecution, finding it untenable to subject every decision of every judicial officer to review by the executive branch. [142] In asserting as much, the court struck heavy tones of the need for separation of powers, which was not a concern at the forefront of the civil immunity cases. [143]

b. Would the Supreme Court Uphold Chaplin?

Although Chaplin was not heard on appeal, the Supreme Court would likely not adopt the reasoning of the Chaplin court. There are two reasons for this: First, the criminal provisions of the civil rights statutes have been interpreted in a way that appears to include judicial acts; and second, the Court has expressly stated that § 242 could be used to prosecute judges.

i. The Interpretation of "Under Color of Law"

Screws v. United States, [144] which addressed the criminal provisions of the civil rights acts, is considered "the most significant criminal civil rights case decided by the Supreme Court since the end of Reconstruction and still represents the touchstone for federal criminal civil rights doctrine." [145] The defendants in Screws were local law enforcement officers in Georgia who arrested an African American and beat him to **[*1086]** death. [146] There was evidence that one of the officers held a grudge against the victim. [147] The defendants were prosecuted and convicted for depriving the victim of his due process rights, as guaranteed under the Fourteenth Amendment. [148] Although the defendants put forth several arguments to rebut the charges against them, [149] this Comment is most concerned with the defendants' argument that they did not act "under color of law," as that argument is most applicable to the question of whether judicial acts fall within the purview of the statute.

---

136  54 F. Supp. 926 (S.D. Cal. 1944).

137  Chaplin, 54 F. Supp. at 926-27. See supra notes 122-23 and accompanying text for a discussion of criminal civil rights laws.

138  Chaplin, 54 F. Supp. at 928.

139  Id. at 928-33.

140  Id. at 933.

141  Id.

142  Id. at 934.

143  See id. (acknowledging that, compared to civil liability, "the reasons are more weighty that [judges] should be protected against criminal actions").

144  325 U.S. 91 (1945).

145  Lawrence, supra note 121, at 2120.

146  Screws, 325 U.S. at 92-93 (plurality opinion).

147  Id. at 93.

148  Id. at 93-95.

149  Id. at 95.

On the question of what it means to act under color of law, the Screws Court was splintered. A plurality, repeating the reasoning from Ex parte Virginia, [150] asserted that "under color of law" refers to the foundation of the official's authority when that official is depriving another of a civil right, and does not refer to the type of law the official breaks in doing so. [151] Furthermore, according to the plurality, "acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it." [152] This would seem to include judicial acts.

Although Justice Rutledge, who joined the plurality only in voting to remand the matter, [153] and Justice Murphy, who dissented, disagreed with the plurality on some issues, they both had little to say with regard to the plurality's definition of "under color of law." [154] Thus, for six of the Justices on the Screws Court, a judge who is performing his official duties, that is, performing judicial acts, would presumably be acting "under color of law."

The disagreement over what it means to act "under color of law" came from the three remaining justices - Justices Roberts, Frankfurter, and Jackson. [155] The plurality defined acts done "under color of law" as any acts that flow from state-given authority, even if not directly authorized, or in violation of state law. [156] The dissent, by contrast, **[*1087]** argued that principles of federalism, the provision's legislative history, and the language of the statute indicated that the statute was never meant to make federal crimes of acts also in violation of state law simply because they were performed by a state official. [157] Rather, Justice Roberts interpreted "under color of law" to apply to state officials acting according to, or dictating, state policy. [158]

That "policy," however, need not be etched in statutory stone, as state policy could come from a custom contradicting the written law or as a result of "judicial voice." [159] Given this last distinction, it appears that all nine Justices on the Screws Court would have considered attaching criminal liability to a judge's courtroom act if that

---

[150] See id. at 110 ("As he acts in the name and for the State, and is clothed with the State's power, his act is that of the State." (quoting Ex parte Virginia, 100 U.S. 339, 347 (1879)).

[151] Id. at 107-10.

[152] Id. at 111. For example, the law enforcement officers in Screws used their authority to arrest a man, and, in doing so, they were authorized to use force sufficient to effectuate the arrest. Id. The officers in Screws used more force than necessary to effectuate that arrest. Id. Thus, the officers acted "under color of law," in so far as they were authorized to arrest the man, and only exceeded their authority by using excessive force. Id. It was this use of excessive force, not the act of arresting the man, that violated his constitutional rights. Id.

[153] See id. at 113 (Rutledge, J., concurring).

[154] See id. (stating he would rather affirm judgment); id. at 138 (Murphy, J., dissenting) (stating that Court should affirm judgment).

[155] Compare id. at 111 (plurality opinion) ("Acts of officers in the ambit of their personal pursuits are plainly excluded. Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it."), with id. at 141 (Roberts, J., dissenting) ("Congress provided for the prosecution of any officer who deprives others of their guaranteed rights and denied such an officer the right to defend by claiming the authority of the State for his action.").

[156] The Screws plurality did not, however, find that an act was "under color of law" simply because it was done by an official. Using the facts from Screws as an example, the law enforcement officers arrested their victim and they were authorized to make the arrest effective. Id. at 108 (plurality opinion). In doing so, they employed tactics that violated his constitutional rights. Id. at 111. Had they, as officers, simply shown up at his house and beat him to death, without arresting him, the plurality would have likely found their actions to not be "under color of law." See id. ("We are not dealing here with a case where an officer not authorized to act nevertheless takes action.").

[157] Id. at 148-49 (Roberts, J., dissenting).

[158] See id. at 141 (arguing that criminal civil rights statute forbids States from authorizing officers to commit acts in violation of Constitution).

[159] Id. (emphasis added).

84 Temp. L. Rev. 1071, *1087

judicial act was interpreted to be announcing state policy through judicial voice. [160] Thus, it is very likely that "under color of law" would be interpreted to include a judge performing a judicial act.

ii. Official Immunity Does Not Reach Proscribed Criminal Conduct

Even more fatal to the reasoning of Chaplin is that the Supreme Court, albeit in dicta, expressly endorsed prosecuting judges under § 242. In O'Shea v. Littleton, [161] seventeen African American and two white residents, who engaged in boycotting practices, brought a suit seeking an injunction against, among others, a magistrate and associate county judge in Virginia. [162] The respondents claimed the judges violated their civil rights by setting higher bonds than scheduled, imposing harsher sentences than were typical, and subjecting the respondents to trials where they could not pay fines. [163] Although the claim was dismissed as insufficient to meet the constitutional case or controversy requirement, [164] the Court provided a response to the ruling of the district court in Chaplin. Said the Court:

Judges who would willfully discriminate on the ground of race or otherwise would willfully deprive the citizen of his constitutional rights, as this complaint alleges, must take account of 18 U.S.C. § 242… . We have **[*1088]** never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivations of constitutional rights. On the contrary, the judicially fashioned doctrine of official immunity does not reach so far as to immunize criminal conduct proscribed by an Act of Congress. [165]

In stating as much, the Court clearly assumed the criminal law, specifically § 242, is an adequate alternative remedy where a judge has maliciously or corruptly deprived a litigant of her civil rights. [166]

c. Modern Use of Criminal Civil Rights Statutes to Prosecute Judges

Although Ex parte Virginia demonstrates that judges can be prosecuted under § 242, albeit for non-judicial acts, that statute appears to be used sparingly, if at all, to prosecute judges today for anything related to a judge's official

---

[160] This proposition is only true if the statute in question could not be considered vague, as the three-Justice dissent was also concerned that the statute was unconstitutionally vague and disagreed with the method the plurality used to satisfy those concerns. See id. at 149-50 (Roberts, J., dissenting). The plurality framed the test for vagueness in terms of those rights that have been made specific by the terms of the Constitution, the laws of the United States, and the judicial opinions interpreting them. See id. at 103 (plurality opinion). Justice Roberts's dissent, on the other hand, asserted that constitutional definiteness must be defined not by the courts but by the legislature. Id. at 153 (Roberts, J., dissenting). See infra Part III.B for a discussion of the relevance of extending criminal liability to judicial acts.

[161] 414 U.S. 488 (1974).

[162] Littleton, 414 U.S. at 490.

[163] Id. at 491-92.

[164] Id. at 493.

[165] Littleton, 414 U.S. at 503 (internal quotation mark and citations omitted).

[166] Id. at 504. In a dissenting opinion, Justice Douglas, joined by Justices Brennan and Marshall, disagreed with the Court's analysis of the requirements for a constitutional "case." Id. at 506 (Douglas, J., dissenting). The dissent did not, however, weigh in on the second part of the majority opinion, instead reiterating its status as an "advisory opinion." Id. at 512. Although this could be interpreted to cast some doubt on the implication that a majority of the Court would allow prosecution for judicial acts under § 242, such an interpretation does not necessarily follow, especially considering Justice Douglas's strong dissent from the expansive application of judicial immunity in earlier cases. See, e.g., Pierson v. Ray, 386 U.S. 547, 558-67 (Douglas, J., dissenting).

duties. [167] In fact, the concern expressed by the dissent in Screws - that criminal civil rights laws would be used to prosecute state officials for typical state crimes - appears to be coming to fruition. [168]

For example, in United States v. Lanier, [169] a state judge, who sexually assaulted five women in his chambers, [170] was charged and convicted for violating the women's "right not to be deprived of liberty without due process of law, including the right to be free from willful sexual assault." [171] The Sixth Circuit, sitting en banc, ultimately reversed the conviction, holding that criminal liability could only be imposed under § 242 if the violated right in question had been previously defined by the Supreme Court. [172]

The Supreme Court, however, disagreed. The Lanier Court found that § 242 covers rights "fairly warned of, having been "made specific' by the time of the charged conduct." [173] The Court found that the Sixth Circuit's test - that the right had been **[*1089]** defined by the Supreme Court - required too much in terms of notice and fair warning, and remanded the case for further review. [174]

Although it could be inferred from a combined reading of Ex parte Virginia, Screws, Littleton, and Lanier that judges can be held criminally liable for judicial acts that deprive another of his or her clearly established civil rights, there does not appear to be any controlling cases explicitly establishing that. [175] Only Chaplin, which granted a judge criminal immunity, seems to be directly on point, [176] but Chaplin is not binding. Nor is Chaplin indicative of the direction the Supreme Court would likely rule, given the Littleton Court's assertion that criminal prosecution under § 242 is a viable and superior alternative to civil liability. [177]

3. Civil Liability

 The application of civil immunity for judges under civil rights legislation has become far clearer than its criminal counterpart in terms of its reach, albeit not without some initial confusion. For example, in a Third Circuit case, Picking v. Pennsylvania Rail Co., [178] the plaintiffs sued a laundry list of defendants, including the Pennsylvania

---

[167] John O. Haley, The Civil, Criminal, and Disciplinary Liability of Judges, 54 Am. J. Comp. L. 281, 287 (2006) (noting lack of statistics documenting prosecution of judges). Although it is beyond the scope of this Comment to theorize on prosecutorial strategy, it is also worth noting that neither judge in the Kids-for-Cash scandal was charged with criminal deprivation of civil rights. See generally Indictment, supra note 11.

[168] See Norman Abrams & Sara Sun Beale, Federal Criminal Law and Its Enforcement 637 (4th ed. 2006) ("Civil rights prosecutions are sometimes initiated where there has been a prior state prosecution that failed to produce a conviction or resulted in a penalty deemed inadequate.").

[169] 520 U.S. 259 (1997).

[170] Lanier, 520 U.S. at 261.

[171] Id. at 262.

[172] Id. at 263.

[173] Id. at 267.

[174] Id. at 272.

[175] See id. at 267 (finding judge liable under criminal civil rights statute for raping women in violation of right "fairly warned of, having been "made specific' by the time of the charged conduct"); Screws v. U.S., 325 U.S. 91, 107-110 (1945) (plurality opinion) (finding under color of law refers to foundation of official's authority); id. at 141 (Roberts, J., dissenting) (arguing officials act "under color of law" only when acting in accordance with state policy but acknowledging state policy can come from "judicial voice"); Ex parte Virginia, 100 U.S. 339, 340 (1880) (denying habeas relief to judge found liable for nonjudicial act under criminal civil rights law).

[176] See supra notes 136-43 and accompanying text for a discussion of Chaplin.

[177] See, e.g., O'Shea v. Littleton, 414 U.S. 488, 503 (1974).

[178] 151 F.2d 240 (3d Cir. 1945).

Railroad, as well as executive and judicial officers from Pennsylvania and New York. [179] The Pickings, a husband and wife, claimed they were deprived of their Fourteenth Amendment rights as the result of an illegal extradition process. [180] The trial court dismissed the complaint and ruled sua sponte that no cognizable federal action was stated against the railroad because the railroad did not act "under color of law." [181] The trial court also held that no cause of action could lie against any officials because they enjoyed immunity for their official actions. [182] The Third Circuit Court of Appeals, however, reversed. [183]

In determining whether or not the defendants could be held accountable, the Third Circuit applied the interpretation of "under color of law" from Screws. [184] Said the court: "In the light of the Screws decision we are compelled to the conclusion that **[*1090]** Congress gave a right of action sounding in tort to every individual whose federal rights were trespassed upon by any officer acting under pretense of state law." [185] The court found that they were acting under pretense of law because they were acting pursuant to warrants issued by the Governor of Pennsylvania. [186]

With regard to the issue of immunity, the court found, in light of Screws, that the police officers involved were not privileged, even though Screws was a criminal case and Picking was a civil case. [187] The court then, citing Chaplin, acknowledged that the justice of the peace, who denied the Pickings a hearing upon their arrest, would have traditionally enjoyed absolute immunity. [188] The court noted, however, that "Congress possessed the power to wipe [absolute judicial immunity] out." The court thought it an "irresistible" conclusion "that Congress by enacting the Civil Rights Act sub judice intended to abrogate the privilege to the extent indicated by that act and in fact did so." [189] Commenting on the language of the Civil Rights Act, which proscribes "any person" from depriving another of civil rights, the court could "imagine no broader definition," and cited Supreme Court precedent, including Ex parte Virginia, as controlling. [190]

In other words, the Third Circuit in Picking found no distinction between criminal and civil liability for official acts that deprive another of his or her civil rights, including official acts of judges. Further, the court found that civil rights

---

[179] Picking, 151 F.2d at 246.

[180] The Pickings, appearing pro se, filed a complaint that was difficult to follow. Id. at 244. The court interpreted the complaint to raise three causes of action - violation of Fourteenth Amendment rights, conspiracy to violate the Uniform Criminal Extradition act, and conspiracy to "subject the plaintiffs to false arrest and to false imprisonment." Id. at 247.

[181] Id. at 247.

[182] Id.

[183] Id. at 254.

[184] Id. at 248-49.

[185] Id. at 249 (emphasis added). The Third Circuit, however, distinguished Screws, noting that the Supreme Court relied on the term "willfully" as a bridge from the constitutional wasteland of statutory vagueness. Id. In Picking, the court was interpreting a civil action, with no requisite state of mind. Id. Thus, for the Picking court, the civil counterpart to the criminal statute in Screws incorporated the Screws reading of "under color of law" without any of the constitutional concerns.

[186] Id. The court easily determined the individual defendants to be acting "under color of law" but did not attach such designation as easily to the railroad. Id. at 249-50. Ultimately, the court found the claim against the railroad to be valid on the Pickings' theory that the railroad conspired and adopted the plan to deprive them of their rights. Id. at 250. Although the Pickings did not specifically state how the railroad conspired, the railroad did not seek to have the plaintiffs state their case, so the court allowed the claim to proceed. Id.

[187] Id.

[188] Id.

[189] Id. (emphasis added).

[190] Id. at 250-51.

legislation abrogated any immunity enjoyed by the judiciary. [191] The Supreme Court, however, would disagree with the Third Circuit in subsequent rulings.

The Supreme Court first considered the intersection of civil immunity and civil rights legislation in Tenney v. Brandhove. [192] In Tenney, the Court determined that the Civil Rights Act did not apply to legislators. [193] William Brandhove alleged Jack Tenney and other members of the California Legislature deprived him of his rights to free speech and to petition the government, as well as his Fourteenth Amendment rights. [194] Brandhove claimed they suppressed his rights in response to his opposition to the Senate Fact-Finding Committee on Un-American Activities, also known as the **[*1091]** Tenney Committee. [195]

The Court, relying on "the presuppositions of our political history," [196] noted that the Speech or Debate Clause of the Constitution, which shields members of Congress from liability for acts taken in furtherance of their office, was "a reflection of political principles already firmly established in the States." [197] Thus, the Court concluded, "We cannot believe that Congress - itself a staunch advocate of legislative freedom - would impinge on a tradition so well grounded in history and reason by covert inclusion in the general language before us." [198]

The Court also noted that although the immunity at issue is contained to legitimate legislative activity, "the claim of an unworthy purpose does not destroy the privilege." [199] This, according to the Court, was for the public good and not to immunize private legislative indulgence. [200] The Tenney Committee was acting pursuant to its legitimate legislative power, and so the Court found its members to be immune. [201] Although the facts of this decision were confined to legislative immunity, its effects were felt throughout, as the Third Circuit interpreted Tenney to overturn its ruling on judicial immunity in Picking, as did other lower courts. [202]

Several years later, the Supreme Court confirmed that trend and applied Tenney to the doctrine of absolute judicial immunity in Pierson v. Ray. [203] Despite the inclusive language of § 1983, a glaring difference between the foundations on which legislative and judicial immunity respectively rest, [204] and suggestive legislative history to the contrary, [205] the Court repeated its reasoning from Tenney. [206] Judicial immunity was established long before the

---

[191] Id. at 250.

[192] 341 U.S. 367 (1951).

[193] See Tenney, 341 U.S. at 379.

[194] Id. at 369, 371.

[195] Id. at 369-71.

[196] Id. at 372.

[197] Id. at 373.

[198] Id. at 376; see also Imbler v. Pachtman, 424 U.S. 409, 418 (1976) ("The decision in Tenney established that § 1983 is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them."). It is worth noting the "general" language referred to by the Court was "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects … any citizen of the United States … to the deprivation of any rights … secured by the Constitution … shall be liable to the party injured." 42 U.S.C. § 1983 (2006) (emphasis added).

[199] Tenney, 341 U.S. at 377.

[200] Id.

[201] Id. at 378-79.

[202] Block, supra note 45, at 906.

[203] 386 U.S. 547 (1967).

[204] See supra note 45 for a discussion of the common law origins of judicial immunity.

Civil Rights Act, and without a clear indication on the part of Congress that it meant to abrogate the doctrine, the Court could not do so. [207]

The Court's decision was given some cover by the facts of the case, as the fifteen Episcopalian ministers, who were convicted for protesting racial segregation on the bus system, had their sentences reversed on appeal. [208] Although their conviction was reversed, the ministers brought a civil rights action in federal court against the **[*1092]** municipal judge and arresting officers. [209] The Supreme Court, in agreeing with the lower court's grant of immunity, reiterated the arguments from Bradley that judicial immunity is for the benefit of the public, whose interest it is that the judges function independently and without fear of consequences. [210] Also, the Court reiterated that judicial error is to be corrected on appeal, as it was in this case, [211] and because of the success of the appellate process, the Court was able to grant immunity while still promoting the balance between preserving judicial immunity and providing a sufficient remedy for an allegedly wronged litigant. [212]

## C. The Current State of Judicial Immunity

 Read together, the case law discussed above details the doctrine of absolute judicial immunity as it has developed over time. This doctrine is both narrow - in terms of the acts it covers - and stout - in terms of the might with which it protects an act falling within its domain.

The doctrine of absolute judicial immunity could be summarized in the following way: A judge is immune from a civil suit for damages for an act that is a function normally performed in his or her judicial, not administrative, capacity, regardless of whether that act is alleged to have been performed maliciously or corruptly, and even if that act allegedly violated a constitutionally guaranteed right. Although the cases have addressed a plethora of factual situations, this doctrine leaves open the question of what happens to judicial immunity when a judicial act has been proven or admitted to be malicious or corrupt.

## D. The Justification for Immunizing Alleged Malicious and Corrupt Judicial Acts

 There are a variety of reasons offered for judicial immunity. [213] This Comment, **[*1093]** however, distills those reasons into three principle reasons for absolute judicial immunity, as relied upon by the case law: (1) the chilling

---

[205]  See Block, supra note 45, at 907-10.

[206]  See Pierson, 386 U.S. at 554-55.

[207]  Id.

[208]  Id. at 549-50.

[209]  Id. at 550.

[210]  Id. at 553-54; see also Bradley v. Fisher, 80 U.S. 335, 347 (1871) (finding independence of judiciary is preserved by immunity).

[211]  Pierson, 386 U.S. at 554.

[212]  The reasoning from Pierson was later extended in Imbler v. Pachtman, 424 U.S. 409 (1976), to immunize prosecutors from liability for deciding when to charge a defendant. Imbler, 424 U.S. at 410. After a lengthy procedural history, Imbler, who had been serving a sentence for murder, was retried and released. Id. at 410-15. At the root of his release was state misconduct, including the use of misleading evidence by the prosecution at trial. Id. at 414. Although the prosecutor, Pachtman, had admitted in a postconviction letter to the Governor that new, possibly exculpatory, evidence had surfaced, Imbler sued Pachtman under § 1983. Id. at 412, 415-16. The Court, finding immunity for prosecutors is based on the same considerations as that of judges, granted Pachtman immunity from suit. Id. at 422-24.

[213]  See supra Parts II.A and II.B for a discussion of the case law that formed the doctrine of absolute judicial immunity and the reasons offered for judicial immunity in those cases. See also Pierson v. Ray, 386 U.S. 547, 564 n.4 (1967) (Douglas, J., dissenting) (offering nine reasons for judicial immunity in addition to the principle reason of preventing chilling effect on judicial independence, including "(1) preventing threat of suit from influencing decision; (2) protecting judges from liability for honest

84 Temp. L. Rev. 1071, *1093

effect civil liability will have on a vigorous and independent judiciary, (2) the need to shield the judicial system from perpetual or unfounded litigation, and (3) the availability of alternative means to rectify judicial corruption. [214]

Of these three reasons, the first two operate similarly, whereas the last one is of a different character. Preventing the chilling effect on the independence of the judiciary and the strain on the system caused by unfounded and vexatious litigation are reasons for judicial immunity. [215] As these interests must be weighed against the potential damage done by malicious or corrupt judicial acts, the Supreme Court has struck the balance by relying on the third "reason" - the availability of alternative remedies. [216] As such, an alternative remedy acts more as a justification for judicial immunity. [217]

There are, in essence, three alternative remedies relied upon by the Supreme Court: (1) impeachment and removal from office, [218] (2) criminal prosecution, [219] and **[*1094]** (3) appellate review. [220] These alternatives, however,

---

mistakes; (3) relieving judges of the time and expense of defending suits; (4) removing an impediment to responsible men entering the judiciary; (5) necessity of finality; (6) appellate review is satisfactory remedy; (7) the judge's duty is to the public and not to the individual; (8) judicial self-protection; (9) separation of powers"); Griffin & Pelegrin, supra note 119, at 386 (asserting five "justifications" for judicial immunity, including "(1) it ensures [sic] the finality of judgments; (2) it protects judicial independence; (3) it avoids continual attacks upon judges who may be sincere in their conduct; and (4) it protects the system of justice from falling into disrepute"; as well as a fifth reason - "the need for an end to litigation" (quoting Jeffrey M. Shaman et al., Judicial Conduct & Ethics, § 14.01, at 491 (2d ed. 1995); Harper v. Merckle, 638 F.2d 848, 856 n.10 (5th Cir. 1981))). Judge Caputo cited four reasons for judicial immunity in dismissing certain charges against Judges Conahan and Ciavarella, including the finality of judgments, the protection of judicial independence, the avoidance of continual attacks on judges who may be sincere, and the protection of the justice system from falling into disrepute. Memorandum, supra note 32, at 8 (quoting Shaman, supra note 42, at 3).

[214] Although there is no clear way to categorize all the reasons offered for judicial immunity, these three reasons are the ones relied on most heavily by the Supreme Court. See Linwood I. Rogers, Note, Mireles v. Waco: The Supreme Court Prescribes the Bitter Pill of Judicial Immunity and Summary Reversal, 26 U. Rich. L. Rev. 539, 544-55 (1992) (discussing reasons articulated by Justice O'Conner in Forrester).

[215] See Pulliam v. Allen, 466 U.S. 522, 537-38 (1984) (refusing to extend judicial immunity to injunctive relief because judicial independence is compromised less by injunctions); Dennis v. Sparks, 449 U.S. 24, 31 (1980) (finding immunity necessary to shield judges from fear of being sued for damages by unsatisfied litigants); Stump v. Sparkman, 435 U.S. 349, 363-64 (1978) (finding that judges should be free to act on their own convictions); Pierson, 386 U.S. at 553-54 (finding that it is in the public interest that judges function independently); Bradley v. Fisher, 80 U.S. 335, 348, 354 (1871) (finding immunity necessary to protect judicial independence and promote finality of judgments); Randall v. Brigham, 74 U.S. 523, 536 (1868) (finding immunity necessary to preserve judicial impartiality).

[216] See Forrester v. White, 484 U.S. 219, 226-27 (1988) (explaining that using immunity to prevent "avalanche of suits" is balanced by mechanisms for correcting judicial error). The most apparent example of the Court not relying on the availability of alternative means as justification for a grant of immunity is Sparkman. See supra notes 65-81 and accompanying text for a discussion of Sparkman. Perhaps this is why Sparkman was so criticized. See infra notes 254-63 and accompanying text for a discussion of the criticism of Sparkman.

[217] See Sparkman, 435 U.S. at 369-70 (Powell, J., dissenting) (arguing that a lack of appellate procedure should weigh against the grant of immunity); Pierson, 386 U.S. at 547 (finding it possible to grant immunity because judicial error was reversed on appeal).

[218] See, e.g., Randall, 74 U.S. at 537 (asserting that impeachment and removal from office may be better alternatives to civil liability).

[219] See Forrester, 484 U.S. at 226-27 (explaining that using immunity to prevent "avalanche of suits" is balanced by mechanisms for correcting judicial error); O'Shea v. Littleton, 414 U.S. 488, 503 (1974) (discussing how criminal civil rights laws are the appropriate remedy for judicial misconduct). But see Sparkman, 435 U.S. at 363 (noting that occasional unfair rulings are the cost of having an independent judiciary).

[220] See Pierson, 386 U.S. 547 (finding it possible to grant immunity because judicial error was reversed on appeal).

84 Temp. L. Rev. 1071, *1094

vary in their ability to compensate victims of judicial corruption, rendering some remedies perhaps more adequate than others. [221] As this Comment seeks to determine whether certain suits for damages should be allowed to proceed against judges, a brief discussion of the compensatory qualities of both the criminal law and the appellate process is necessary. [222]

1. The Compensatory Abilities of the Criminal Law

The criminal law serves a variety of purposes in our society. One foundational purpose is to deter those who do not share a particular social ethic from acting contrary to that ethic. [223] Another is to punish. [224] Although effective at punishing the culpable, "criminal sanctions … have neither the scope nor the flexibility of civil remedies." [225] Increasingly, however, the line between the two is blurred; and the criminal law is increasingly matching the civil law in terms of richness of remedies by adopting civil remedies. [226]

Restitution orders - where a convicted defendant is ordered to compensate her victim for the harm she caused - is one way the criminal justice system has lightened the burden on potential civil plaintiffs. [227] Although the idea behind restitution "is more to deprive the wrongdoer of her ill-gotten gains," [228] its compensatory aspect is difficult to ignore when searching for adequate means to remedy a deprivation of civil rights. [229]

The criminal law also incorporates civil causes of action that track criminal wrongs. [230] For example, under the Racketeering Influenced Corrupt Organizations (RICO) Act, a party injured by the criminal conduct proscribed by that law can collect **[*1095]** damages if she can prove certain predicate crimes, such as murder, arson, or fraud. [231] This is particularly relevant for this Comment because judicial immunity does not extend to predicate crimes

---

[221] See David Rudovsky, Running in Place: The Paradox of Expanding Rights and Restricted Remedies, 2005 U. Ill. L. Rev. 1199, 1211 (2005) (arguing that a fair remedial structure for civil rights violations "should provide (1) effective deterrence of governmental misconduct, (2) compensation to individuals for violations of their constitutional or statutory rights, and (3) enforcement mechanisms that ensure compliance with constitutional and statutory norms").

[222] Impeachment and removal from office are criticized for their failure to compensate victims. Rogers, supra note 214, at 547. Thus, it is not discussed.

[223] See Oliver Wendell Holmes, Jr., The Path of the Law, 10 Harv. L. Rev. 457, 459 (1897) ("A man who cares nothing for an ethical rule which is believed and practised by his neighbors is likely nevertheless to care a good deal to avoid being made to pay money, and will want to keep out of jail if he can.").

[224] See Mary M. Cheh, Constitutional Limits on Using Civil Remedies to Achieve Criminal Law Objectives: Understanding and Transcending the Criminal-Civil Law Distinction, 42 Hastings L.J. 1325, 1332 (1991) ("A criminal justice system seeks to prevent crime, but, failing that, to find and punish offenders." (footnotes omitted)).

[225] Id. at 1348.

[226] See id. at 1333.

[227] See id. at 1334.

[228] Id. at 1335. The civil remedy of "forfeiture" - where the government confiscates contraband, instrumentalities, or profits from a crime - is more truly geared toward deprivation of ill-gotten gains, as any forfeited property remains the property of the government. Id. at 1340-42.

[229] See Rudovsky, supra note 221, at 1213 ("Violations of constitutional rights can result in significant losses and damages provide both compensation and a means of deterrence.").

[230] See Cheh, supra note 224, at 1345.

[231] See 18 U.S.C. §§1961, 1964 (2006) (providing for a civil action in which a party may collect treble damages for any harm she sustains from proscribed racketeering activity).

related to immunized judicial acts. [232] Furthermore, under Dennis, immunized judicial acts can be used as evidence in proving the existence of predicate crimes. [233]

There are certainly benefits to using civil remedies to rectify some harms typically treated as criminal matters. [234] For one, increased use of the civil law maintains a special province for criminal punishment; that is, the criminal law remains reserved for punishing only the most serious antisocial behavior. [235] Also, the criminal law has not proven effective in countering political corruption or organized crime, whereas some civil remedies have. [236]

This increase in civil remedies for criminal offenses is not uniformly approved, however, as one commentator has argued that the distinction between the two must be kept. [237] Those concerns, however, are mostly based on the potential for the government to exploit the lesser individual protections in civil suits, while accomplishing traditional criminal law objectives. [238] In other words, arguments for maintaining that distinction are centered on keeping criminal law out of civil court, and not on preventing harmed individuals from pressing civil claims where the criminal law, for whatever reason, has failed. [239] Regardless of their ultimate value, civil remedies are a valid way for the criminal law to adequately compensate those who have had their rights violated by a judge, even if the victim cannot sue the judge directly.

2. Appellate Review

Although not traditionally thought of as compensatory, the appellate process arguably makes victims of judicial corruption whole by preventing them from suffering [*1096] measurable harm in the first place. [240] As such, a brief discussion of the appellate process, and some of its shortcomings, is necessary to illuminate its effectiveness in guarding against harm caused by judicial corruption.

Appellate review is intended "to guard against erroneous outcomes," and an optimist might argue it is essential to finding truth in our system. [241] Although not a constitutional guarantee, "providing for an appeal from a criminal conviction is a deeply ingrained part of American jurisprudence. Every state provides some system for appeals from criminal convictions, and almost every one provides for at least one appeal of right." [242]

---

[232] Compare United States v. Lanier, 520 U.S. 259, 261 (1997) (finding that judge could be prosecuted for raping women in his chambers), and Ex parte Virginia, 100 U.S. 339, 340 (1879) (denying habeas corpus petition of judge because act was not judicial), with Lal v. Borough of Kennett Square, 935 F.Supp. 570, 573-74 (E.D. Pa. 1996) (granting immunity from civil RICO because participation in alleged enterprise was through judicial act).

[233] See Dennis v. Sparks, 449 U.S. 24, 30 (1980) (finding that a judge may be forced to testify about judicial acts).

[234] Cheh, supra note 224, at 1348 ("Criminal sanctions, focused as they are on culpable individuals, have neither the scope nor the flexibility of civil remedies.").

[235] Id. at 1346.

[236] Id. at 1346-47.

[237] See id. at 1369 (arguing for maintaining at least a limited definition of "crime" because blurring distinction between civil remedies and criminal punishments can have constitutional implications, albeit minor ones).

[238] See id. at 1369-89 (discussing constitutional implications of using civil remedies to accomplish criminal ends).

[239] See id. at 1394-95 (arguing that reliance on criminal law to make victims whole impedes role reserved for civil remedies and allows government to take advantage of lessened constitutional protections in civil realm).

[240] See Keith A. Findley, Innocence Protection in the Appellate Process, 93 Marq. L. Rev. 591, 591-92 (2009) (discussing common conception that appellate process corrects errors and finds truth).

[241] Id.

[242] Leonard N. Sosnov, No Mere Error of State Law: When State Appellate Courts Deny Criminal Defendants Due Process, 63 Tenn. L. Rev. 281, 288 (1996).

84 Temp. L. Rev. 1071, *1096

That appeal, however, does not guarantee accurate, or even consistent results. There are two main reasons for this: the standard for appellate review is highly deferential, [243] and judges' own interpretations of the deferential standard may be affected by their personal ideals of what the appellate process is supposed to do. [244] Although some judges no doubt seek to cure any and all wrongs committed by the lower court, whether intentional or not, other judges simply review for obvious error, regardless of the concerns raised by the parties. [245]

Indeed, some have argued that the appellate process has failed, especially in the criminal context. [246] This has been reflected in failures to recognize innocent criminal appellants, as well as faulty evidence and procedural errors. [247] The reasons for this are varied, but for the purposes of this Comment, the mere fact that such failures exist casts doubt on the notion that a blanket grant of immunity is justified by the assumption that any judicial misconduct will be corrected when another judge gets her eyes on the matter. [248]

E. Dissenting Views in the Debate Over Judicial Immunity

Despite the theoretical availability of alternative remedies and the narrowness [*1097] with which a judicial act has been defined, the Supreme Court's treatment of absolute judicial immunity is not without criticism. That criticism has been directed at both the definition of judicial act and the reasons for judicial immunity, as put forth by the Supreme Court.

For example, Justice Davis, joined by Justice Clifford, saw the unreasonableness of such a far-reaching doctrine and filed a dissenting opinion in Bradley. [249] They wrote that "where it is alleged not only that [a] proceeding was in excess of jurisdiction, but that [a judge] acted maliciously and corruptly," he should be subject to the same liability as a private person. [250]

Both Tenney and Pierson faced strong dissent from within the Court, as well. Justice Douglas, who departed from the majority in both cases, opened his dissent in Pierson by stating, "I do not think that all judges, under all circumstances, no matter how outrageous their conduct are immune from suit." [251] Justice Douglas acknowledged the importance of a "vigorous and independent judiciary" [252] but concluded that it would be "monstrous" to refuse "recovery to a person injured by the ruling of a judge acting for personal gain." [253]

---

[243] Findley, supra note 240, at 602. See generally Michael H. Graham, Abuse of Discretion, Reversible Error, Harmless Error, Plain Error, Structural Error; A New Paradigm for Criminal Cases, 43 Crim. Law Bulletin Art 6 (2007) (discussing various standards of review used by appellate courts).

[244] See Chad M. Oldfather, Error Correction, 85 Ind. L.J. 49, 59-63 (2010) (discussing several conceptions judges might have of appellate process).

[245] Id. at 49 (recounting conversation where author asked judge why appellate opinions do not match arguments made by attorneys and was told, "Why should we? We review the case for error, and if we don't find any we move on to the next one").

[246] See Findley, supra note 240, at 592 (discussing article on failure of appellate system in criminal context).

[247] See id. at 593-601.

[248] See infra notes 297-306 and accompanying text for a discussion of the reasons why the appellate process can fail. That is certainly not to imply the appellate system is beyond repair or is useless in correcting judicial error. In fact, at least one juvenile who appeared before Judge Ciavarella had his sentence reversed on appeal. Sullivan, supra note 2. Judge Ciavarella's response to the appellate court's reprimand? He would never do it again. Id.

[249] Bradley v. Fisher, 80 U.S. 335, 357 (1871) (Davis, J., dissenting).

[250] Id.

[251] Pierson v. Ray, 386 U.S. 547, 558-59 (1967) (Douglas, J., dissenting).

[252] Id. at 559.

[253] Id. at 564.

Sparkman faced perhaps the most criticism, both from inside and outside the Court. Justices Stewart, Marshall, and Powell argued that what Judge Stump did "was beyond the pale of anything that could sensibly be called a judicial act." [254] The dissent in Sparkman disagreed with the majority's interpretation with regard to both prongs of the judicial act definition. [255] With regard to the question of whether it was an act normally performed by a judge, Justice Stewart wrote that it is not normal for a judge to grant a mother's petition to sterilize her daughter, nor is it normal for a judge to grant consent for medical procedures, generally. [256] With regard to the second prong, because neither the mother, nor the daughter, dealt with the judge in his official capacity, Justice Stewart argued that a "judicial act must take its content from a consideration of the factors that support immunity from liability for the performance of such an act." [257]

Justice Powell penned his own dissent in Sparkman to emphasize that the lack of remedy elsewhere in the judicial system should weigh on the question of whether a judge should be granted immunity. [258] The Bradley reasoning that some private rights could be sacrificed for the greater public good was predicated on the fact that those who sacrificed their private rights could be made whole elsewhere. [259] Where, however, **[*1098]** a judge acts in a way that precludes all appellate or other judicial remedies, judicial immunity is far less justifiable. [260]

The Sparkman decision also faced scrutiny from commentators as a "misstatement, misinterpretation, and misapplication of the doctrine," [261] which reduced "the stature of the doctrine and [called] into question the integrity of the judiciary and of the judicial process." [262] Randolph Block, for example, picked up on the reasoning from Justice Powell's dissent in Sparkman and crafted an exception to judicial immunity where a judge has taken action precluding effective use of the appellate process. [263]

There were two brief dissenting opinions in Mireles, one by Justice Stevens and another by Justice Scalia, in which Justice Kennedy joined. [264] Justice Stevens asserted that Judge Mireles actually made two orders. [265] The first, to bring an attorney to his courtroom, was a function normally performed by a judge, and thus a judicial act. [266] By contrast, the second order, to use excessive force, was not a function normally performed by a judge, and Justice Stevens would have not extended judicial liability to that order. [267] Justice Stevens reasoned that if the second

---

[254]   Stump v. Sparkman, 435 U.S. 349, 365 (1978) (Stewart, J., dissenting).

[255]   See id. at 365-69 (arguing that Stump did not perform act normally performed by a judge, nor did he act in judicial capacity).

[256]   Id. at 365-66.

[257]   Id. at 368 (citing Pierson v. Ray, 386 U.S. 547, 554 (1967)). Justice Stewart's dissent marks the first time it was suggested that "the limits of judicial immunity should be defined by the policies giving rise to the doctrine." Block, supra note 45, at 915-16. This Comment endorses Justice Stewart's suggestion.

[258]   Sparkman, 435 U.S. at 369 (Powell, J., dissenting).

[259]   Id.

[260]   See id. at 370 ("Where a judicial officer acts in a manner that precludes all resort to appellate … remedies … the underlying assumption of the Bradley doctrine is inoperative.").

[261]   Block, supra note 45, at 881.

[262]   Id. at 880.

[263]   See id. at 923-24 (discussing an alternate proposal for holding judges liable for malicious or corrupt judicial acts).

[264]   See Mireles v. Waco, 502 U.S. 9, 14-15 (1991) (Stevens, J., dissenting); id. at 15 (Scalia, J., dissenting).

[265]   Id. at 14 (Stevens, J., dissenting).

[266]   Id.

[267]   Id.

order was given a minute after the first, judicial immunity would not have covered the second act and the fact that those two acts were of the same communication should not "enlarge the judge's immunity." [268]

Justice Scalia, on the other hand, stated that it was not apparent whether the majority or Justice Stevens was correct. [269] Rather, "the factual situation" the case presented was "so extraordinary that it [did] not warrant the expenditure of [the Court's] time" and he would have not granted certiorari. [270] Although this dissent does not explicitly endorse a position on judicial immunity, it is worth noting that the majority's decision was a reversal of the court of appeals' denial of immunity. [271] In other words, both Justices Scalia and Kennedy would have allowed Judge Mireles to face civil liability for his malicious judicial act. The Mireles decision also faced criticism from outside the judiciary as adding to the confusion generated by Sparkman. [272]

The cases establishing the doctrine of judicial immunity arose from a variety of **[*1099]** factual situations. However, where the majority opinions tended to build the doctrine one aspect at a time, the criticisms of judicial immunity struck a common chord: where judges act maliciously or corruptly, they should not enjoy immunity.

Many proposals for combating judicial misconduct in lieu of limiting judicial immunity tend to ignore the underlying need to compensate victims and instead focus on deterrent or retributive functions in the vein of disciplinary boards. [273] These, it could be argued, promote judicial independence while still holding judges accountable. [274] Such measures, however, tend to be of greater use as tools for improving public perception than compensating the victims. [275] One commentator, however, has attempted to incorporate both elements, calling for a disciplinary system that steps out from the shadows and takes into account victim compensation. [276] Indeed, another commentator has argued this compensatory element is necessary for any remedy to be considered effective. [277]

There is no clear agreement among commentators about how to maintain the benefits of judicial immunity while still allowing victims of malicious or corrupt judicial practice to be compensated for their injury. What is clear is that there is unease with the scope of judicial immunity.

III. Discussion

As discussed above, there have been strong voices - both judicial and scholarly - calling for an end to judicial immunity when an act has been alleged to be malicious or corrupt. This Comment joins that chorus, but argues that

---

268  Id. at 14-15.

269  Id. at 15 (Scalia, J., dissenting).

270  Id.

271  Id. at 11 (per curiam).

272  See Rogers, supra note 214, at 540-41.

273  See id. at 547-48 (arguing such methods are insufficient because they do not compensate victims).

274  See Model Code of Judicial Conduct Scope (2007) ("The Code is not designed or intended as a basis for civil or criminal liability. Neither is it intended to be the basis for litigants to seek collateral remedies against each other or to obtain tactical advantages in proceedings before a court.").

275  See K.G. Jan Pillai, Rethinking Judicial Immunity for the Twenty-First Century, 39 How. L.J. 95, 138 (1995) (discussing the Judicial Council Reform and Judicial Conduct and Disability Act of 1980 as being appreciated for its "symbolic value"); Rogers, supra note 214, at 547 ("Judicial conduct boards have received wide criticism for their flaccid punitive effect."); Shaman, supra note 42, at 24 (stating that purpose of disciplinary proceedings "is not to punish, but to maintain the honor and integrity of the judiciary and to restore and reaffirm the public confidence in the administration of justice").

276  See Pillai, supra note 275, at 143-47.

277  See Rudovsky, supra note 221, at 1211.

mere allegations of malice or corruption should not be enough. Rather, those allegations must be substantiated in some way before a corrupt or malicious judge loses her immunity.

As Justice Holmes once wrote,

The rational study of law is still to a large extent the study of history … . because without it we cannot know the precise scope of rules … . It is a part of the rational study, because it is the first step toward an enlightened scepticism, that is, toward a deliberate reconsideration of the worth of those rules. [278]

It is in this spirit that Part II of this Comment explored the historical reasons behind the doctrine of absolute judicial immunity. Part III revisits the reasons offered for judicial immunity, and attempts to show that when those reasons have been sacrificed, judicial **[*1100]** immunity becomes a baseless obstacle in the path of justice. In doing so, a tolerable exception to absolute judicial immunity emerges.

As discussed above, this Comment focuses on three principle reasons for absolute judicial immunity. [279] Two of those reasons are arguments for the grant of immunity, whereas the third reason - the availability of alternative remedies - operates to justify immunizing judicial misconduct. The next Section discusses why the availability of alternative remedies does not always justify the grant of immunity.

A. Absolute Judicial Immunity Cannot Always Be Justified

As discussed, given the position a judge holds in our justice system, and the narrowness with which a judicial act is defined, the harm most likely to result from a corrupt or malicious judicial act is a deprivation of civil rights. This Comment accepts the proposition advanced by David Rudovsky that an appropriate remedy for such violations "should provide: (1) effective deterrence of governmental misconduct, (2) compensation to individuals for violations of their constitutional or statutory rights, and (3) enforcement mechanisms that ensure compliance with constitutional and statutory norms." [280] With this tripartite scheme in mind, this Comment focuses on the second prong - compensation for those deprived of their constitutional rights by judicial acts.

Although the Supreme Court puts forth alternative remedies for judicial corruption or maliciousness, those alternative remedies are limited in their capacity to compensate victims. [281] Indeed, when this tripartite scheme is applied to those alternative remedies, the Supreme Court's reliance on those alternatives begins to have "the appearance of a "shell game.'" [282]

Although removal from office, by impeachment or otherwise, could be said to fulfill the first and third criteria, only the appellate and criminal processes have the potential to compensate victims. [283] The criminal law can achieve

---

[278] Holmes, supra note 223, at 469.

[279] See supra notes 213-14 and accompanying text for a discussion of the reasons for judicial immunity.

[280] Rudovsky, supra note 221, at 1211.

[281] See Stump v. Sparkman, 435 U.S. 349, 370 (1978) (Powell, J., dissenting) (noting that judge's conduct precluded appellate remedy); Shaman, supra note 42, at 24 (noting that judicial conduct boards are intended to restore public confidence, not to punish or compensate).

[282] Rudovsky, supra note 221, at 1212.

[283] See supra notes 218-48 and accompanying text for a discussion of the alternative remedies available to mitigate judicial misconduct.

this end through compensatory civil remedies, [284] and the appellate process can do so by not allowing victims to be substantially harmed in the first place. [285] Unfortunately, both have the potential to be insufficient.

1. The Criminal Law Does Not Necessarily Make Victims Whole

 Although the Supreme Court has seemed less concerned with making victims of [*1101] judicial corruption whole than with punishing and deterring judicial corruption, [286] real injury can come as a result of judicial misconduct. [287] As discussed above, the criminal law has the ability to deter, punish, and compensate, making it perhaps the most potent remedy for judicial corruption. [288] The criminal law, however, does not always fulfill that potential.

In the Kids-for-Cash scandal, for example, hundreds of juveniles suffered severe harm. [289] However, because those juveniles did not part with any money as a result of the judges' corruption, they did not receive any sort of restitution as a result of the criminal proceedings. By contrast, Judges Conahan and Ciavarella were ordered to repay the "kick-backs" they received from the developers of the juvenile detention center, as well as their judicial salaries to the Commonwealth of Pennsylvania. [290] They were also ordered to pay back-taxes to the Internal Revenue Service. [291] Even if that money was directed to the juvenile victims, the amount is arguably inadequate, as those funds would have to be allocated among the nearly 2,000 juveniles wronged in that scandal. [292] That is to say, of course, that the judges could even afford to pay an amount sufficient to compensate the juvenile victims. [293]

Although not entirely pertinent to the issue of compensating victims, it is worth noting that where the criminal law fails, exposing judges to civil liability in certain circumstances can act as a "back-stop" for the criminal law. Even if one rejects the notion that all wrongs must be compensated and accepts the proposition that the criminal law is the most appropriate arena for dealing with judicial corruption - a stance the Supreme Court seems to adopt [294] - the criminal law may fail to deter or punish, rendering it entirely ineffective at mitigating judicial misconduct. If, for example, a criminal prosecution fails for reasons outside the merits of the case - such as prosecutor's error - neither the public nor the individual victims would have a remedy of any sort. Although the primary purpose of civil liability is

---

[284] See supra Part II.D.1 for a discussion of the criminal law utilizing civil remedies.

[285] See Pierson v. Ray, 386 U.S. 547 (1967) (granting immunity where appeal was successful). But see Block, supra note 45 (arguing Sparkman was wrongly decided because appellate process could not make victim whole).

[286] See O'Shea v. Littleton, 414 U.S. 488, 503 (1974) (asserting that criminal prosecution is available to correct judicial misconduct).

[287] See, e.g., Stump v. Sparkman, 435 U.S. 349, 349 (1978) (a case where a judge enjoyed immunity regardless of ordering sterilization of girl without her knowledge).

[288] See supra Part II.D.1 for discussion of the rich remedies now available to the criminal law.

[289] Several media sources, as well as the report filed by the Interbranch Commission, have detailed tragic stories. See, e.g., Interbranch Report, supra note 2, at 21-23 (describing juvenile victims' encounters with Judge Ciavarella); A Judge's Victims, N.Y. Times (Mar. 28, 2009), http://www.nytimes.com/interactive/2 009/03/28/us/20090328_JUDGES.html?ref=us (providing multi-media, interactive portrayal of several juvenile victims).

[290] Jerry Lynott, Judge Hikes Ciavarella's Restitution, The Times Leader, Aug. 13, 2011, available at http://www.timesleader.com/news/Judge_hikes_Ciava rella_rsquo_s_restitution_08-12-2011.html (discussing Ciavarella's restitution order).

[291] Id.

[292] See Interbranch Report, supra note 2, at 10.

[293] See Lynott, supra note 290 (discussing Ciavarella's ability to pay restitution).

[294] See, e.g., O'Shea v. Littleton, 414 U.S. 488, 503 (1974) (asserting that criminal prosecution is available to correct judicial misconduct).

to compensate, where the criminal law fails, civil liability in certain circumstances would provide an opportunity for retribution and deterrence, thus complimenting the criminal law. [295]

**[\*1102]**

2. The Appellate Process Can Fail

If judicial corruption is only alleged and never proven, the only available remedy to a victim of judicial misconduct is through the appellate process. [296] That process, however, does not guarantee that judicial misconduct, or even judicial error, will be corrected. [297] In the criminal context, for example, the appellate process has frequently failed to reverse convictions of defendants proven later to be innocent. [298]

The appellate remedy is constrained by both process and perception. It is constrained by process because the standard used by appellate courts to review trial level findings is highly deferential and generally only reviews the trial record for clear errors or abuses of discretion. [299] Plus, even if an error is raised, appellate courts may determine that error is harmless. [300] Thus, as long as the corrupt judge influences the case before her in a way that appears on the record to be procedurally sound, that judge's ruling has little chance of being reversed.

Further, appellate courts generally avoid substantive claims that were not preserved at trial; and in most jurisdictions, new evidence of innocence can be introduced only after a defendant has the opportunity to collaterally attack her sentence. [301] For the victim of judicial misconduct, however, a collateral attack is too late, as significant harm would have occurred as a result of her tainted interaction with the judge. [302]

The appellate process is also burdened by psychological and political pressures. [303] In the Kids-for-Cash scandal, for example, Judge Ciavarella perpetuated a "tough on crime" persona, which was praised by some in the community, and which made his harsher than normal sentences seem severe, but not necessarily corrupt. [304] Similarly, appellate judges - those charged with correcting judicial error - are no less susceptible to the same pressures to be harsh on crime, and many simply do not see their job as one of finding truth or justice. [305]

Moreover, even when the appellate process accomplishes its intended goal, it may not solve the underlying problem. For example, even if a corrupt judge is reversed, and an individual case is corrected, there is no guarantee a judge engaged in a systematic plot to abuse her bench will cease those acts after being reversed. [306]

---

[295] See generally Cheh, supra note 224 (discussing interplay between civil and criminal remedies).

[296] See supra Part II.D for a discussion of the alternative remedies available for mitigating judicial misconduct.

[297] See Findley, supra note 240, at 593 (noting that appellate system does not act as the safety net it is intended to be).

[298] See id. at 593-96.

[299] Id. at 602.

[300] Id. at 603.

[301] See id. at 603-05 (stating that actual innocence is not, in itself, admissible in a direct appeal).

[302] See, e.g., Dennis v. Sparks, 449 U.S. 24, 26 (1980) (stating appellants' claim that they lost two years worth of revenue as result of improperly granted injunction).

[303] Findley, supra note 240, at 606-07.

[304] See Interbranch Report, supra note 2, at 13 (discussing Judge Ciavarella's zero-tolerance policy).

[305] Oldfather, supra note 244, at 55-63 (discussing different perceptions held by appellate judges of their role in appellate process).

[306] For instance, Judge Ciavarella was reversed on appeal in 2001 after denying counsel to a juvenile who appeared before him. Interbranch Report, supra note 2, at 11.

[*1103]

B. The Chilling Effect of Criminal Prosecution is Not Necessarily Less than Civil Liability

The argument relied on most heavily in favor of absolute judicial immunity is that immunity is necessary to guarantee the independence of the judiciary. Without absolute judicial immunity, the argument goes, judges will be chilled into making impartial decisions based on fear of retributive litigation. As Judge Ciavarella was convicted on many of the criminal counts against him, one could argue the system has acted as it should and punished a criminal. As such, there is no reason to open the judiciary to an unnecessary intrusion of its independence. This Section, however, raises a curious inconsistency with the chilling effect argument: we are already litigating judicial acts.

This occurs in two ways. First, although there does not appear to be controlling case law on the subject, it is very likely that judges can be prosecuted for judicial acts. Second, even where a judge is not being prosecuted for her judicial acts, those judicial acts may come into evidence to prove a related criminal act. The next subsections expand on this inconsistency.

1. Prosecuting Judicial Acts

Although the court in Chaplin granted a judge criminal immunity for a judicial act, that decision appears to be an outlier. [307] In fact, the Supreme Court has indicated, both implicitly and explicitly, that a judge can be prosecuted for a judicial act under § 242. [308] In Screws, for example, although the Court was splintered, all nine justices were willing to extend liability to an official acting pursuant to a state policy, which, according to the Roberts's dissent, could come from "judicial voice." [309] Arguably, Judge Ciavarella's insistence that juveniles waive their right to counsel could give "judicial voice" to such a policy, and his acts would therefore be subject to criminal liability. [310]

Also, in Littleton, the Court explicitly stated that § 242 should be used as an alternative remedy to combat judicial misconduct. [311] As discussed above, § 242 and § 1983 proscribe the exact same conduct: depriving another of his or her federal right while acting "under color of law." [312] Why then should a judge be more chilled by the possibility of a civil action when that judge could be forced to defend himself against **[*1104]** criminal charges stemming from the exact same conduct?

Thus, assuming judges can be prosecuted for judicial acts under § 242, it follows that there is at least a minimum level of chilled judicial independence with which we are comfortable, and that level is set at formal criminal charges. Prosecution for purely judicial acts, however, is certainly not the only means by which the criminal law affects judges.

2. Judicial Acts as Evidence

---

[307]  See supra notes 136-43 and accompanying text for a discussion of Chaplin.

[308]  See, e.g., O'Shea v. Littleton, 414 U.S. 488, 503 (1974) ("We have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivations of constitutional rights."). The history of the criminal civil rights statute also point away from the conclusion of the Chaplin court. See, e.g., Kaczorowski, supra note 126, at 231-32 (explaining that criminal penalties under early civil rights legislation were intended to punish judges who refused to enforce the Civil Rights Acts and noting that the opposition to such imposition was based on concerns of federalism, and, implicitly, not on preservation of judicial independence).

[309]  See supra notes 144-52 and accompanying text for a discussion of Screws and the relevance of giving "judicial voice" to a policy depriving an individual of her civil rights.

[310]  See supra notes 155-58 and accompanying text for a discussion of the Screws dissent.

[311]  Littleton, 414 U.S. at 503.

[312]  See supra notes 122-24 and accompanying text for a discussion of civil rights legislation.

Although judges enjoy civil immunity for judicial acts, those acts may still be used as evidence in other proceedings, both criminal and civil. [313] For example, a person injured by judicial corruption can bring a civil suit under RICO and will be able to collect treble damages if she can prove certain predicate offenses. [314] In doing so, the plaintiff can, under Dennis, introduce evidence of corruptly influenced judicial acts. [315] Similarly, if a judge is prosecuted under state law for accepting bribes - or any offense involving a judicial act - that judicial act can be used as evidence in that prosecution. [316] This, it would seem, would have a chilling effect equivalent to civil liability for a judicial act, as there is little, if any, difference between being held liable for a corrupt judicial act and being held liable for a nonjudicial act related to a corrupt judicial act.

C. The Potential Flood of Litigation Can Be Slowed

Thus far, this Comment has sought to show that two of the reasons given for judicial immunity - the availability of alternative remedies and the independence of the judiciary - have limits. However, there remains a weighty concern with exposing judges to civil immunity - the need to protect the system from a crippling amount of new or continuing litigation. In a system where, by definition, one party leaves the courthouse feeling as though justice was not done, it is fair to imagine a flood of unhappy litigants grinding the judicial system to a halt; and indeed, the Supreme Court has imagined such an event. [317] This concern, however, can be mitigated by slightly tweaking the current test for judicial immunity. [318]

This Section proposes crafting a new test from the current one. Contrary to existing proposals to limit judicial immunity, [319] and taking into consideration the problems inherent in qualified immunity, [320] this Comment advocates looking outside  **[*1105]**  the mere allegations in the complaint. Instead, this Comment proposes looking to an external event that would trigger a further inquiry. If tweaked slightly, the test for judicial immunity could better account for the existing chilling effect caused by criminal liability, while striking a balance between the concerns of protecting the system from a flood of litigation and the need to compensate victims of judicial corruption.

1. The Trigger

Any trigger to an exception for absolute judicial immunity should be a factual event - one that both parties, and the court, are forced to accept as true. [321] For example, the impeachment and removal from office of a judge is one possible trigger, as the Supreme Court has endorsed it as a means to punish judicial misconduct and it inherently

---

[313] See Dennis v. Sparks, 449 U.S. 24, 30 (1980) (finding "no … privilege immunizing judges from being required to testify about their judicial conduct").

[314] See Cheh, supra note 224, at 1337 (discussing civil remedy under RICO).

[315] See Dennis, 449 U.S. at 30.

[316] Id.

[317] See, e.g., Forrester v. White, 484 U.S. 219, 226-27 (1988) (explaining that judicial immunity is necessary to guard against "avalanche of suits").

[318] See Shaman, supra note 42, at 5-6 (describing the current test for judicial immunity as protecting "all judges, from the lowest to the highest court, so long as they are performing a judicial act that is not clearly beyond their jurisdiction").

[319] See, e.g., Block, supra note 45, at 923-24 (proposing exception to judicial immunity based on denial of appellate process).

[320] See generally Alan K. Chen, The Burdens of Qualified Immunity: Summary Judgment and the Role of Facts in Constitutional Tort Law, 47 Am. U. L. Rev. 1 (1997) (discussing problems with qualified immunity).

[321] See generally id. (arguing legal determination of qualified immunity based on facts discourages disposition at pleadings stage).

relates to official acts. [322] However, the inherently political nature of impeachment and removal from office does not lend itself well to acting as a trigger for judicial proceedings.

A criminal conviction is another possibility, although it, too, is not without complications. First, although the high burden of obtaining a conviction would act as a dense filter, going far toward preserving judicial independence and the integrity of the system, it would also indirectly impose a higher than normal burden for a civil plaintiff. [323] Also, where a criminal matter fails for reasons outside the merits, the harmed parties would be without a remedy, as the judge's immunity would remain. Further, there is a question as to what "convictions" should count, as using any conviction as a trigger could be overly broad and limiting the trigger to certain convictions might not be inclusive enough. Finally, using a criminal conviction as a trigger might discourage guilty pleas, as defendants would fear pleading into civil liability. Conversely, creating an exception for guilty pleas could have the opposite effect, and a corrupt judge could plead guilty for the very purpose of escaping civil liability.

There is a better option - the filing of criminal charges. Such a trigger would not only alleviate the issues with using a criminal conviction as a trigger, at least with regard to the increased burden concerns, but would be consistent with the level of chilled judicial independence with which we are already comfortable. [324] The question then is which charging instrument to use - an information or an indictment or both. Although these two charging instruments are functionally very similar in how they fit in the criminal enforcement process, it is worth discussing a key difference that could **[*1106]** arguably elevate one over the other - jurors. [325]

On one hand, a grand jury indictment appears to be a natural choice for a trigger, as an indictment would strike the easiest balance between the competing interests of judicial independence and fairness to victims. After all, if a grand jury has issued an indictment, a panel of jurors has determined that there is at least sufficient evidence to believe the judge did what she is accused of doing. [326] Such a trigger would provide a filter from vexatious litigation without exposing judges to civil liability at the discretion of a prosecutor, the very concern that led the Chaplin court to grant criminal immunity to the judge in that case. [327]

However, this Comment rejects limiting the trigger to a grand jury indictment and proposes that the filing of criminal charges, regardless of form, be used as a trigger. There are several reasons why both an information and indictment could and should be used. First, although there is no doubt that the presence of jurors could mitigate, to some extent, concerns of prosecutorial misconduct, it is also certainly possible for a prosecutor to orchestrate a politically motivated indictment. [328] Also, if an information (or indictment, for that matter) is the result of prosecutorial misconduct, there will likely not be a plaintiff to bring the civil suit, assuming the charges were

---

[322] See Bradley v. Fisher, 80 U.S. 335, 354 (1871) (finding that judges can be disciplined through "public prosecution in the form of impeachment, or in such other form as may be specially prescribed").

[323] See Kamisar et al., supra note 3, at 15 (describing criminal justice process, including burden of proof at trial); Cheh, supra note 224, at 1345 (discussing appeal of civil remedies in relation to criminal punishment).

[324] See supra Part III.B for a discussion of the existing - and acceptable - level of chilling on the independence of the judiciary.

[325] A grand jury indictment is the result of a panel of jurors determining that the prosecution has sufficient evidence to charge the defendant. By contrast, an "information" is issued by a prosecutor without input from a grand jury and used to charge a defendant when an indictment is either not necessary or is waived. See supra note 3 for a discussion of formal charging instruments.

[326] Kamisar et al., supra note 3, at 1041-42 (discussing ways to improve utility of grand jury indictments and noting that a slight majority of jurisdictions require a lesser standard of "probable cause," whereas other jurisdictions require showing of "prima facie case").

[327] See supra notes 136-43 and accompanying text for a discussion of Chaplin.

[328] See Hot Coffee (HBO 2011), http://www.hotcoffeethemovie.com (discussing the possibly politically motivated indictment of Mississippi Supreme Court Justice Oliver Diaz). Ironically, however, if a prosecutor falsely filed an information or maliciously pursued a grand jury indictment against a judge, that judge could not sue the prosecutor, as the prosecutor would enjoy the same brand of immunity. See supra note 212 for a discussion of prosecutorial immunity.

fabricated. Perhaps even more fatal is the fact that the Supreme Court in Littleton rejected such concerns, noting that separation of powers is not a problem for which judicial immunity is the solution. [329]

There is, however, a more practical reason - judges, scared of losing their immunity, could plead around civil liability. Luzerne County presents a very real example of this. As discussed in Part I of this Comment, the two judges in that case pled guilty to certain charges included in an information filed by the U.S. Attorney's office. Ultimately, their guilty pleas were rejected because they failed to take responsibility for their actions; but had that not happened, a test built on a trigger of a grand jury indictment would not have reached them. Thus, the filing of criminal charges, regardless of the form in which those charges are filed, should trigger courts to look beyond the current judicial immunity doctrine. The question then is beyond to what?

[*1107]

2. The Additional Inquiry

The filing of criminal charges is not an adequate filter on its own, as judges could be indicted for any number of crimes that have no relation to their judicial acts. As the law stands, judicial immunity is immunity from suit, [330] and to pierce the shield of immunity based solely on criminal charges could potentially eviscerate a judge's immunity unnecessarily. Thus, criminal charges should simply allow the court to consider the complaint, but before the courthouse doors open, the claim should still be able to survive an additional inquiry at the pleading stage. That additional inquiry, however, need only perform a basic gate-keeping function.

Taking inspiration from Justice Stewart's dissent in Sparkman, [331] it seems that any exception to absolute judicial immunity should take into account the considerations underlying the doctrine; namely, preservation of judicial independence, adequate alternative remedies, and systemic integrity. The proposed trigger, however, already accounts for the systemic integrity, and the very purpose of an exception to judicial immunity is to provide an adequate remedy where there was none. Thus, once criminal charges have been filed, a court faced with the issue of whether to grant a judge immunity merely needs to determine that the plaintiff's claim is based on harm caused by judicial acts that were not performed independently, as reflected in the criminal charges against that judge.

For example, if the judge has been indicted for murdering his wife, but the civil complaint alleges a deprivation of due process rights flowing from the judge's courtroom activities, then the criminal charges have nothing to do with the alleged corrupt or malicious judicial acts, and the suit should be dismissed. If, however, the judge has been charged with bribery in connection with his courtroom activities, and the plaintiff alleges she was deprived due process as a result of that bribery, then the judge should lose her immunity.

Although these considerations may prevent some claims based on actual corruption to proceed, it is apparent that relying merely on criminal charges to trigger an exception to a judge's immunity would tip the scales too forcefully in favor of compensating victims. Rather, any exception should seek to balance the competing interests of judicial independence and fairness to those harmed by judicial corruption.

IV. Conclusion

The doctrine of absolute judicial immunity has deep historical roots, and it has come to serve a necessary function in our judicial landscape - saving the judiciary and the system from an avalanche of litigation. The argument for judicial immunity provides that although the doctrine will inevitably allow some harm from judicial acts to go uncompensated, the grant of immunity is justified by the presence of alternative remedies.

---

[329] See O'Shea v. Littleton, 414 U.S. 488, 503 (1974) (asserting that judges can be prosecuted).

[330] See Griffin & Pelegrin, supra note 119, at 386 ("Judicial immunity is an immunity from the suit itself … .").

[331] Stump v. Sparkman, 435 U.S. 349, 368 (1978) (Stewart, J., dissenting) (arguing the content of judicial immunity should arise from its purposes). See supra notes 254-57 and accompanying text for a discussion of Justice Stewart's dissent.

84 Temp. L. Rev. 1071, *1107

**[*1108]** There are limits, however, to how far the reasons underlying judicial immunity can stretch. [332] The need for an independent judiciary is of the utmost importance. However, to shield judges from liability for malicious or corrupt judicial acts elevates judicial independence beyond its foundation. [333] This Comment has sought to demonstrate that there are workable alternatives to blanket immunization of judicial acts that still account for judicial independence while also protecting the rights of litigants who have been victimized by judicial corruption. [334]

Temple Law Review
Copyright (c) 2012 Temple University of the Commonwealth System of Higher Education
Temple Law Review

**End of Document**

---

[332] See supra Part II.E for a discussion of the criticism of absolute judicial immunity.

[333] See supra Part III.A for a discussion of the failure of alternative remedies.

[334] See supra Part III.C for a discussion of an expanded test for judicial immunity.