# NOTE: *PULLIAM V. ALLEN:* HARMONIZING JUDICIAL ACCOUNTABILITY FOR CIVIL RIGHTS ABUSES WITH JUDICIAL IMMUNITY. [*]

WINTER, 1985

**Reporter**
34 Am. U.L. Rev. 523 *

**Length:** 11328 words

**Author:** JEFFREY A. ZALUDA

## Text

[*523]  INTRODUCTION

The United States Supreme Court has stated that individual accountability for one's conduct is central to an organized society. [1] The doctrine of sovereign immunity, which is based on the notion that "The King can do no wrong," [2] stands in sharp contrast to the principle of individual accountability. [3] The American colonists' repugnance for sovereign immunity was one of the factors that led to the revolution against King George [4] and to

---

[*] © 1985 Jeffrey Alan Zaluda.

[1]  *See* Complete Auto Transit, Inc. v. Reis, 451 U.S. 401, 429 (1981) (Burger, C.J., dissenting) (recognizing principle of individual accountability as fundamental to organized society and organized system of justice); United States v. Lee, 106 U.S. (16 Otto) 196, 220 (1882) (stating that no man is above law and all government officials are bound to obey the law); Marbury v. Madison, 5 U.S. 137, 162, 1 Cranch 137, 163 (1803) (recognizing the right to seek remedy for injury as the essence of civil liberty).

[2]  1 W. BLACKSTONE, COMMENTARIES ON THE LAW OF ENGLAND *244, *246 (defining concept of sovereign immunity with phrase "The King can do no wrong"); *see* Complete Auto Transit, Inc. v. Reis, 451 U.S. 401, 429 (1981) (Burger, C.J., dissenting) (describing notion underlying sovereign immunity as "The King can do no wrong"); *see also* P. SCHUCK, SUING GOVERNMENT 30 (1983) (reviewing English common-law tradition of sovereign immunity).

[3]  *See* Complete Auto Transit, Inc. v. Reis, 457 U.S. 401, 429 (1981) (Burger, C.J., dissenting) (noting inverse relationship between demise of sovereign immunity and rise of individual accountability).

[4]  The Declaration of Independence para. 2 (U.S. 1776).  The document justifies the colonies' claim of independence from England by listing a "history of repeated injuries and usurptions" against the colonies by King George of Great Britain who presumably did not consider himself accountable to the colonies for his conduct.  *Id.*

decisions denying many government officials sovereign immunity. [5] Sovereign immunity, **[\*524]** however, has traditionally insulated judges from accountability even for violations of a litigant's civil rights. [6]

Congress enacted the Civil Rights Act of 1871 [7] to strengthen the newly ratified fourteenth amendment. [8] Section 1983 [9] of the Act imposes civil liability on any person who, under the color of state law, causes the deprivation of another individual's civil rights. [10] Although Congress intended section 1983 to reach all state actors, including state judges, [11] it presented the federal courts with a conflict between the traditional concept of judicial immunity and civil liability for state judges who violate an individual's civil rights. The Supreme Court has traditionally

——————————————————

[5] *See* Osborn v. Bank of the United States, 22 U.S. 737, 858, 9 Wheat. 738, 859 (1824) (officers and agents of states not immune from suit); Chisholm v. Georgia, 2 U.S. (2 Dall.) 419, 476-77 (1793) (federal court jurisdiction extends to United States and states as both plaintiff and defendants).

Less than five years after the decision in *Chisholm,* the states ratified the eleventh amendment. U.S. CONST. amend. XI; *see* J. NOWAK, R. ROTUNDA & J. YOUNG, CONSTITUTIONAL LAW 53 (2d ed. 1983). This amendment, which limits federal court jurisdiction over suits brought against state governments, effectively overruled *Chisholm.* *Id.* Fearing that the eleventh amendment would preclude effective enforcement of the Constitution against state officers who committed constitutional violations, the Supreme Court restricted the scope of the eleventh amendment by upholding suits against state officers. *See* Ex parte Young, 209 U.S. 123, 168 (1908) (state officer attempting to enforce unconstitutional state statute not immune from suit); Osborn v. Bank of the United States, 22 U.S. 737, 858, 9 Wheat. 738, 859 (1824) (officers and agents of state not immune from suit); *see also* Olmstead v. United States, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting) (arguing that government officials should be subject to same laws as private citizens); Jaffe, *Suits Against Governments and Officers: Sovereign Immunity,* 77 HARV. L. REV. 1, 19-20 (1963) (discussing *Chisholm* and the eleventh amendment in context of early development of sovereign immunity doctrine in United States). Presently, liability attaches to government officials unless they are exercising discretion in connection with their normal duties. P. SCHUCK, *supra* note 2, at 38.

[6] *See, e.g.,* Stump v. Sparkman, 435 U.S. 349, 364 (1978) (insulating judge from liability for procedural errors in proceeding that resulted in sterilization of minor child); O'Shea v. Littleton, 414 U.S. 488, 503 (1974) (extending immunity to judge involved in depriving racial minority of equal protection); Pierson v. Ray, 386 U.S. 547, 554 (1967) (arguing that judicial immunity extends to judge despite his role in conviction and false imprisonment based on false arrest); *see also* Alzua v. Johnson, 231 U.S. 106, 110-11 (1913) (extending protection of judicial immunity to justice of Supreme Court of Philippine Islands); Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 351-52 (1871) (holding judge immune from judicial acts unless clear absence of jurisdiction exists); Randall v. Brigham, 74 U.S. (7 Wall.) 523, 536 (1868) (recognizing validity of general doctrine of judicial immunity).

[7] Ch. 22, 17 Stat. 13 (current version at 42 U.S.C. § 1983 (1982)). Originally, Congress entitled the Civil Rights Act "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes." *Id.* § 1, 17 Stat. at 13.

[8] *See* U.S. CONST. amend. XIV; *see also* Block, *Stump v. Sparkman and the History of Judicial Immunity,* 1980 DUKE L.J. 879, 901 (noting that Congress wanted to control civil rights abuses against newly emancipated blacks).

[9] 42 U.S.C. § 1983 (1982).

[10] The current version of § 1983 reads, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*Id.* Section 1983 is an exception to the federal anti-injunction statute, which prohibits a federal court from enjoining a state court proceeding "except as expressly authorized by Act of Congress." 28 U.S.C. § 2283 (1982). The Supreme Court has decided that Congress intended to allow injunctive relief in § 1983 actions. *See* Mitchum v. Foster, 407 U.S. 225, 238-42 (1972) (finding that § 1983 falls within "Act of Congress" exception to anti-injunction statute).

[11] *See infra* note 109 (discussing scope and legislative background of § 1983).

34 Am. U.L. Rev. 523, *524

reconciled the conflict by upholding the common-law doctrine of judicial immunity, even in light of section 1983 violations. [12]

[*525] In *Pulliam v. Allen* [13] the Supreme Court took a major step in removing one of the last vestiges of sovereign immunity for members of the judiciary. In *Pulliam* the Court upheld the award of injunctive and declaratory relief under section 1983 [14] and attorney's fees under section 1988 [15] against a state magistrate who, although acting within a magistrate's proper jurisdiction, had violated a litigant's civil rights. [16] *Pulliam* was the first Supreme Court case to reject judicial immunity by holding a judge civilly accountable for her conduct. [17]

Although section 1983 only applies to state officials who violate an individual's civil rights, [18] the Supreme Court has recognized similar constitutional remedies for civil rights violations by federal officials. [19] Prior to *Pulliam,* however, courts routinely dismissed suits against federal judges for abuses of plaintiffs' civil rights on the basis of judicial immunity. [20] Although the Supreme Court in *Pulliam* [*526] held that federal courts may grant plaintiffs

---

[12] *See* Supreme Court of Va. v. Consumers Union, 446 U.S. 719 (1980) (holding state judges absolutely immune from declaratory or injunctive relief under § 1983 for legislative functions); Stump v. Sparkman, 435 U.S. 349 (1978) (holding judges absolutely immune for judicial acts even in excess of jurisdiction); Pierson v. Ray, 386 U.S. 547 (1967) (holding judges immune from suit for damages under § 1983).

[13] 104 S. Ct. 1970 (1984).

[14] Id. at 1981-82.

[15] 42 U.S.C. § 1988 (1982). Section 1988 is the codification of the Civil Rights Attorney's Fees Awards Act of 1976, Pub. L. No. 94-559, § 2, 90 Stat. 2641, 2641. Section 1988 reads, in pertinent part:

In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988 (1982).

[16] Pulliam v. Allen, 104 S. Ct. 1970, 1981-82 (1984).

[17] Previous Supreme Court cases had held judges absolutely immune from civil damages liability when acting in their judicial capacity. *See* Stump v. Sparkman, 435 U.S. 349, 459-60 (1978) (granting judge absolute immunity from civil liability for procedural error in approval of petition authorizing sterilization of minor); Pierson v. Ray, 386 U.S. 547, 553 (1967) (extending absolute immunity to judge in § 1983 action for false imprisonment); Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 357 (1871) (granting judge absolute immunity from civil liability for possible error in removing attorney's name from court's roll). The Supreme Court had also held judges absolutely immune from damages and injunctive relief when acting in a legislative capacity. *See* Supreme Court of Va. v. Consumers Union, 446 U.S. 719, 734 (1979) (granting absolute immunity to judge promulgating state code of professional responsibility). *But see* Ex parte Virginia, 100 U.S. (10 Otto) 339, 348-49 (1880) (denying immunity to judge who violated constitution in ministerial act of jury selection). In dictum, the Supreme Court has indicated that judicial immunity does not extend to a judge's liability for criminal acts in his judicial capacity. *See* O'Shea v. Littleton, 414 U.S. 488, 503 (1974) (noting absence of Supreme Court holdings in this area).

[18] *See* 42 U.S.C. § 1983 (1982) (limiting application to person acting under color of law of any state, territory, or District of Columbia); *see also* Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 406 (1971) (Harlan, J., concurring) (stating that § 1983 does not apply to federal actors).

[19] *See* Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 396-97 (1971) (allowing recovery of damages for fourth amendment violation). For a discussion of federal officials' liability for constitutional deprivations under *Bivens,* see *infra* notes 122-26 and accompanying text.

[20] *See, e.g.,* Williams v. Siler, No. 83-5089 (6th Cir. Apr. 9, 1984) (available on LEXIS, Genfed library, Cir file) (holding federal district and circuit court judges absolutely immune from liability in civil suit brought under § 1983); Martinez v. Winner, 548 F. Supp. 278, 308 (D. Colo. 1982) (holding federal district court judge absolutely immune from liability in civil suit brought under *Bivens* doctrine for deprivation of constitutional rights); Kennedy v. Brimmer, No. C80-0209 (D. Wyo. Sept. 30, 1980) (available on LEXIS, Genfed library, Dist file) (holding federal court judges absolutely immune from liability in civil suit for civil rights abuses).

injunctive relief under section 1983 and attorney's fees under section 1988 against state court judges who abuse plaintiffs' federal civil rights, the question remains whether similar relief is now available against federal judges.

This Note discusses and evaluates the Supreme Court's opinion in *Pulliam v. Allen* and suggests ways to apply the opinion to federal judges.  Part I discusses the development of common-law judicial immunity and the application of the immunity doctrine to civil rights suits against judges prior to *Pulliam.* Part II outlines and analyzes the Court's opinion in *Pulliam.* Part III discusses the future application of the Court's holding in *Pulliam* in civil rights suits brought against federal judges.  The Note concludes that the holding in *Pulliam* should be applied equally to state and federal judges who abuse litigants' civil rights.

## I.  THE DEVELOPMENT OF JUDICIAL IMMUNITY PRIOR TO *PULLIAM V. ALLEN*

### A.  Earliest Development

The common-law development of judicial immunity began with the development of the writ of error in the King's courts of England in the fourteenth century.   [21] By application for a writ of error to the King's courts, a party could challenge an inferior court of record's possible error of law but could not challenge an error of fact.   [22] The distinction between an error of law and an error of fact was based on the need to preserve the sanctity of the record.   [23] Historians have suggested that the doctrine of the sanctity of the record was the impetus for the doctrine of judicial immunity.   [24]

 [*527]  In *Floyd & Barker*  [25] Lord Coke discussed four early policies in support of judicial immunity.  [26] First, allowing actions against judges would result in an infinite number of controversies because the losing party could always challenge the decision by suing the judge.   [27] Second, judicial immunity is necessary to maintain the independence of lower court judges from the constant scrutiny of rival courts.   [28] Third, Lord Coke suggested that

---

[21]  The doctrine of judicial immunity was recognized as early as the reign of Edward III, from 1326 to 1377.  *See* 6 W. HOLDSWORTH, A HISTORY OF ENGLISH LAW 234-35 (2d ed. 1937) (immunity during reign of Edward III limited suits against judges to errors of law within the formal case record); *see also* Block, *supra* note 8, at 883-84 (1980) (relating development of doctrine of judicial immunity to development of writ of error).

[22]  *See* 1 W. HOLDSWORTH, *supra* note 21, at 214 (7th ed. 1956) (complaint must show error in from record of case).

[23]  *Id.*

[24]  Feinman & Cohen, *Suing Judges: History and Theory,*  31 S.C.L. REV. 201, 206 (1980) (judicial immunity followed naturally from 14th century doctrine of sanctity of records).  By 1589, an English court recognized judicial immunity for judges of record, stating "for such things as he doth as judge, no action lieth." Green and the Hundred of Buccle-Churches Case, 74 Eng. Rep. 294, 294 (C.P. 1589).

[25]  77 Eng. Rep. 1305 (Star Chamber 1607). The judge in *Floyd & Barker* was a common-law judge of Assize who presided over a murder trial that eventually led to a judgment of death for the accused. Id. at 1306. Conspiracy charges were then brought against the judge in the Star Chamber for his actions against the accused.  *Id. See also* 6 W. HOLDSWORTH, *supra* note 21, at 203-05 (2d ed. 1937) (discussing bill of conspiracy in *Floyd & Barker*).

[26]  Floyd & Barker, 77 Eng. Rep. 1305, 1306-07 (Star Chamber 1607).

[27]  Id. at 1306. The "floodgates" argument draws no less concern from courts today.  *See*  Pulliam v. Allen, 104 S. Ct. 1970, 1988-89 (1984) (Powell, J., dissenting) (allowing relief against judges will "geometrically" increase number of harassing suits); Butz v. Economou, 438 U.S. 478, 512 (1978) (asserting necessity of absolute judicial immunity to protect judges from harassing law suits); Pierson v. Ray, 386 U.S. 547, 554 (1967) (noting real danger of intimidation if unsatisfied litigants allowed to sue judges); *see also* Feinman & Cohen, *supra* note 24, at 208 (recognizing potential for multiplicity of suits against judges as principal policy argument for judicial immunity).

[28]  Floyd & Barker, 77 Eng. Rep. 1305, 1307 (Star Chamber 1607). Lord Coke was concerned that the growth of courts such as the Privy Council and Star Chamber would subvert the effectiveness of the common-law courts.  *See* 5 W. HOLDSWORTH,

subjecting judges to suit would jeopardize public confidence in the common-law system of justice. [29] Finally, Lord Coke insisted that the most independent and conscientious judges would be the most susceptible to continual attacks. [30]

Lord Coke, however, only addressed immunity for higher court judges in *Floyd & Barker.* Later English cases expanded the doctrine of judicial immunity to include all judges of courts of record. [31] The **[*528]** common law, however, limited the doctrine's application to include only those cases in which lower court judges had acted properly within their jurisdiction. [32] Thus, lower common-law judges who had acted outside the scope of their proper jurisdiction, or who had acted maliciously even if within their proper jurisdiction, were not immune from suit. [33]

The first American state courts to address the issue of judicial immunity based their holdings primarily on English common-law precedent. [34] Similarly, when the United States Supreme Court first addressed a judicial immunity question in *Randall v. Brigham,* [35] the Court also relied on the English common-law doctrine of judicial immunity. [36] In *Randall* the Court based the scope of judicial immunity on jurisdiction. [37] Judges of courts with limited or

_____

*supra* note 21, at 159-60 (2d ed. 1937) (detailing Lord Coke's efforts to cripple courts whose power rivaled that of common-law courts); Block, *supra* note 8, at 886-87 (interpreting Lord Coke's motive for establishing immunity for judges of common-law courts as means of ensuring their independence from review by other courts).   Lord Coke's concern for maintaining the independence of the common-law courts from rival superior courts closely resembles American state courts' concern for independence from the federal judiciary under the comity doctrine.   For a discussion of comity, see *infra* note 107.

[29]  Floyd & Barker, 77 Eng. Rep. 1305, 1307 (Star Chamber 1607). Lord Coke feared that subjecting judges to collateral attack in other courts "would tend to the scandal and subversion of all justices." *Id.; see* Feinman & Cohen, *supra* note 24, at 267 (subjecting judges to suits and public examination would cause a loss of stature in judicial system). *But see id.* at 269 (allowing suits against judges may dignify legal process by contributing to public perception that system punishes its own wrongdoers).

[30]  Floyd & Barker, 77 Eng. Rep. 1305, 1307 (Star Chamber 1607);  *see* Feinman & Cohen, *supra* note 24, at 267 (suggesting that tradition of independent judiciary would suffer if losing party could sue judge). *But see id.* at 269 (judicial liability ensures concern for the rights of parties and establishes check on judicial misconduct).

[31]  *See, e.g.,*  Scott v. Stansfield, 3 L.R.-Ex. 220, 220-23 (1868) (noting that doctrine of judicial immunity should extend not only to superior courts but also to inferior court of record, court of a coroner, and court-martial); Haggard v. Pelicier Freres, 1892 A.C. 61, 69 (extending immunity to judge of Consular Court of Madagascar), *cited in*  Pulliam v. Allen, 104 S. Ct. 1970, 1975 (1984).

[32]  *See*  The Marshalsea, 77 Eng. Rep. 1027, 1039 (Star Chamber 1612) (proceedings conducted in absence of jurisdiction are void and suit can be brought against presiding judge).  *See generally* Block, *supra* note 8, at 892-96 (discussing jurisdictional limit on immunity in English courts).

[33]  *See* Feinman & Cohen, *supra* note 24, at 214-15.

[34]  *See, e.g.,*  Phelps v. Sill, 1 Day 315, 319, 328-29 (Conn. 1804) (establishing immunity of probate judge by agreeing with defendant's reliance on English precedent); Yates v. Lansing, 5 Johns. 282, 292 (N.Y. Sup. Ct. 1810) (establishing immunity of state chancellor by relying on Floyd & Barker, 77 Eng. Rep. 1305, 1307 (Star Chamber 1607), and other English cases), *aff'd,*  9 Johns. 395, 424 (N.Y. 1811). For a discussion of the early application of judicial immunity in American courts, see Block, *supra* note 8, at 897-901 (outlining development of judicial immunity prior to Civil Rights Act); Feinman & Cohen, *supra* note 24, at 221-61 (discussing early development of doctrine of judicial liability in United States); Note, *Judicial Immunity and Judicial Misconduct: A Proposal For Limited Liability,*  20 ARIZ. L. REV. 549, 552-55 (1978) (summarizing American case law on judicial immunity).

[35]  74 U.S. (7 Wall.) 523 (1868). In *Randall* the plaintiff, a disbarred attorney, brought suit for damages against the state judge who had disbarred him for malpractice and gross professional misconduct. Id. at 524-26.

[36]  Id. at 536-38 (relying on English common-law decisions that articulated policy considerations behind doctrine of judicial immunity) (citing Floyd & Barker, 77 Eng. Rep. 1305, 1307 (Star Chamber 1607), and Taaffe v. Downes, 13 Eng. Rep. 15, 16-22 (1813), for proposition that holding judges liable for their actions makes them slaves to other courts, destroys their dignity, allows wasting and harassing persecution, and degrades and weakens their responsibility).

34 Am. U.L. Rev. 523, *528

inferior jurisdiction, like lower common-law judges, were immune from suit only for acts performed within their proper jurisdiction. [38] Judges of courts with superior or general jurisdiction were immune from suit **[*529]** for all their judicial acts, even if outside their jurisdiction, unless the acts in excess of jurisdiction were done maliciously. [39]

Three years later in *Bradley v. Fisher,* [40] the Court again relied on English common-law principles of judicial immunity in refusing to impose liability on a judge in a civil action. [41] The Court rationalized that holding a judge liable to answer to all those aggrieved by his actions would destroy the independence necessary for a respectable and useful judiciary. [42] In *Bradley* the Court refined the jurisdictional rule created in *Randall* by distinguishing between acts in excess of jurisdiction, for which a superior court judge could not be held liable even if acting

---

[37]   Randall v. Brigham, 74 U.S. (7 Wall.) 523, 536 (1868). The jurisdictional criterion established in *Randall* still stands as the threshold issue in judicial immunity claims before American courts. *See* Stump v. Sparkman, 435 U.S. 349, 356 (1978) (stating that issue of jurisdiction is key inquiry in determination of judicial immunity); Pierson v. Ray, 386 U.S. 547, 554 (1967) (indicating that issue of jurisdiction is important consideration in any judicial immunity case); *cf.* Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 351-52 (1871) (clarifying distinction between excess of jurisdiction and absence of jurisdiction in judicial immunity cases); Note, *Judicial Immunity: Developments in Federal Law,* 33 BAYLOR L. REV. 351, 355 (1981) (proposing issues of "jurisdiction" and "function" as key elements of inquiry into claim of judicial immunity).

[38]   Randall v. Brigham, 74 U.S. (7 Wall.) 523, 536 (1868).

[39]   *Id.*

[40]   80 U.S. (13 Wall.) 335 (1871). In this case, an attorney had brought suit against the judge who had ordered the removal of the attorney's name from the court's roll. Id. at 337.

[41]   Id. at 349-50 (reviewing English precedent and policy considerations behind English decisions) (citing Scott v. Stansfield, 3 L.R.-Ex. 220, 223 (1868), for proposition that judicial immunity is not for protection of malicious or corrupt judges but rather for protection of public interest in the ability of the judiciary to function independently without fear of consequences).

[42]   Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 347 (1871).

maliciously, and acts done in the clear absence of subject matter jurisdiction, for which a judge would be held liable. [43] The jurisdictional rule of *Bradley* remains the general view most American courts take today. [44]

[*530]   *B. Judicial Immunity and the Civil Rights Acts*

The first federal case that addressed the question of judicial liability under section 1983 was *Picking v. Pennsylvania Railroad.* [45] In *Picking* the United States Court of Appeals for the Third Circuit denied a state judge immunity from an action for damages resulting from civil rights abuses. [46] The Third Circuit held that any state official acting under color of law, who deprives another person of a federal right, is liable for damages to that person under section 1983. [47]

The Supreme Court's decision in *Tenney v. Brandhove,* [48] however, undermined the Third Circuit's holding in *Pickering.* Relying on the precedent of legislative immunity, the Court held that government officials exercising legislative functions are absolutely immune from suit for damages under section 1983. [49] The Court concluded that Congress was "such a staunch advocate of legislative freedom," that it would not have intended section 1983 to impinge on legislative immunity without an express statement in the statute. [50] The federal courts of appeals

---

[43]  Id. at 351. Justice Field explained that an act in excess of subject matter jurisdiction would occur if a judge of a criminal court improperly held a particular act to be a crime or sentenced a defendant to more than the statutory maximum; the judge would be immune from suit in these instances. Id. at 352. On the other hand, a probate judge trying a criminal case would be acting in clear absence of all jurisdiction.  *Id.* The probate judge could not claim the protection of judicial immunity if sued for this action. *Id.* The Court eliminated the exception for malicious acts because, in the Court's opinion, aggrieved litigants would not hesitate to manufacture charges of corrupt or malicious conduct in an attempt to circumvent a judge's claim of judicial immunity.  Id. at 347-51. In Turner v. Raynes, 611 F.2d 92 (5th Cir.), *cert. denied,*  449 U.S. 900 (1980), Judge Gee, writing for the Fifth Circuit, applied the terms vertical and horizontal limitations to the previously articulated jurisdiction distinction.  Id. at 95. Judge Gee described vertical limitations on jurisdiction as those confining judicial action to "areas of jurisprudence of a particular kind: probate, bankruptcy, tax and so on." *Id.* Horizontal limitations on jurisdiction apply to general authority, which is limited in scope. For example, "a Texas justice of the peace has general civil and criminal jurisdiction, essentially limited to small matters." *Id.* According to the Fifth Circuit, acts in violation of vertical jurisdiction are in clear absence of all jurisdiction and are not immune from liability.  *Id.* Acts in violation of horizontal jurisdiction are in excess of jurisdictional boundries and are protected by judicial immunity.  *Id.*

[44]  *See, e.g.,*  O'Neil v. City of Lake Oswego, 642 F.2d 367, 370 (9th Cir. 1981) (extending immunity to pro tem municipal judge who acted in excess of jurisdiction rather than clear absence of jurisdiction); Harris v. Harvey, 605 F.2d 330, 336 (7th Cir. 1979), *cert. denied,*  449 U.S. 938 (1980) (refusing to extend immunity to county judge whose extrajudicial actions in discrediting police officer were in clear absence of all jurisdiction); *see also*  Gregory v. Thompson, 500 F.2d 59, 62 (9th Cir. 1974) (defining *Bradley* rule as "seemingly impregnable fortress in American Jurisprudence"); Williams v. Sipe, 487 F.2d 913, 913 (5th Cir. 1973) (per curiam) (extending immunity to judge on ground that contested act did not fall within clear absence of all jurisdiction); Robinson v. McConkle, 462 F.2d 111, 113 (3d Cir.) (sustaining shield of judicial immunity by citing distinction between excess of jurisdiction and clear absence of jurisdiction); *cert. denied,*  409 U.S. 1042 (1972).  *See generally* Note, *supra* note 37, at 355-57 (discussing jurisdictional limitations on judicial immunity claims).

[45]  151 F.2d 240 (3d Cir. 1945).

[46]  Id. at 249-50. The state judge had knowingly and unlawfully issued an arrest warrant based on false pleadings.  Id. at 245.

[47]  Id. at 249;  *see also*  McShane v. Moldovan, 172 F.2d 1016, 1023 (6th Cir. 1949) (holding that action for damages lies against state judges who, acting under color of law, deprive persons of fourteenth amendment rights); Burt v. City of New York, 156 F.2d 791, 793 (2d Cir. 1946) (stating Civil Rights Act tolls judicial immunity and forces judges to defend actions brought in district court).  *But see*  Botlane v. Lindsley, 170 F.2d 705, 707 (10th Cir. 1948) (noting cause of action arises only if state court proceedings are completely void and instituted solely for purpose of depriving person of property without due process of law).

[48]  341 U.S. 367 (1951).

[49]  Id. at 376;  *see also*  Supreme Court of Va. v. Consumers Union, 446 U.S. 719, 731-34 (1980) (holding judges absolutely immune from both injunctive relief and damages for performing legislative functions).

34 Am. U.L. Rev. 523, *530

that subsequently considered judicial immunity extended the rationale of *Tenney* to protect judges from liability under section 1983.  [51] These courts typically held that the doctrines of judicial immunity and legislative immunity were equally grounded in history and reason.  [52]

The Supreme Court first addressed the question of judicial immunity **[\*531]** from a section 1983 action in *Pierson v. Ray.*  [53] In *Pierson* the Court affirmed the federal courts of appeals extension of the rationale in *Tenney* to the judiciary, holding that the doctrine of judicial immunity is a defense to an action for damages brought against a judge under section 1983.  [54] Applying the rationale used to uphold legislative immunity in *Tenney,* the Court stated that had Congress intended to abolish the doctrine of judicial immunity, it would have expressly stated so in the Civil Rights Act.  [55]

The principal rationale supporting the Court's recognition of judicial immunity under section 1983 is similar to the rationale that Lord Coke expressed almost four hundred years ago in *Floyd & Barker:*  [56] concern over vexatious and continuing litigation tending to diminish a judge's independent and fearless decisionmaking.  [57] Other policies

---

50   Tenney v. Brandhove, 341 U.S. 367, 372-76 (1951).

51   *See, e.g.,* Bauers v. Heisel, 361 F.2d 581, 587-88 (3d Cir.) (stating that Congress did not intend § 1983 to derogate common-law judicial immunity), *cert. denied,* 386 U.S. 1021 (1967);  Tate v. Arnold, 223 F.2d 782, 785 (8th Cir. 1955) (holding no evidence that Congress intended § 1983 to impair judicial immunity); Souther v. Reid, 101 F. Supp. 806, 807 (E.D. Va. 1951) (noting that public policy dictates that § 1983 not abrogate judicial immunity).

52   *See, e.g.,* Tate v. Arnold, 223 F.2d 782, 785 (8th Cir. 1955) (finding that common-law rule of judicial immunity not abrogated by § 1983); Cawley v. Warren, 216 F.2d 74, 75 (7th Cir. 1954) (recognizing judicial immunity as deeply established) (quoting Aluza v. Johnson, 231 U.S. 106, 111 (1913));  Morgan v. Sylvester, 125 F. Supp. 380, 385 (S.D.N.Y. 1954) (noting that judicial immunity is more deeply rooted than and equally compelling as legislative immunity), *aff'd per curiam,* 220 F.2d 758 (2d Cir. 1955);  *cf.* Francis v. Crafts, 203 F.2d 809, 812 (1st Cir.) (noting that judicial officers stand in no less favorable position than state legislators for acts done in official capacity), *cert. denied,* 346 U.S. 835 (1953).

53   386 U.S. 547 (1967). In *Pierson* police had arrested for breach of the peace, black and white clergymen who were on a prayer pilgrimage to promote racial integration and who attempted to use a segregated bus terminal in Jackson, Mississippi. Id. at 549. A municipal police justice convicted and incarcerated the clergymen. *Id.* Following an appeal in which the court directed a verdict in the clergymen's favor, the clergymen brought suit under § 1983 against the justice for false imprisonment. Id. at 549-50.

54   Id. at 554. The Court had declined the opportunity to consider the question of extending the *Tenney* rationale to the judiciary on several occasions prior to *Pierson. See, e.g.,* Kenney v. Fox, 232 F.2d 288 (6th Cir.) (concerning judge who wrongfully committed plaintiff to state mental hospital in violation of plaintiff's civil rights), *cert. denied,* 352 U.S. 855 (1956);  Francis v. Crafts, 203 F.2d 809 (1st Cir.) (concerning judge who wrongfully committed 17-year-old plaintiff as defective delinquent in violation of plaintiff's civil rights), *cert. denied,* 346 U.S. 835 (1953).

55   Pierson v. Ray, 386 U.S. 547, 554-55 (1967). In a vigorous dissent, Justice Douglas quoted legislative history showing that Congress had enacted the 1871 Civil Rights Act against a backdrop of civil rights abuses by, among others, judges in the Reconstruction South. Id. at 559 (Douglas, J., dissenting).  During debates on the Act, Congressman Rainey of South Carolina had remarked that "the courts are in many instances under the control of those who are wholly inimical to the impartial administration of law and equity." *Id.* (citing CONG. GLOBE, 42d Cong., 1st Sess. 394 (1871)).  Douglas concluded that although exempting judges from liability for the consequences of their honest mistakes was necessary, judges should be liable for the "knowing and intentional deprivation of a person's civil rights." Id. at 566.

56   *See supra* notes 27-30 and accompanying text (discussing Lord Coke's policy rationales for judicial immunity).

57   *See, e.g.,* Supreme Court of Va. v. Consumers Union, 446 U.S. 719, 731-34 (1980) (rationale for immunity for judges acting in their legislative capacity is to ensure independent performance of functions free from outside interferences); Butz v. Economou, 438 U.S. 478, 512 (1978) (rationale for immunity for judges acting in their judicial capacity is to assure that judges fearlessly perform their functions without harassment or intimidation); Pierson v. Ray, 386 U.S. 547, 554 (1967) (rationale for judicial immunity for judges acting in their judicial capacity is to free judges from harassment by unsatisfied litigants); Bradley v.

on which American courts have justified the doctrine of judicial immunity have included preventing undue influence on judicial decisions, [58] protecting judges from the burden of defending **[*532]** retaliatory suits by unsuccessful litigants, [59] enhancing the attractiveness of judicial service, [60] promoting finality in litigation, [61] preserving the appellate process and the administration of justice, [62] and upholding the concepts of federalism and separation of powers. [63]

Since *Pierson v. Ray* the Court has further delineated the scope of judicial immunity under section 1983. In *Stump v. Sparkman* [64] the Court held that judges are absolutely immune from monetary damages under section 1983 for all their judicial acts, unless the judge acted in the clear absence of subject matter jurisdiction. [65] In **[*533]**

---

Fisher, 80 U.S. (13 Wall.) 335, 349 (1871) (securing judicial independence and preventing harassment from vexatious actions justifies judicial immunity for judges acting in their judicial capacity).  For a discussion of the primary policy rationales for judicial immunity, see Feinman & Cohen, *supra* note 24, at 267-70.

[58]  Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 347 (1871).

[59]  Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949).

[60]  Phelps v. Sill, 1 Day 315, 329 (Conn. 1804).

[61]  Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 349 (1871).

[62]  *Id.*

[63]  Pierson v. Ray, 386 U.S. 547, 564 n.4 (1967) (Douglas, J., dissenting).

[64]  435 U.S. 349 (1978).

[65]  Id. at 355-64. In *Stump,* a mother petitioned an Indiana state court judge for the sterilization of her "somewhat retarded" 15-year-old daughter.  Id. at 351. The judge approved the petition in an ex parte proceeding, without a hearing, notice to the daughter, or appointment of a guardian ad litem.  Id. at 352. Shortly thereafter, the daughter was surgically sterilized, although she believed she was undergoing an appendectomy.  Id. at 353. Two years later the daughter, who had married, discovered after unsuccessfully attempting to become pregnant that she had been sterilized.  Id. at 353. She brought suit for damages under § 1983 against the judge who had ordered the sterilization.  Id. at 353. The daughter also brought suit against her mother, her mother's attorney, the doctors who had performed and assisted in the tubal litigation, and the hospital in which the operation took place.  *Id.*

The U.S. District Court for the Northern District of Indiana held that whether or not Judge Stump had based his approval of the petition for sterilization on an erroneous understanding of the law.  Judge Stump was within his proper jurisdiction to consider the petition.  *See* id. at 354-55 (quoting Sparkman v. McFarlin, Civ. No. F 75-129 (N.D. Ind. May 13, 1976)).  The district court held that Judge Stump was absolutely immune from suit under the doctrine of judicial immunity espoused in Bradley v. Fisher, 80 U.S. (13 Wall.) 335 (1871) (holding judges immune from civil liability for their judicial acts).  *See*  Stump v. Sparkman, 435 U.S. 349, 355 (1978).

The U.S. Court of Appeals for the Seventh Circuit reversed stating that Judge Stump had no statutory or common-law basis on which to order the sterilization and, therefore, had not acted within his jurisdiction in approving the petition.  Sparkman v. McFarlin, 552 F.2d 172, 174 (7th Cir. 1977), *rev'd sub nom.*  Stump v. Sparkman 435 U.S. 349 (1978). Accordingly, the Seventh Circuit held that Judge Stump was not immune from a suit for damages.  *Id.* Subsequently, the Supreme Court reversed the Seventh Circuit's decision.  Stump v. Sparkman, 435 U.S. 349 (1978). Reaffirming *Pierson,* the Supreme Court held that absolute judicial immunity from damages applies to actions against judges for their judicial acts, unless in a clear absence of all jurisdiction.  Id. at 357, 360. Sparkman had argued that Judge Stump's approval of the petition did not constitute a judicial act because the petition was not given a docket number and was not filed with the clerk's office.  Id. at 360. Rejecting this argument, the Court concluded that granting petitions affecting minor children was a judicial act normally within Judge Stump's jurisdiction and, therefore, the judge was immune from damages.  Id. at 362-63.

After the decisions in both *Stump* and *Pierson,* several commentators severely criticized the Supreme Court for placing the judiciary above reproach.  *See, e.g.,* Block, *supra* note 8, at 880 (holding in *Stump* calls into question integrity of judiciary and judicial process); Feldthusen, *Judicial Immunity: In Search of an Appropriate Limiting Formula,* 29 U.N.B. L.J. 73, 105 (1980) (urging greater tort liability for judges); Kates, *Immunity of State Judges Under the Federal Civil Rights Act:* Pierson v. Ray *Reconsidered,* 65 NW. U.L. REV. 615, 622-23 (1970) (concluding no congressional intent to grant absolute immunity under §

*Supreme Court of Virginia v. Consumers Union* [66] the Court held that judges are absolutely immune from either damages or injunctive relief for acts that they perform in their legislative capacity. [67] The Court left unresolved the question of whether absolute immunity from injunctive relief attaches to judicial acts performed within a judge's proper subject matter jurisdiction.

## II.  *PULLIAM V. ALLEN*

In *Pulliam v. Allen* [68] the Supreme Court addressed the unresolved question of whether judicial immunity bars injunctive relief under section 1983 against judges acting in their judicial capacity. The court held that a federal judge may award a plaintiff injunctive and **[*534]** declaratory relief under section 1983 [69] and attorney's fees

---

1983); Laycock, *Civil Rights and Civil Liberties,* 54 CHI.-KENT L. REV. 390, 399-400 (1977) (stating that Court's holding in *Stump* demonstrates unfairness of subject matter jurisdiction rule); Nagel, *Judicial Immunity and Sovereignty,* 6 HASTINGS CONST. L.Q. 237, 239 (1978) (arguing that special status of judiciary is unnecessary and destructive); Nahmod, *Persons Who are not "Persons:" Absolute Individual Immunity Under Section 1983,* 28 DEPAUL L. REV. 1, 3 (1978) (stating that Court's holding for absolute immunity has potential of undercutting § 1983); Rosenberg, Stump v. Sparkman: *The Doctrine of Judicial Impunity,* 64 VA. L. REV. 833, 836 (1978) (asserting that Court's grant of judicial immunity allows judicial lawlessness); Way, *A Call for Limits to Judicial Immunity: Must Judges be Kings in their Courts?,* 64 JUDICATURE 390, 393 (1981) (stating that Court's grant of judicial immunity allows malicious abuse of power); Note, *supra* note 37, at 351 (asserting that Court's holding in *Stump* opened door to broad abuse by judiciary); Note, *Immunity Under 42 U.S.C. § 1983: A Benefit to the Public?,* 12 CONN. L. REV. 116, 136 (1979) (arguing that Court's grant of immunity condones judicial corruption and works injustice on innocent parties); Note, *Judicial Immunity:* Stump v. Sparkman, 47 UMKC L. REV. 81, 90-91 (1978) (questioning whether there are any limitations on judge's actions in court of general jurisdiction after *Stump*); Note, *Liability of Judicial Officers Under Section 1983,* 79 YALE L.J. 322 (1969) (arguing that judicial officers should be subject to liability under § 1983 under actual malice standard).

[66]   446 U.S. 719 (1980).

[67]   *Id.* The Consumers Union of the United States brought suit against the Chief Justice of the Supreme Court of Virginia to enjoin enforcement of a rule established by the Supreme Court of Virginia that prohibited Virginia attorneys from listing certain information in legal services directories. Consumers Union of United States, Inc. v. American Bar Ass'n, 470 F. Supp. 1055, 1058 (E.D. Va. 1979), *rev'd sub nom.* Supreme Court of Va. v. Consumers Union, 446 U.S. 719 (1980).

The Consumers Union alleged violation of their first and fourteenth amendment rights to gather, publish, and receive such information. *Id.* The district court held the rule unconstitutional on its face and permanently enjoined the Supreme Court of Virginia from enforcing it. *Id.* The court also awarded reasonable attorney's fees to the Consumers Union. Id. at 1058-63. The Supreme Court originally noted probable jurisdiction to decide whether state officials acting in a judicial capacity were immune from suits for declaratory or injunctive relief and attorney's fees. Consumers Union v. American Bar Ass'n, 470 F. Supp. 1055 (E.D. Va.), *probable jurisdiction noted sub nom.* Supreme Court of Va. v. Consumers Union, 444 U.S. 914 (1979), *rev'd,* 446 U.S. 719 (1980). The Court, however, never addressed that question, ruling instead that the Supreme Court of Virginia's promulgation and enforcement of rules of governing attorneys' professional conduct were actually legislative functions. Supreme Court of Va. v. Consumers Union, 446 U.S. 719, 731 (1980). Applying the rationale from *Tenney,* the Court held that judges are absolutely immune from declaratory or injunctive relief for acts performed in their legislative capacity. Id. at 734 (citing Tenney v. Brandhove, 341 U.S. 367 (1951)).

[68]   104 S. Ct. 1970 (1984). Originally, Judge Burke, who presided at Allen's trial, was named a defendant in the suit. Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available on LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982), *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970 (1984). The district court dismissed the claims against Judge Burke because his involvement in the unconstitutional practices was insignificant. *Id.*

[69]   An injunction is a court order restraining a party from committing or continuing an act which is unjust or injurious to the other party. BLACK'S LAW DICTIONARY 705 (5th ed. 1979) (defining injunctions). The injunction is only available if a complaint cannot be adequately redressed by an action at law. *Id.* Allen had sought injunctive relief to enjoin Magistrate Pulliam from continuing to unlawfully incarcerate alleged offenders of nonincarcerable crimes. Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available on LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982), *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970, 1972-73 (1984). For discussions of the application of injunctive relief, see Harris v. Harvey, 605 F.2d 330, 335 (7th Cir. 1979) (upholding injunction against practice of county judge); Heimback v. Village of Lyons, 597 F.2d 344, 347 (2d Cir. 1979) (upholding injunction against village justice of the peace); Shipp v. Todd, 568 F.2d 133, 134 (9th Cir. 1978) (upholding injunction

under section 1988 against a state court judge who, while acting within proper subject matter jurisdiction, violates the plaintiff's constitutional rights. [70]

Several factors may have influenced the Court in *Pulliam*. Although the civil and constitutional rights abuses that occurred in the Reconstruction South and provided the impetus for the Civil Rights Acts no longer occur with the same blatancy and frequency, [71] *Pulliam* demonstrates that some judicial abuses still occur. Furthermore, in light of the criticisms of the Court's opinions in *Pierson* and *Stump*, [72] and the overwhelming view of the federal courts of appeals that judicial immunity should not be extended to claims for injunctive relief, [73] the Court may have sensed pressure to allow some relief **[*535]** in suits against judges who abuse litigant's civil and constitutional rights.

*A. Proceedings in the Lower Federal Courts*

Police had arrested the plaintiff, Allen, in Culpeper County, Virginia, for allegedly using abusive and insulting language, which is a misdemeanor punishable by a maximum fine of five hundred dollars. [74] At a bond hearing held shortly after Allen's arrest, State Magistrate Pulliam set Allen's bond at two hundred and fifty dollars. [75] When

---

against state clerk). *See also* C. WRIGHT, THE LAW OF THE FEDERAL COURTS § 47, at 277-86 (4th ed. 1983) (discussing prohibitory relief); Nahomd, *Damages and Injunctive Relief Under Section 1983,* 16 URB. L. REV. 201-16 (1984) (discussing criteria for granting injunctive relief).

In granting declaratory relief, a court establishes the legal rights of the parties. *See* BLACK'S LAW DICTIONARY 368 (5th ed. 1979) (defining declaratory relief). The court's declaration of relative rights is binding on the parties in any subsequent action between them. *Id.; see also* 28 U.S.C. § 2201 (1982) (declaratory relief statute). Allen petitioned the court to declare unconstitutional Pulliam's practice of incarcerating alleged offenders of nonincarcerable crimes. Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available on LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982), *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970, 1972-73 (1984). For discussions of declaratory relief, see Lake Carriers Ass'n v. MacMullen, 406 U.S. 498, 502 (1972) (delineating standards for availability of declaratory judgments); Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 230 (1937) (finding Federal Declaratory Judgment Act valid). *See also* C. WRIGHT, *supra,* § 100, at 670-77 (discussing declaratory relief); Hamilton, *Declaratory Judgments -- Theory and Practice,* 64 CHI. B. REC. 136-45 (1982) (discussing considerations in granting declaratory relief).

[70] Pulliam v. Allen, 104 S. Ct. 1970, 1981-82 (1984) (finding that Congress did not intend to insulate state judges from injunctive relief).

[71] *See supra* notes 7-8 (discussing history of Civil Rights Act).

[72] *See supra* note 65 (discussing scholarly criticism of Court after *Pierson* and *Stump*).

[73] *See* In re Justices of Supreme Court of P.R., 695 F.2d 17, 26 (1st Cir. 1982) (judges not absolutely immune from injunctions in appropriate circumstances); Richardson v. Koshiba, 693 F.2d 911, 913 (9th Cir. 1982) (judicial immunity under § 1983 only extends to damages); WXYZ, Inc. v. Hand, 658 F.2d 420, 423 (6th Cir. 1981) (in appropriate circumstances, federal courts may grant declaratory and injunctive relief against state judges); Harris v. Harvey, 605 F.2d 330, 335 (7th Cir. 1979) (doctrine of judicial immunity does not bar injunctive relief), *cert. denied,* 445 U.S. 938 (1980); Heimback v. Village of Lyons, 597 F.2d 344, 347 (2d Cir. 1979) (justice of the peace not immune from suit for injunctive relief); Kelsey v. Fitzgerald, 574 F.2d 443, 444 (8th Cir. 1978) (judicial immunity does not bar injunctive relief); Shippv. Todd, 568 F.2d 133, 134 (9th Cir. 1978) (judicial immunity does not extend to suits for injunctive relief); Timmerman v. Brown, 528 F.2d 811, 814 (4th Cir. 1975) (state magistrate not immune from equitable or declaratory relief), *rev'd on other grounds sub nom.* Leeke v. Timmerman, 454 U.S. 83 (1981); *cf.* Slavin v. Curry, 574 F.2d 1256, 1264 (5th Cir.) (prosecutors not immune from actions for equitable relief), *vacated as moot,* 583 F.2d 779 (5th Cir. 1978).

[74] *See* Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available on LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982), *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970 (1984); *see also* VA. CODE § 18.2-416 (1982) (describing circumstances under which use of abusive language is considered a misdemeanor); *id.* § 18.2-11(c) ($ 500 maximum penalty for abusive language misdemeanor).

Allen was unable to pay the bond, Pulliam incarcerated Allen in the Culpeper County jail, where he remained for fourteen days until his trial.   [76] Police had arrested the plaintiff-intervenor, Nicholson,   [77] four times during a two-month period for allegedly being drunk in public, which is a misdemeanor punishable by a maximum fine of one hundred dollars.   [78] At hearings before magistrates after each of Nicholson's arrests, at least one of which was before Magistrate Pulliam, the magistrates incarcerated Nicholson for periods of two-to-six days solely because he was unable to pay a thirty-dollar bond.   [79]

  [*536]   Allen brought suit in federal district court seeking injunctive and declaratory relief under section 1983 against Magistrate Pulliam's practice of incarcerating individuals awaiting trial for nonincarcerable offenses.   [80]

---

[75]   Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available on LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982), *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970 (1984).

[76]   *See id.*

[77]   The district court granted Nicholson's motion to intervene in Allen's suit as a party plaintiff.   *See* Allen v. Burke, 690 F.2d 376, 377 n.4 (4th Cir. 1982), *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970 (1984).

[78]   *See id.; see also* VA. CODE § 18.2-388 (1982) (providing that public drunkenness is a misdemeanor); *id.* § 18.2-11(d) (maximum penalty for public drunkenness is $ 100 fine).

[79]   *See* Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available on LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982), *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970 (1984). A Virginia Assistant Attorney General, arguing the case for Magistrate Pulliam, claimed that state law authorized an arresting officer to hold in custody "any person reasonably believed to be likely to cause harm to himself or to any other person." *Id.; see* VA. CODE § 19.2-74 (1982).  Although the statute applied to those arrested for public drunkeness, the district court noted that once a drunk was sober, the statute was no longer valid towards that person.  Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available on LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982), *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970 (1984). The court concluded that Nicholson's incarcerations were invalid because periods between two and six days were more than enough time to presume Nicholson had become sober. *Id.*

[80]   Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available on LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982), *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970 (1984).

Allen asserted that Pulliam had violated his sixth amendment, [81] eighth amendment, [82] and fourteenth amendment [83] rights under the Constitution.

The United States District Court for the Eastern District of Virginia found that Magistrate Pulliam's practice of incarcerating persons for nonincarcerable offenses based solely on their failure to pay a bond violated the

---

[81]  U.S. CONST. amend. VI.  The amendment reads, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . to be informed of the nature and cause of the accusation . . . and to have the Assistance of Counsel for his defense." *Id.* Allen claimed, in the district court, that the magistrate violated his sixth amendment rights because he was not advised of his rights, and the court did not appoint counsel at any time while he was in jail.  Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available of LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982),  *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970 (1984). Allen also argued that his incarceration violated state law.  *See* VA. CODE § 19.2-158 (1982).  The Virginia statute requires that an accused who is incarcerated awaiting trial for a jailable offense be brought before the trial judge on the first day in which the judge is sitting after the accused is incarcerated.  *Id.* In Allen's case, the appropriate judge sat in Culpeper County seven days prior to the time Allen was actually brought before him.  Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available on LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982),  *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970 (1984). Allen argued that the state's failure to adhere to the statute violated the speedy trial clause of the sixth amendment.  *Id.* Allen's argument regarding the statute was misplaced, however, because Allen was incarcerated for a nonincarcerable offense.  The statute only refers to incarcerable offenses.  *See* VA. CODE § 19.2-158 (1982) (stating conditions under which police may jail person for nonjailable offense).

[82]  U.S. CONST. amend. VIII.  The amendment reads, in pertinent part: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." *Id.* Allen argued that Pulliam's practice of setting bond and jailing persons for nonincarcerable offenses violated the eighth amendment prohibition against excessive bail, and cruel and unusual punishment.  Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available on LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982),  *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970 (1984).

[83]  U.S. CONST. amend. XIV.  The amendment reads, in pertinent part: "No state shall deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." *Id.* Allen argued in the district court that Pulliam's practice of incarcerating defendants for nonincarcerable offenses violated the due process clause and the equal protection clause of the fourteenth amendment.  *See* Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available on LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982),  *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970 (1984).

individuals' fourteenth amendment rights of due process and equal protection. [84] Pursuant to section 1983, the district **[\*537]** court enjoined Magistrate Pulliam from continuing this practice. [85]

Subsequently, Allen filed a request for attorney's fees pursuant to section 1988, which authorizes a court to award reasonable attorney's fees when equitable relief is properly awarded under section 1983. [86] The district court granted Allen's fee request and awarded Allen attorney's fees totaling seven thousand and thirty-eight dollars. [87] Magistrate Pulliam appealed the district court's award of attorney's fees on the ground that as a judicial officer she was absolutely immune from such awards. [88]

The United States Court of Appeals for the Fourth Circuit, however, affirmed the district court's order and award of attorney's fees. [89] Relying on its own precedent, the court stated that judicial immunity does not extend to the award of injunctive and declaratory relief against judicial officers under section 1983. [90] After examining the legislative history, the court held that a prevailing party may recover **[\*538]** costs against a judicial officer under section 1988 if the award of injunctive relief against that official is proper. [91] Because the district court properly

---

[84] Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available on LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982), *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970 (1984). Because the district court found the fourteenth amendment due process and equal protection claims dispositive, it did not discuss the sixth or eighth amendment claims. *Id.* The district court held that one of the most basic constitutional guarantees is freedom from bodily restraint and punishment without due process by the state. *Id.; see* Parham v. J.R., 442 U.S. 584, 600 (1979) (recognizing substantial liberty interest in unnecessary confinement); Ingraham v. Wright, 430 U.S. 651 (1977) (holding freedom from bodily restraint within liberty interest and historically protected from state deprivation without due process of law). The district court found that subjecting a potentially innocent pretrial detainee to greater punishment than he would receive if found guilty, solely because of an inability to pay a bond, was offensive to the basic notion of fairness and to constitutional due process rights. Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available on LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982), *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970 (1984).

The district court also found that Magistrate Pulliam's practice of pretrial incarceration violated the equal protection clause. *Id.; see* Tate v. Short, 401 U.S. 395, 397 (1971) (holding state practice of converting indigents' menial fines into short imprisonment is violative of equal protection); Williams v. Illinois, 399 U.S. 235, 241-42 (1970) (holding that fourteenth amendment requires statutory ceiling on punishment for substantive offense to be same for all defendants irrespective of their economic status). Thus, incarcerating Allen solely on his inability to pay the bond violated his right to equal protection.

[85] Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available on LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982), *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970 (1984). The district court found that in a five-month period, beginning three months prior to the time of Allen's arrest, at least 49 persons arrested for alleged violations of misdemeanors, similar to the ones Allen and Nicholson committed, were required to post a cash bond. *Id.* In the same five-month period, at least 34 of those persons were incarcerated for their noncarcerable offenses for at least one day or night while awaiting trial, solely because of their inability to meet bond. *Id.*

[86] *See* Allen v. Burke, 690 F.2d 376, 378 (4th Cir. 1982) (summarizing district court findings), *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970 (1984); *see also* 42 U.S.C. § 1988 (1982).

[87] *See* Allen v. Burke, 690 F.2d 376, 378 (4th Cir. 1982) (summarizing district court findings), *aff'd sub nom.* Pulliam v. Allen, 104 S. Ct. 1970 (1984).

[88] Magistrate Pulliam originally filed an objection to the fee request with the district court on the ground that Allen's attorney's hourly rate was excessive and that work had been charged on the sixth and eighth amendment issues, which the court never reached. *Id.* The district court, however, found the fee request proper and reasonable. *Id.* The court also noted that the attorney took Allen's case on a contingency basis, which weighed against any decrease in the "modest" request. *Id.*

[89] Id. at 377.

[90] Id. at 378 (citing Timmerman v. Brown, 528 F.2d 811, 814 (4th Cir. 1975) (finding that judicial immunity protects qualified defendants only from claims for money damages), *rev'd on other grounds sub nom.* Leeke v. Timmerman, 454 U.S. 83 (1981)); *see supra* note 73 (citing other courts of appeals denying judicial immunity from injunctive relief).

awarded injunctive relief against Magistrate Pulliam, the Fourth Circuit held that Allen was entitled to attorney's fees. [92]

*B. Proceedings in the Supreme Court*

The Supreme Court granted certiorari in *Pulliam v. Allen* to determine whether judicial immunity bars the award of attorney's fees pursuant to section 1988 against a member of the judiciary acting in her official capacity. [93] Prior to

---

[91]   Allen v. Burke, 690 F.2d 376, 379 (4th Cir. 1982),  *aff'd sub nom.*  Pulliam v. Allen, 104 S. Ct. 1970 (1984);  *see* H.R. REP. NO. 1558, 94th Cong., 2d Sess. 9 (1976) (awarding counsel fees to prevailing plaintiffs in § 1983 litigation is particularly important to protect federal civil and constitutional rights because immunity doctrines and special defenses may preclude or severely limit damage remedy in cases against public officials); *see also*  Supreme Court of Va. v. Consumers Union, 446 U.S. 719, 738-39 (1980) (awarding attorney's fees against official when prospective relief properly granted); Morrison v. Ayoub, 627 F.2d 669, 672-73 (3d Cir. 1980) (holding that doctrine of judicial immunity does not bar recovery of attorney's fees by prevailing party under § 1988 from judicial officers acting in their judicial capacity), *cert. denied,*  449 U.S. 1102 (1981);  Entertainment Concepts, Inc., III v. Maciejewski, 631 F.2d 497, 507 (7th Cir. 1980) (finding that Congress intended to abrogate judicial immunity in § 1988 suits), *cert. denied,*  450 U.S. 919 (1981).

[92]   Allen v. Burke, 690 F.2d 376, 380 (4th Cir. 1982),  *aff'd sub nom.*  Pulliam v. Allen, 104 S. Ct. 1970 (1984).

[93]   Pulliam v. Allen, 104 S. Ct. 1970, 1974 (1984).

reaching this question, however, the court had to determine whether a judicial officer acting in her judicial capacity is immune from claims seeking equitable relief under section 1983. [94]

[*539] Believing that common-law judicial immunity was incorporated into the American judicial system, Justice Blackmun began the majority opinion by examining the English common law to discern whether common-law judicial immunity barred injunctive relief against judges. [95] Although injunctions against judges were unknown at common law, [96] Justice Blackmun paralleled the use of such injunctions with the use of the King's prerogative

—————————————————

[94]   Id. Attorney's fees under § 1988 may only be granted when relief has been properly granted against state officials under § 1983.  42 U.S.C. § 1988 (1982). Therefore, if injunctive relief could not have been properly granted against Magistrate Pulliam, Allen would not have been entitled to attorney's fees.

Prior to discussing Justice Blackmun's opinion in Pulliam, it should be noted that because of the result in City of Los Angeles v. Lyons, 461 U.S. 95 (1983), Allen and Nicholson should not have had standing to sue Magistrate Pulliam in the first place.  In Lyons Los Angeles police stopped complainant Lyons for a routine traffic violation.  Id. at 97. Without provocation, the police applied a chokehold on Lyons, rendering Lyons unconscious and damaging his larynx.  Id. at 97-98. Lyons sought a permanent injunction against the city barring the use of the chokeholds and declaratory relief against the city declaring the use of the chokeholds absent the threat of immediate use of deadly force a per se violation of various constitutional rights. Id. at 97.

The Supreme Court held that Lyons had failed to demonstrate a case or controversy against the city.  Id. at 105. Lyons's standing to sue for injunctive relief depended on whether he was likely to suffer future injury from the use of chokeholds by police officers.  Id. at 105-06. Although Lyons had already been a victim of illegal state action, there was no "real and immediate" threat that he would be stopped for a traffic or other violation that again would result in a nonprovoked chokehold. Id. at 104-10. The Court held that an equitable remedy is unavailable absent a showing of irreparable injury or immediate threat that the plaintiff would be harmed again in the future.  Id. at 111-13.

The federal courts of appeals have consistently followed Lyons.  See, e.g.,  Curtiss v. City of New Haven, 726 F.2d 65, 69 (2d Cir. 1984) (no standing to sue police to enjoin use of mace absent evidence the plaintiff will be victim of practice in the future); Carter v. Orleans Parish Public Schools, 725 F.2d 261, 263 (5th Cir. 1984) (no standing to sue school board to enjoin unwarranted practice of placing students in class for mentally handicapped absent evidence that children will be wrongly placed in future); Dudley v. Stewart, 724 F.2d 1493, 1496 (11th Cir. 1984) (no standing to sue county jail officials to enjoin illegal solitary confinement without evidence that plaintiff will be incarcerated again in county jail and subject to illegal confinement); Buie v. James, 717 F.2d 925, 928 (4th Cir. 1983) (no standing to sue county jail official for visiting rights absent evidence that plaintiff will likely be arrested again and placed in county jail); Munoz-Mendoza v. Pierce, 711 F.2d 421, 426 (1st Cir. 1983) (no standing to sue HUD for injunction to stop allocation of money to city absent evidence that HUD action will lead to immediate rent increase); cf.  Davis v. Page, 714 F.2d 512, 518 (5th Cir. 1983) (Tjoflat, J., concurring) (arguing that appellant had no standing to sue state official for injunction absent evidence that counsel for indigent would not be properly appointed again).

Whether Allen will again be charged with using abusive language is only speculation because Allen was acquitted of a crime with which he had never before been charged.  See  City of Los Angeles v. Lyons, 461 U.S. 95, 107 (1983) (holding similar speculation insufficient ground for standing to seek injunctive or declaratory relief).  The likelihood that Nicholson will again be brought in front of Magistrate Pulliam, charged with public drunkenness, and face immediate threat of unconstitutional incarceration is much greater.  Nicholson had been arrested four times for public drunkenness within a four-month period.  See Pulliam v. Allen, 104 S. Ct. 1970, 1972 (1984). The assumption that Nicholson will be arrested again, however, is inimical to the American criminal justice notion of innocent until proven guilty.  See Ross v. Reed, 719 F.2d 689, 694 (1983) (noting that legal justice system assumes that defendant will be law-abiding citizen in future).  The Court, therefore, also should have considered Nicholson's claim too speculative to establish standing to sue.

The reasons for hearing Pulliam in light of Lyons is unclear, particularly because the Supreme Court itself cited Lyons for the proposition that claims for injunctive relief against unconstitutional state practices are too speculative.  Pulliam v. Allen, 104 S. Ct. 1970, 1979 n.18 (1984). For a discussion of possible influences on the Court leading it to hear the case, see supra notes 71-73 and accompanying text.

[95]   Pulliam v. Allen, 104 S. Ct. 1970, 1974 (1984) (noting prior cases assumed common law principles of legislative and judicial immunity were incorporated into American judicial system) (citing Tenney v. Brandhove, 341 U.S. 367, 372-78 (1951);  Pierson v. Ray, 386 U.S. 547, 554-55 (1967)).

writs. [97] The **[\*540]** Court found that the most analogous writs to Allen's case were the writ of prohibition and the writ of mandamus, both of which the King's Bench issued against inferior and rival judges to prevent those judges from either exceeding their authority or failing to exercise it. [98]

The relationship between the King's Bench and the inferior courts of England is not quite parallel to the relationship in the American judicial system between federal and state courts. [99] The King's Bench's use of the prerogative writs, nevertheless, was relevant to the federal courts exercise of similar control over state courts because

---

[96]   See 2 J. STORY, COMMENTARIES ON EQUITY JURISDICTION § 1195 (14th ed. 1918).  The writ of injunction was not directed at courts, but rather at the parties before a court.  This is really a legal fiction, however, because the ultimate effect of the injunction was to enjoin the judge from hearing the case.

[97]   Pulliam v. Allen, 104 S. Ct. 1970, 1974-75 (1984). In English law, prerogative writs involved a direct governmental interference with the liberty and property of the subject.  See 1 W. HOLDSWORTH, supra note 21, at 228 (7th ed. 1956) (discussing King's Bench's use of writs of prohibition to assert control over officials and individuals); supra notes 21-23 and accompanying text (discussing prerogative writs).  It was necessary, therefore, to show proper cause to justify the exercise of such extraordinary power by the crown. Id. In the United States prerogative writs are known as extraordinary writs and are used in only limited circumstances.  BLACK'S LAW DICTIONARY 1064 (5th ed. 1979).  These writs include mandamus, id. (superior court confining lower court to lawful exercise of jurisdiction); procedendo, id. (superior court commanding inferior court to give judgment); prohibition, id. (superior court prohibiting inferior court from exceeding jurisdiction); quo warranto, id. (commanding defendant to show authority for actions); habeas corpus, id. (commanding official to show legality of detention or imprisonment of person); and certiorari, id. (superior court commanding records of inferior court for inspection).  See generally 1 W. HOLDSWORTH, supra note 21, at 226-231 (7th ed. 1956) (discussing origin of prerogative writs); R. POUND, APPELLATE PROCEDURE IN CIVIL CASES 61 (1941).

[98]   Pulliam v. Allen, 104 S. Ct. 1970, 1976 (1984). At common law, the King's Bench used the writs of prohibition and mandamus to prohibit inferior judges from acting beyond their subject matter jurisdiction, rejecting legal evidence, and misconstruing substantive law.  See 1 HALSBURY'S LAWS OF ENGLAND 81 (4th ed. 1973) (discussing scope of prohibition and mandamus orders).  The writ of prohibition was used more often than the writ of mandamus to control inferior courts.  Id.; see also 3 W. BLACKSTONE, COMMENTARIES *112-*113 (Bancroft-Whitney ed. 1916) (discussing use of writ of prohibition).  In Pulliam the Court observed that the King's Bench issued prerogative writs not only to prevent judges from exceeding their authority, but also to prevent an inferior court's mischief or misconstruction of an Act of Parliament.  Pulliam v. Allen, 104 S. Ct. 1970, 1977 (1984) (citing Shatter v. Friend, 89 Eng. Rep. 510, 512 (K.B. 1691) (writ of prohibition issued to ecclesiastical court prohibiting lower court from disallowing certain evidence); In re Hill, 10 Ex. 726, 730-31 (1855) (writ of prohibition issued to prevent judge from proceeding in case in which judge had sua sponte amended claim to an amount within his jurisdiction); King v. Emerson, 2 Ir. R. 377, 380 (1912) (writ of prohibition issued to prevent justice of peace from taking deposition because of possible bias in favor of Crown)).  See generally 1 HALSBURY'S LAWS OF ENGLAND, supra, PP76, 81, 130 (discussing various uses of prerogative writs).

American courts use writs of prohibition and mandamus only for the writs' original and limited purpose of controlling inferior judges' proper exercise of jurisdiction.  See  28 U.S.C. § 1361 (establishing original jurisdiction of district court to issue mandamus to compel official to act); id. § 1651 (authorizing courts to issue all writs necessary or appropriate in aid of their respective jurisdiction); see also  Pulliam v. Allen, 104 S. Ct. 1970, 1985-86 (1984) (Powell, J., dissenting) (American courts rejected English courts' expanding use of prerogative writs at common law); Will v. United States, 389 U.S. 90, 103-04 (1967) (writ of mandamus not used to control decision of trial court but merely to confine lower court to sphere of its discretionary power); Bankers Life & Cas. Co. v. Holland, 346 U.S. 379, 382-83 (1953) (writ of mandamus should be used only in exceptional case of clear abuse of power or usurpation of judicial power beyond judge's prescribed jurisdiction); Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 26 (1943) (writ of mandamus in common-law and federal courts traditionally used to confine an inferior court to a lawful exercise of its prescribed jurisdiction).

Allen made no allegation at any stage of the proceedings that Magistrate Pulliam acted outside her authorized jurisdiction.  See Pulliam v. Allen, 104 S. Ct. 1970, 1985 (1984). Thus an injunction against Pulliam based on an analogy to the King's Bench's use of common-law writs of prohibition or mandamus would be improper due to the limited use of that writ in American courts. For a discussion of the policy supporting the grant of injunctive relief, see infra note 101.

[99]   Pulliam v. Allen, 104 S. Ct. 1970, 1978 (1984).

American courts have relied so heavily on the common law in shaping their immunity doctrine. [100] The Court observed **[\*541]** that the use of the King's prerogative writs demonstrated that injunctive relief was available against judges in exceptional cases despite common-law judicial immunity. [101] The Court concluded that the practice of American courts was fully consistent with the common law because American courts had never adopted a rule of absolute judicial immunity from injunctive relief against judges acting in their judicial capacity. [102]

**[\*542]**  The majority opinion then addressed the concern that the risk of vexatious litigation justifies absolute judicial immunity from suits against judges.  The Court dismissed that concern as inapplicable to injunctive relief against judges. [103] The Court stated that the limitations on the availability of injunctive relief requiring the plaintiff

---

[100]  *Id.* The Court contended that despite the limited use of prerogative writs America, the King's Bench's control over rival and inferior judges through the writs w "highly relevant" to federal courts' use of injunctive relief in limiting the judicial immunity doctrine in America.  *Id.* Equating American courts' use of injunctive relief against judges to English courts' broad use of prerogative writs, however, raises problems with regard to American rules for injunctions.  A federal court can issue injunctive relief only upon a showing of an inadequate remedy at law and a serious risk of irreparable harm.  *See* Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959) (basis for injunctive relief in federal courts has always been irreparable harm and inadequacy of legal remedy).  State courts, however, provide an adequate remedy at law in the form of appeal for all the purposes for which the King's Bench issued prerogative writs.  The relevance of the English common-law use of the prerogative writs to American courts' use of injunctions, therefore, is inappropriate and irrelevant.

[101]  Arguments in favor of judicial immunity stress that ample alternative remedies to judicial liability are available, including appellate review, the ballot box for elected judges, and in extraordinary circumstances, impeachment.  *See, e.g.,*  Pulliam v. Allen, 104 S. Ct. 1970, 1987 n.13 (1984) (Powell, J., dissenting) (suggesting writ of habeas corpus or appellate review of unreasonable bail as remedies for unlawful detention); Stump v. Sparkman, 435 U.S. 349, 370 (1978) (Powell, J., dissenting) (observing that existence of alternative remedies to vindicate private rights weighs in favor of judicial immunity); Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 354 (1871) (noting that law has provided aggrieved parties numerous alternative remedies to judicial liability to which aggrieved must resort); AMERICAN JUDICATURE SOCIETY, *Judicial Conduct Organizations: Governing Provisions* (2d ed. 1982) (stating that all 50 states, District of Columbia, and federal government have intrajudiciary procedures for receiving, investigating, and adjudicating complaints against judges); *see also* I. BRANT, IMPEACHMENT: TRIALS AND ERRORS 178-200 (1972) (discussing constitutional support for impeachment of federal judges); P. DUBOIS, FROM BALLOT TO BENCH: JUDICIAL ELECTIONS AND THE QUEST FOR ACCOUNTABILITY 95-100 (1980) (discussing effects of electoral process on judicial accountability); Feinman & Cohen, *supra* note 24, at 266 (discussing alternative remedies).

Magistrate Pulliam suggested that Allen could have appealed the magistrate's bail determination in the Virginia courts.  Pulliam v. Allen, 104 S. Ct. 1970, 1981 n.22 (1984). Alternatively, Magistrate Pulliam argued that Allen could have sought state and eventually federal habeas corpus relief.  Brief for Petitioner at 3 n.2, Pulliam v. Allen, 104 S. Ct. 1970 (1984);  *see* VA. CODE § 8.01-654 (1984) (establishing state procedure for habeas corpus relief); 28 U.S.C. § 2254 (1982) (establishing federal procedure for habeas corpus relief).  The Court never reached the issue of alternative remedies, although in a footnote it averred to the likely impossibility of such remedies as applied to Allen and Nicholson.  Pulliam v. Allen, 104 S. Ct. 1970, 1981 n.22 (1984). The magistrate had not appointed counsel for either Allen or Nicholson, nor did the defendants receive advice of their other rights.  Brief for Respondant at 2, Pulliam v. Allen, 104 S. Ct. 1970 (1984). In addition, the brief nature of their prison stays realistically precluded the possibility of review on appeal.  *See*  Gerstein v. Pugh, 420 U.S. 103, 110 n.11 (1975) (noting that temporariness of detention renders pretrial ruling on constitutional claims unlikely).  Although technically available, the unrealistic nature of alternative remedies in *Pulliam* supported Justice Blackmun's affirmation of equitable relief.

[102]  Pulliam v. Allen, 104 S. Ct. 1970, 1978 (1984);  *cf.*  Supreme Court of Va. v. Consumers Union, 446 U.S. 719, 736 (1980) (holding judges immune from suits for damages and prospective relief while acting in a legislative capacity); Stump v. Sparkman, 435 U.S. 349, 364 (1978) (holding judges immune from suit for damages while acting in judicial capacity); Pierson v. Ray, 386 U.S. 547, 553 (1967) (holding judges immune from suit for damages while acting in judicial capacity); Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 356 (1871) (holding judges immune from suit for damages while acting in judicial capacity); Randall v. Bringham, 74 U.S. (7 Wall.) 523, 524 (1868) (holding judges immune from suit for damages while acting in judicial capacity).

[103]  Pulliam v. Allen, 104 S. Ct. 1970, 1978-81 (1984). The majority opinion failed to adequately address this concern.  Justice Powell argued in the dissent that judges would be required to defend their judicial acts against continuous and vexatious litigation.  *See* id. at 1982 (Powell, J., dissenting).  Justice Blackmun's majority opinion stated that injunctive relief against judges

to show the lack of an adequate remedy at law and a serious risk of irreparable harm [104] were sufficient to curb the threat to judges of continuous and harassing suits by disgruntled litigants. [105]

The Court next addressed the concern that by allowing federal judges to grant injunctive relief against state judges under section 1983, such actions would be inconsistent with the doctrines of comity and federalism. [106] The Court

---

raises concerns different from those raised by damage awards against judges. Id. at 1978. Justice Powell, however, was concerned with the number and not the type of suits that would be brought. Id. at 1988 (Powell, J., dissenting). Because a judge's burden in having to defend a suit is the same regardless of whether the suit seeks damages or injunctive relief, both actions will equally harass the judiciary. See id. at 1982 (Powell, J., dissenting); see also Taaffe v. Downes, 13 Eng. Rep. 15, 18 (1813) (action against judge is tantamount to action against independence of judiciary regardless of relief sought).

[104]  See Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959) (noting that basis of injunctive relief in federal courts is usually irreparable harm and inadequacy of legal remedy).

[105]  See Pulliam v. Allen, 104 S. Ct. 1970, 1978-79 (1984). The majority believed that the requirements for injunctive relief would reduce the risk of continuous and vexatious suits against judges. Id. at 1978-79. The likely unwillingness on the part of attorneys to participate in frivolous actions that may have the effect of alienating judges and colleagues also lessens the risk of a flood of suits against judges. See Feinman & Cohen, supra note 24, at 268 (discussing factors limiting likelihood of frivolous suits). By granting appropriate motions for summary judgment and motions to dismiss, courts will ensure that frivolous lawsuits will not harass government officials. See FED. R. CIV. P. 12(b) (motions to dismiss); id. at 56 (summary judgment); see also Butz v. Economou, 438 U.S. 478, 507-08 (1978) (noting that proper use of Federal Rules protects against harassment). Further, the Court has stated that a concern for judicial economy alone should not deny a litigant protection of his constitutional rights. See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 411 (1971) (Harlan, J., concurring).

Furthermore, a good faith exemption to provide some protection from vexatious suits against judges should be created. A fair standard would allow plaintiffs to bring suit only against judges who had knowingly, intentionally, or repeatedly violated litigants' civil rights. Judges who commit civil rights violations due to misunderstanding or ignorance of the law, but in good faith sought to correct their errors, should be exempt from prosecution. Repeated violations of civil rights also may be the result of ignorance of the law, but should warrant injunctive relief against the judge to prevent further abusive acts. Even with a good faith standard, suit against Magistrate Pulliam was proper. Although Allen's suit served to inform Magistrate Pulliam of possible civil rights violations, she continued her unconstitutional practice. Allen v. Burke, 690 F.2d 376, 377 n.4 (4th Cir. 1982) (Nicholson incarcerated once following filing of Allen's suit), aff'd sub nom. Pulliam v. Allen, 104 S. Ct. 1970 (1984). Magistrate Pulliam's repeated violations also justified Allen's suit against the magistrate. See supra note 85 (discussing number of Magistrate Pulliam's unconstitutional incarceration orders).

[106]  See Pulliam v. Allen, 104 S. Ct. 1970, 1981 (1984). A federal court issuing an injunction against a state court officer when an adequate remedy at law exists in that state's courts would create needless conflict with the state's administration of its own affairs and thus violate the federalism and comity doctrines. Federalism is the principle that divides governmental authority between the federal government and the state governments. See R. LEACH, AMERICAN FEDERALISM 26-27 (1970) (discussing how federalist principles mandate division of power between federal and state authorities). The federal government is delegated authority through the Constitution and the powers not delegated to it are reserved for the states or the people. See U.S. CONST. amend. X. See generally R. LEACH, supra, at 26-27 (discussing rationale behind doctrine of federalism); Note, The Extension of Comity: Fair Assessment in Real Estate Ass'n v. McNary, 32 AM. U.L. REV. 1123, 1123-24 (1983) (discussing rationale behind doctrine of federalism). Comity is the principle under which one jurisdiction gives affect to the decisions of another jurisdiction, not as an obligation but out of deference to the other jurisdiction. See Note, supra, at 1125. Comity favors the abstention of federal courts from hearing certain controversies. Id. Generally, federal courts recognize four primary abstention doctrines. See 17 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4241 (1978) (discussing abstention doctrines) [hereinafter cited as WRIGHT]. First, federal courts avoid deciding federal constitutional questions in cases that may be disposed of on questions of state law. See 17 WRIGHT, supra, § 4241, at 433-34; Note, supra, at 1125. Federal courts also avoid needless conflicts with a state's administration of its own affairs. See 17 WRIGHT, supra, § 4241, at 433; Note, supra, at 1125. Third, federal courts leave unsettled questions of state law to the states for resolution. See 17 WRIGHT, supra, § 4241, at 448-49; Note, supra, at 1125. Finally, federal courts abstain from cases to avoid duplicative litigation. See 17 WRIGHT, supra, § 4241, at 452; Note, supra, at 1125; see also Colorado River Conserv. Dist. v. United States, 424 U.S. 800, 814-17 (1976) (discussing appropriate circumstances in which federal courts may abstain from hearing cases).

stated, however, that comity and **[\*543]** federalism do not abridge a federal court's authority to stay allegedly unconstitutional state court proceedings. [107]

In reviewing its previous interpretations of the legislative history of section 1983, the Court reaffirmed its view that Congress intended section 1983 to reach unconstitutional actions by all state actors, including judges. [108] The purpose of section 1983 was to interpose the federal courts between the states and the people in order to protect citizens' federal rights from unconstitutional state actions, whether by the executive, the legislature, or the judiciary. [109] **[\*544]** The Court stated that nothing in section 1983 suggests that Congress intended to insulate state judges completely from federal review of their actions. [110] Accordingly, the Court held that judicial immunity is not a bar to injunctive relief under section 1983 against judicial officers acting in their judicial capacity. [111]

The Court then addressed the question of whether judicial immunity is a bar to the award of attorney's fees pursuant to section 1988. [112] Magistrate Pulliam argued that attorney's fees were the functional equivalent of monetary damages, which harbor a chilling effect on judicial independence. [113] In rejecting Magistrate Pulliam's argument, the Court held that the legislative history of section 1988 indicates Congress' clear intent to permit courts to award attorney's fees against state officials even if immunity doctrines that are available to those same officials

---

[107] Pulliam v. Allen, 104 S. Ct. 1970, 1981 (1984);  *see*  Mitchum v. Foster, 407 U.S. 225 (1972) (recognizing restraining principles of comity and federalism on the federal judiciary).  In *Mitchum* the Court held that a federal judge granting an injunction against a state judge under § 1983 to stay allegedly unconstitutional court proceedings did not exceed federal authority.  Id. at 243. The Court in *Pulliam* saw no need to abridge the holding in *Mitchum* on judicial immunity grounds.  *See* Pulliam v. Allen, 104 S. Ct. 1970, 1980 (1984).

Furthermore, the federal court's issuance of an injunction against Magistrate Pulliam did not create a comity problem.  First, the case could not have been disposed of on questions of state law because Allen's § 1983 suit did not involve any questions of state law.  *See*  Pulliam v. Allen, 104 S. Ct. 1970, 1972 (1984). Second, no needless federal action conflicted with the state's administration of its own affairs because the state court had already fully litigated Allen's and Nicholson's criminal violations.  *Id.* Third, the Court was not left with unsettled questions of state law to resolve.  *Id.* Fourth, the federal litigation did not duplicate the proceedings of the state courts because the state court proceedings dealt with the misdemeanor charges and the federal court proceedings dealt with the alleged civil rights violations.  *Id.* A case in which a state judge violates both federal and state statutes, and a federal court intervenes prior to resolution of the state issue, however, will raise the issue of comity.

[108] Pulliam v. Allen, 104 S. Ct. 1970, 1982 (1984). The majority opinion refuted the dissent's claim that the doctrine of absolute judicial immunity for all acts performed within a judge's jurisdiction was solidly supported by common-law precedent.  *Id.* In fact, the legislative history of § 1983 and the case law indicate that Congress intended to reach all state actors who commit unconstitutional violations of individuals' civil rights.  *See infra* note 109.

[109] *See, e.g.,* CONG. GLOBE, 42nd Cong., 1st Sess. 374 (1871) (statement of Rep. Lowe during debates on Civil Rights Act of 1871) (because no evidence in records of state tribunals for effective redress of federally secured rights exists, Civil Rights Act should afford adequate remedy); *id.* at 653 (statement of Sen. Osborne) (state courts incompetent to suppress local disorders, or maintain law and order).  Cases interpreting the legislative history have held that Congress enacted § 1983 to provide an independent means to protect civil rights.  *See*  Mitchum v. Foster, 407 U.S. 225, 240 (1972) (finding that through § 1983 Congress intended federal courts to protect people's federal rights from unconstitutional action under color of state law whether by executive, legislative, or judicial actors); Ex parte Virginia, 100 U.S. 339, 347 (1879) (holding that neither state executive, legislative, nor judicial actors shall deny equal protection of laws to any person within state jurisdiction); *see also*  Pierson v. Ray, 386 U.S. 547, 558-64 (1967) (Douglas, J., dissenting) (concluding that every member of Congress who addressed issue during legislative debates assumed judges would be liable under § 1983).

[110] Pulliam v. Allen, 104 S. Ct. 1970, 1981 (1984).

[111] *Id.*

[112] Id. at 1981-82.

[113] Id. at 1981.

would bar any award of monetary damages. [114] The Court concluded that judicial immunity does not bar a court's award of attorney's fees against a state judge under section **[*545]** 1988. [115]

Nearly four hundred years ago Lord Coke raised the argument that subjecting judges to suits within the public eye and subjecting them to the punitive act of paying damages would severely erode public confidence in the judiciary. [116] By striking a balance between absolute judicial immunity from damages and judicial liability for injunctive relief and attorney's fees, the Court in *Pulliam* managed to protect judges from the degradation of stature that might result from damage payments. [117] At the same time, the Court's affirmation of the injunction and award of attorney's fees against Magistrate Pulliam puts state judges on notice that unconstitutional judicial acts will require compensation for the expense of bringing suit to those whose rights they have violated. [118] The decision in *Pulliam* has also reinforced the public's belief that the judiciary can and will hold its own wrongdoers accountable for their conduct.

III.  EFFECTS OF *PULLIAM V. ALLEN* ON THE FEDERAL JUDICIARY

*Pulliam* held that federal courts may grant injunctive relief under section 1983 against state court judges who abuse plaintiffs' federal civil rights, but left unanswered whether this result should also apply to federal judges committing

---

114  Id. at 1981-82. The majority opinion gave only cursory treatment to the issue of attorney's fees. *Id.* Although, as the majority contended, the legislative history of § 1988 demonstrates Congress' plain intent that attorney's fees should be available, the statutory language of § 1988 states in clear and unambiguous language that courts have discretion to award attorney's fees in § 1983 actions.  *See*  42 U.S.C. § 1988 (1982) (court may allow reasonable attorney's fees in its discretion); *see also* 1 M. DERFNER & A. WOLF, COURT AWARDED ATTORNEY FEES § 7.04[3] (1983) (attorney's fees not automatically assessed under § 1988 against state actor liable for violation of federal civil rights).  Tenets of statutory construction provide that the statute's language is the starting point for interpreting congressional intent.  *See* 2A D. SANDS, SUTHERLAND STATUTORY CONSTRUCTION §§ 45.01-.15 (4th rev. ed. 1984); *cf.* Crane v. Commissioner, 331 U.S. 1, 6 (1947) (statutory words should be interpreted where possible in their ordinary, everyday sense).  Justice Blackmun, therefore, should have given the district court's award of attorney's fees to Allen a fuller discussion.  The majority also failed to address the dissent's contention that allowing fees against judges under § 1988 would lead to "geometrically" increased suits against judges. *See* Pulliam v. Allen, 104 S. Ct. 1970, 1988 (1984) (Powell, J., dissenting).  The dissent claimed that with the lure of substantial fees following § 1983 suits, lawyers will not be reluctant to press suits against judges, thus posing a serious threat to judicial independence through harassing litigation. Id. at 1988-89 (Powell, J., dissenting).

115  Id. at 1982. The Court never disputed that the award of monetary damages was prohibited by the doctrine of judicial immunity. Id. at 1982; *see* Supreme Court of Va. v. Consumers Union, 446 U.S. 719, 734-35 (1980) (holding judges defending against § 1983 actions absolutely immune from damages); Stump v. Sparkman, 435 U.S. 349, 364 (1978) (holding judges acting within jurisdiction absolutely immune from damages); Pierson v. Ray, 386 U.S. 547, 554 (1967) (holding judges absolutely immune from damages for acts committed within their jurisdiction); Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 347 (1871) (holding judges exempt from civil liability for their judicial acts).  The Court had stated prior to *Pulliam* that attorney's fees are the functional equivalent of monetary damages.  *See* Hutto v. Finney, 437 U.S. 678, 691 (1978) (fee award served same purpose as remedial fine); Edelman v. Jordan, 415 U.S. 651, 668 (1974) (label attached to payment of money is inconsequential); *see also* Brief for Petitioner at 18-21, Pulliam v. Allen, 104 S. Ct. 1970, 1981 (1984) (setting forth Magistrate Pulliam's argument that attorney's fees are tantamount to monetary damages).  Because § 1988 allows a judge discretion in awarding attorney's fees, the Court was not compelled to award fees to Allen.  *See* 42 U.S.C. § 1988 (1982). By awarding the fees, however, the Court put state judges on notice that while judicial acts resulting in deprivation of another's federally protected rights will not result in traditional monetary damages, these acts will result in compensation for the expense of bringing suit to those whose rights they have violated.  Pulliam v. Allen, 104 S. Ct. 1970, 1982 (1984).

116  Floyd & Barker, 77 Eng. Rep. 1305, 1307 (Star Chamber 1607). For a more recent articulation of the same concept, see Feinman & Cohen, *supra* note 24, at 267 (subjecting judges to liability would cause degradation of judiciary in eyes of the public).  *But see*  Nixon v. Fitzgerald, 457 U.S. 731, 783-84 (1982) (White, J., dissenting) (official's liability deters unconstitutional and illegal behavior and raises public's view of public officials).

117  *See generally* Feinman & Cohen, *supra* note 24, at 267-68 (discussing resulting degradation of judiciary in public's eye from awarding money damages).

118  Pulliam v. Allen, 104 S. Ct. 1970, 1982 (1984) (affirming award of attorney's fees).

similar abuses.  By allowing injunctive relief against a state judge for a section 1983 violation, the **[\*546]** Court opened the door for similar suits against federal judges.   119 No impediments exist that prevent federal judges from issuing injunctions against other federal judges.   120 Furthermore, by granting attorney's fees against a state judge under section 1988, the Court in *Pulliam* implicitly sanctioned similar awards of attorney's fees against federal judges who violate an individual's civil rights.   121

## A.  The Ability to Bring Suit Against Federal Judges

Federal officials who commit civil rights violations cannot be held liable for their actions under the Civil Rights Acts. 122 The Supreme Court, however, has allowed recovery against federal agents for civil rights abuses even when no federal statute or constitutional provision directly authorizes a remedy for the particular civil offense.   123 In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*   124 the plaintiff brought suit for damages against federal officers who had violated his fourth amendment rights.   125 The Supreme Court held that despite the lack of a congressionally authorized remedy, a petitioner who has properly stated a cause of action under the fourth amendment can recover damages for his injuries.   126 Courts have subsequently expanded the Supreme Court's rationale in *Bivens* to provide a remedy for all constitutional violations by federal officials, not just violations under the fourth amendment.

The federal courts of appeals consistently have held that it would be incongruous and confusing to develop different standards of immunity for state officers sued under section 1983 and federal officers sued for constitutional violations under *Bivens*.   127 In *Butz v.* **[\*547]** *Economou*   128 the Supreme Court affirmed the general view of

---

119   *See infra* notes 122-39 (discussing propriety of bringing suit for equitable relief against federal judges).

120   *See infra* notes 140-61 (discussing appropriateness of awarding equitable relief against federal judges).

121   *See infra* notes 162-71 (discussing authority for awarding attorney's fees against federal judges).

122   *See*  42 U.S.C. § 1983 (1982); *see also*  Butz v. Economou, 438 U.S. 478, 500, 502 n.30 (1978) (§ 1983 reaches only state actors); Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 406 (1971) (Harlan, J., concurring) (§ 1983 does not apply to federal actors).  For a discussion of the application of § 1983, see *supra* notes 7-10 and accompanying text.

123   *See*  Carlson v. Green, 446 U.S. 14, 19 (1980) (holding damages available for eighth amendment violation); Davis v. Passman, 442 U.S. 228, 248-49 (1979) (holding damages available for fifth amendment violation); Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 396-97 (1971) (allowing damages recovery for fourth amendment violations).

124   403 U.S. 388 (1971).

125   Id. at 389-90.

126   Id. at 397.

127   *See, e.g.,*  G.M. Leasing Corp. v. United States, 560 F.2d 1011, 1015 (10th Cir. 1977) (recognizing limited immunity available to both state and federal officers who violate fourth amendment under color of authority), *cert. denied,*  435 U.S. 923 (1978);  Jones v. United States, 536 F.2d 269, 270-71 (8th Cir. 1976) (recognizing cause of action against federal agent in case alleging jury tampering and civil rights abuses), *cert. denied,*  429 U.S. 1039 (1977);  Economou v. United States Dep't of Agriculture, 535 F.2d 688, 695 n.7 (2d Cir. 1976) (denying privilege of absolute immunity to executive branch official for civil rights violations); Weir v. Muller, 527 F.2d 872, 873 (5th Cir. 1976) (per curiam) (separating jurisdictional issue from immunity issue in case against federal officer who violated fifth amendment), *overruled on other grounds,*  571 F.2d 793 (5th Cir. 1978); Paton v. La Prade, 524 F.2d 862, 870 (3d Cir. 1975) (upholding cause of action against federal agent for violation of first amendment rights under *Bivens* doctrine); Mark v. Groff, 521 F.2d 1376, 1380 (9th Cir. 1975) (rejecting arguments of defendant IRS agents for application of absolute immunity to federal officials); Apton v. Wilson, 506 F.2d 83, 92-93 (D.C. Cir. 1974) (holding Justice Department officials entitled only to qualified immunity in action alleging fourth and fifth amendment violations); Brubaker v. King, 505 F.2d 534, 536 (7th Cir. 1974) (holding good faith defense available to federal as well as state officers alleging civil rights violations); Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 456 F.2d 1339, 1346 (2d

the federal courts of appeals that there is no basis for affording federal officials a higher degree of immunity from liability for constitutional infringements, as authorized by *Bivens,* than the immunities afforded state officials sued for identical violations under section 1983.   [129] As a result of the Court's decision in *Butz,* when a court denies a state official a certain degree of immunity under section 1983, the analogous federal official is denied the same immunity when sued in a *Bivens*-type action.   [130] By granting injunctive relief against a state judge for civil rights violations, the Court in *Pulliam* thereby opened the door for similar actions against federal judges.

*Nixon v. Fitzgerald*   [131] is the only case in which the Supreme Court has allowed absolute immunity for a federal official, the President, after having denied absolute immunity to the analogous state official,   **[*548]** the state governor.   [132] The Court reasoned that subjecting the President to liability for his official actions would impair his constitutional obligation to exercise his "executive power"   [133] and to execute faithfully the laws of the United States.   [134] The Court also determined that private law suits against the President would interfere with the doctrine of separation-of-powers.   [135]

Similar fears are unfounded, however, in suits against federal court judges.   The executive power of the United States is vested in the President alone.   [136] Forcing the President to appear in court as a defendant would,

---

Cir. 1972) (on remand) (applying qualified immunity to federal officers who have same limited discretion in scope of their duties as state officers); Bethea v. Reid, 445 F.2d 1163, 1166 (3d Cir. 1971) (finding no reason to distinguish between liability of state prosecutors and federal prosecutors in civil rights actions), *cert. denied,*  404 U.S. 1061 (1972);  Anderson v. Nosser, 438 F.2d 183, 205 (5th Cir. 1971) (Bell, J., concurring) (supporting doctrine of equal accountability for all government personnel, whether state or federal).

[128]   438 U.S. 478 (1978).

[129]   Id. at 500. The Court further stated that it would be untenable to draw a distinction for purposes of immunity between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials.  Id. at 504. Allowing the Bill of Rights to monitor more closely the conduct of state officials than it does the conduct of federal officials would completely undermine the constitutional system.  *Id.*

[130]   *See, e.g.,*  Mark v. Groff, 521 F.2d 1376, 1380 (9th Cir. 1975) (federal IRS agent afforded no greater immunity than state government official in analogous position); Apton v. Wilson, 506 F.2d 83, 93 (D.C. Cir. 1974) (head of federal executive department afforded no greater immunity than chief executives of states); States Marine Lines, Inc. v. Shultz, 498 F.2d 1146, 1159 (4th Cir. 1974) (extending immunity afforded state executive officials to federal executive officials); Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 456 F.2d 1339, 1346-47 (2d Cir. 1972) (on remand) (denying absolute immunity to federal officials performing duties similar to those of state police); Bethea v. Reid, 445 F.2d 1163, 1166 (3d Cir. 1971) (no distinction between immunity afforded state prosecutors and immunity afforded U.S. attorneys), *cert. denied,*  404 U.S. 1061 (1972). For a discussion of the major exception to the analogous liability rule, see *infra* note 132.

[131]   457 U.S. 731 (1982).

[132]   The analogous liability rule is not applicable to the respective immunities of a state governor and the President of the United States.  *Compare*  Scheuer v. Rhodes, 416 U.S. 232, 242-49 (1974) (affording Governor of Ohio only qualified good faith immunity for illegal action in using Ohio National Guard at Kent State University campus) *with*  Nixon v. Fitzgerald, 457 U.S. 731, 748-54 (1982) (holding President entitled to absolute immunity from liability predicated on his official acts despite only qualified immunity for analogous state official).

[133]   Nixon v. Fitzgerald, 457 U.S. 731, 749 (1982);  *see* U.S. CONST. art. II, § 1 (executive power vested in President).

[134]   Nixon v. Fitzgerald, 457 U.S. 731, 750 (1982);  *see*  U.S. CONST. art.  II, § 3 (President shall faithfully execute laws of United States).

[135]   *See*  Nixon v. Fitzgerald, 457 U.S. 731, 762 (1982) (Burger, C.J., concurring) (expressing concern that holding President liable for official acts would lead to almost daily judicial scrutiny of President, interfere with President's ability to function, and violate doctrine of separation-of-powers).

[136]   *See* U.S. CONST. art. II, § 1 (executive power vested in President).

therefore, interfere with the executive branch's authority. [137] In contrast, the judicial power of the United States is spread throughout the entire federal judiciary. [138] Actions brought against individual federal judges, therefore, would not have the effect of interfering with the judicial branch's authority. In addition, there are no separation-of-powers problems because suits against federal judges would result in judicial self-scrutiny and would not implicate another branch of the government. [139]

### [*549]  B.  The Ability to Grant Injunctive Relief Against Federal Judges

#### 1.  Injunctive relief is the proper relief to seek

Federal courts may grant plaintiffs injunctive relief only on a showing of an inadequate remedy at law. [140] Because of judges' absolute immunity from suits for monetary damages, the unavailability of an adequate remedy at law in suits against judges is undisputed. [141] Appealing a conviction or a wrongful imprisonment to a higher court would also be an inadequate remedy at law for plaintiffs in situations similar to those in *Pulliam*. [142] Although federal prisoners can file a motion to vacate or to set aside or correct a sentence upon conviction, [143] federal courts may take between one and six months to hear such motions. [144] For persons wrongfully incarcerated for a short period of time, like Allen or Nicholson, [145] a motion to set aside a wrongful sentence is, therefore, inadequate.

Federal offenders who believe that judges have wrongfully incarcerated them pending trial may also petition for a writ of habeas corpus from the federal courts. [146] A federal court, however, may take from three-to-twenty-five days from the date of filing before it will hear the petition for a writ of habeas corpus. [147] In a situation similar to

---

[137]  *See*  Nixon v. Fitzgerald, 457 U.S. 731, 753-54 (1982). The Court stated that before exercising jurisdiction over the President, it must balance the constitutional interest served by the prospective suit against the potential damages resulting from intrusion on the authority and functions of the executive branch. *Id.* The Court concluded that in the case of a private suit for damages based on the President's official acts, such intrusion with the executive branch was not warranted. Id. at 754 (citing United States v. Nixon, 418 U.S. 683, 703-13 (1974);  Nixon v. Administrator of General Servs., 435 U.S. 425, 443 (1977)).

[138]  *See*  U.S. CONST. art. III, § 1 (judicial power of U.S. vested in one Supreme Court and such inferior courts as Congress may establish).

[139]  Separation of powers problems could arise if a judge were to refuse to abide by an injunction or pay attorney's fees, and that judge was then held in contempt of court and jailed by executive branch personnel.  The problem is tempered, however, because a judicial officer would be ordering the judge held in contempt, and the executive officer would simply be carrying out his normal functions.  The court in *Pulliam* never considered whether its holding would apply to federal judges and, therefore, never discussed the policy supporting or objecting to such application.

[140]  *See*  Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959) (discussing federal court requirements for injunctive relief).

[141]  *See supra* note 115 and accompanying text (discussing unavailability of damages against judges).

[142]  *See* Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available on LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982),  *aff'd sub nom.*  Pulliam v. Allen, 104 S. Ct. 1970 (1984). Both Allen and Nicholson were incarcerated for very short periods of time making their efforts to seek normal procedural relief fruitless.  *Id.; see supra* note 101 (discussing inadequacy of remedies available in *Pulliam*).

[143]  *See*  28 U.S.C. § 2255 (1982) (listing motions available to federal prisoners attacking convictions and sentences).

[144]  Interview with Ira P. Robbins, Professor of Law and Justice and Bernard T. Welsh Scholar, The American University Washington College of Law, in Washington, D.C. (October 4, 1984).

[145]  Pulliam v. Allen, 104 S. Ct. 1970, 1972 (1984) (Allen was in jail 14 days; Nicholson for periods between two and six days).

[146]  *See*  28 U.S.C. § 2241 (1982) (providing federal courts power to grant writ of habeas corpus for wrongful custody).

[147]  *See id.* § 2243 (discussing hearing date requirements for habeas corpus petitions).

Allen's and Nicholson's,  [148] a petition for a writ of habeas corpus hearing may be an inadequate remedy because of the delay between the time the petition is filed and the time that a federal court eventually holds a hearing.  An injunction, therefore, is the only adequate remedy available to individuals in cases in which federal judges violate their civil rights.

In addition to proving that no adequate remedy at law is available, the plaintiff must show that he is subject to a serious risk of irreparable  **[*550]** harm before a federal court can grant injunctive relief.  [149] The Supreme Court has consistently held that violations of citizens' constitutional rights are serious risks of irreparable harm.  Indeed, by hearing Allen's suit, the Court implied that judicial civil rights abuses also constitute serious risks of irreparable harm.  [150] Injunctive relief, therefore, is the proper remedy for a plaintiff seeking relief from civil rights violations by federal judges.

*2.  District courts can properly grant injunctive relief against federal judges*

Suits brought in federal courts against federal judges for civil rights abuses similar to the abuses in *Pulliam* would be brought against either U.S. magistrates or district court judges.  [151] A district court judge who enjoined a U.S. magistrate from violating individuals' civil rights would be acting in a manner that is consistent with the superior court-inferior court analysis in *Pulliam*.  [152] The superior court-inferior court analysis, however, is not applicable to district court judges enjoining other district court judges for civil rights violations.

In *Pulliam* the Court analogized the relationship between federal and state courts to that of the King's Bench and lower English courts.  [153] The Court justified federal judges' imposition of injunctive relief on state judges by showing that the King's Bench invoked similar controls on its lower courts in the form of prerogative  **[*551]** writs. [154] In so doing, the Court based its analysis on legitimizing superior court actions against inferior courts.  [155] By analogy, the common law superior court-inferior court analysis applies equally well to the relationship between district court judges and U.S. magistrates.

---

148  *See supra* note 145 (indicating Allen's and Nicholson's sentences).

149  *See*  Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959) (discussing requirements for federal injunctive relief).

150  *Compare*  Pulliam v. Allen, 104 S. Ct. 1970 (1984)  *with*  City of Los Angeles v. Lyons, 461 U.S. 95 (1983). In *Lyons* the Court held that absent a showing of irreparable injury -- any real or immediate threat that the plaintiff will be wronged again -- an equitable remedy is unavailable.  City of Los Angeles v. Lyons, 461 U.S. at 111. By affirming the district court's award of injunctive relief in *Pulliam,* the Court has implicitly rejected the requirement of a showing of irreparable harm.  Pulliam v. Allen, 104 S. Ct. at 1981-82. The Court upheld the award of injunctive relief even though neither Allen nor Nicholson showed any likelihood that Magistrate Pulliam would again incarcerate them for a noncriminal offense.  *See supra* note 94 (discussing likelihood of future violations against Allen and Nicholson and discussing *Lyons* in greater detail).

151  *See*  18 U.S.C. § 3231 (1982) (U.S. district courts have original jurisdiction over all federal offenses); *id.* § 3401(a) (U.S. magistrates have original jurisdiction over misdemeanors when so designated by district court within magistrates judicial district); *id.* § 3041 (district court judges and magistrates have jurisdiction over pretrial arrest, commitment, and bail setting); *id.* § 3141 (district court judges and magistrates have jurisdiction over release of arrestee upon payment of bail).  For a discussion of Magistrate Pulliam's violations of petitioners' civil rights, see Pulliam v. Allen, 104 S. Ct. 1970, 1972-73 (1984).

152  *See*  Pulliam v. Allen, 104 S. Ct. 1970, 1974-78 (1984) (Court's analysis based on legitimating superior courts' actions against inferior courts).

153  Id. at 1978 (noting that relationship between King's Bench and inferior courts not precisely parallel to relationship between federal courts and state courts); *see supra* notes 100 & 102 and accompanying text (discussing American-English court system parallel).

154  Pulliam v. Allen, 104 S. Ct. 1970, 1974-78 (1984) (discussing use of prerogative writs of King's Bench).

155  *See* id. at 1974-78 (discussing control by superior courts over inferior courts).

U.S. magistrates have limited subject matter jurisdiction and, in some cases, the district courts define the magistrates' functions. [156] Furthermore, magistrates' actions are appealable to district court judges. [157] A district court judge's issuance of an injunction against a U.S. magistrate is thereby tantamount to a superior court's action against an inferior court. A plaintiff requesting a district court judge to grant injunctive relief against another district court judge or against a federal appellate judge must base his request on grounds different from the superior court-inferior court analysis employed in *Pulliam*. If a district court judge granted an injunction against a judicial peer or superior, the action would not be that of a superior court against an inferior court.

The justification for a district court's issuance of an injunction against another district court is based on the traditional practices of American courts of equity. As early as 1792, Congress specifically authorized federal courts to exercise equitable jurisdiction. [158] The federal equitable power extends to all cases arising under the Constitution, treaties, and other laws of the federal government. [159] Because **[*552]** cases in which federal judges have violated individuals' civil rights arise under the Constitution, federal courts have proper subject matter and equitable jurisdiction over these actions. [160] Traditionally, the jurisdiction of equity courts has included

---

[156] *See* 28 U.S.C. § 636 (1982). The Federal Magistrates Act, Pub. L. No. 90-578, § 101, 82 Stat. 1107, 1113 (1968), expanded magistrates' jurisdiction over that which existed under the U.S. Commissioner system that it replaced. *See* H.R. REP. NO. 1629, 90th Cong., 2d Sess., *reprinted in* 1968 U.S. CODE CONG. & AD. NEWS 4257. The magistrates' jurisdiction is limited to those functions that district court judges designate magistrates to perform, *see* 28 U.S.C. § 636(b) (1982); and select jurisdictional powers. *See, e.g.,* 18 U.S.C. § 3041 (1982) (authorizing magistrates to conduct pretrial arrest, commitment, and bail hearings); *id.* § 3141 (authorizing magistrates to release detainees upon payment of bail); *id.* § 3401(a) (authorizing magistrates to try misdemeanants with approval of district court); *see also* FED. R. CRIM. P. 5 (defining magistrates' jurisdiction over criminal proceedings).

[157] *See* 18 U.S.C. § 3402 (1982) (magistrate's convictions appealable as matter of right to district court judges); RULES OF PROCEDURE FOR THE TRIAL OF MISDEMEANORS BEFORE UNITED STATES MAGISTRATES 7 (discussing procedure for appeal of magistrates' actions to district courts).

[158] Act of May 8, 1792, ch. 36, § 2, 1 Stat. 275, 276 (current version at 28 U.S.C. § 165 (1982)) (forms of writs, executions, and other processes used in federal courts shall be same as those used in courts of equity according to principles, rules, and usages traditionally employed); *see* von Moschzisker, *Equity Jurisdiction in the Federal Courts,* 75 U. PA. L. REV. 287, 294 (1927) (Act of 1792 requires that principles of equity courts and not those of common-law courts should regulate proceedings in equity).

[159] 28 U.S.C. § 1331 (1982) (granting district courts original jurisdiction of all civil actions arising under Constitution, laws, or treaties of United States). The Supreme Court has held that federal equitable power exists in any case in which the federal judiciary has subject matter jurisdiction. *See* Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 404 (1971) (Harlan, J., concurring) (federal courts empowered to grant equitable relief when Congress has extended court jurisdiction over subject matter of suit) (citing Textile Workers v. Lincoln Mills, 353 U.S. 448, 460 (1957) (Burton, J., concurring in result)).

Early case law implied that federal equitable jurisdiction was independent of state law. *See, e.g.,* Neves v. Scott, 54 U.S. (13 How.) 268, 272 (1851) (well-settled doctrine that U.S. courts should decide equitable principles not according to practice of state courts, but according to common-law principles) (citing Livingston v. Story, 34 U.S. (9 Pet.) 508, 511 (1835); United States v. Howland, 17 U.S. (4 Wheat.) 108, 115 (1819); Robinson v. Campbell, 16 U.S. (3 Wheat.) 212, 222-23 (1818)). Later federal courts sitting in equity followed state statutes only to the extent that they were applicable to substantive rights. C. WRIGHT, *supra* note 69, § 54, at 352. State statutes, however, are not relevant in suits against federal judges because state law cannot supercede federal law pertaining to federal judges. U.S. CONST. art. VI, cl. 2 (supremacy clause).

[160] The Court in *Bivens* was concerned with providing a remedy for damages. Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 389 (1971) (noting issue was whether federal agent's violations of constitutional rights gives rise to cause of action for damages). The *Bivens* rationale, however, was that a petitioner who can demonstrate that federal agents had violated his constitutional rights and caused him injury is entitled to redress. Id. at 397. The Court has held in subsequent cases that whatever relief will remedy an injury is available against federal officials under the *Bivens* doctrine. *See, e.g.,* Duke Power Co. v. Carolina Envtl. Study Group, 438 U.S. 59, 71 (1978) (relying on *Bivens* in holding that if fifth amendment rights are deprived by federal officials, then federal courts should provide remedy necessary to grant relief); Carey v. Piphus, 435 U.S. 247, 259 (1978) (citing *Bivens* in holding that compensation for injuries caused by deprivation of

enjoining proceedings in courts of law.  [161] Federal district court judges, therefore, **[*553]** can grant injunctive relief against other federal judges who have violated a litigant's civil rights despite the superior court-inferior court analysis employed in *Pulliam.*

## C. The Ability to Award Attorney's Fees Against Federal Judges

Similar to causes of action under section 1983, attorney's fees awards under section 1988 are limited to actions against state actors.  [162] By enacting the Equal Access to Justice Act (EAJA),  [163] however, Congress allowed federal courts to award attorney's fees in actions against federal actors as well.  [164] The EAJA is unique among

---

constitutional rights by federal officers should be tailored to interests protected by particular right in question); Lipsett v. University of P.R., 576 F. Supp. 1217, 1221-22 (D.P.R. 1983) (injunctive relief against officers of U.S. Veterans Administration available in suit brought under *Bivens* rationale).  Federal cases prior to *Bivens* also employed the equitable powers of the federal courts.  *See, e.g.,* Bell v. Hood, 327 U.S. 678, 684 (1946) (federal courts have jurisdiction to issue injunctions to protect rights safeguarded by Constitution); Philadelphia Co. v. Stimson, 223 U.S. 605, 619-20 (1912) (state and federal officers who have acted beyond their authority cannot claim immunity from injunctive process when their actions have violated personal property rights); Davis v. Passman, 571 F.2d 793, 800 (5th Cir. 1978) (noting in dicta that equitable relief may be sought for civil rights abuses by U.S. Congressman), *rev'd,* 442 U.S. 1113 (1979).

[161]   *See* F. MAITLAND, EQUITY, ALSO THE FORMS OF ACTION AT COMMON LAW 9-10 (1909).  The power of equity courts to enjoin suits in courts of law dates to 1616 and the rule of King James I. Lord Chancellor Ellesmere of the equity courts declared that in order to carry out the judgments of equity courts, it was essential that such courts have the power to prevent men from going to courts of law in an attempt to enforce the judgments that they had obtained there.  *Id.* Lord Chief Justice Coke of the courts of law declared that the man who obtained such an injunction from the equity courts was criminally guilty of questioning the judgment of the King's courts.  *Id.* King James I resolved the dispute by declaring that the Chancellor may enjoin parties from participating in actions at law.  *Id.* The equity courts were not deemed superior to the courts of law, but when equitable relief was properly deserved, the Chancellor could enjoin actions in law.  *Id.* For further discussion of the dispute between Ellesmere and Coke, see 1 W. HOLDSWORTH, *supra* note 21, at 459-65 (7th ed. 1956); J. BAKER, AN INTRODUCTION TO ENGLISH LEGAL HISTORY, 92-95 (1979).  American courts adopted the practice of equity courts enjoining the proceedings in law courts.  2 J. STORY ON EQUITY JURISDICTION § 1195 (14th ed. 1918).  Although the federal equitable power to enjoin proceedings in a court of law traditionally has been directed at the litigants before the court, *id.,* the federal district court in *Pulliam* directly enjoined Magistrate Pulliam.  *See* Allen v. Burke, No. 81-0040A (E.D. Va. June 4, 1981) (available on LEXIS, Genfed library, Dist file), *aff'd,* 690 F.2d 376 (4th Cir. 1982),  *aff'd sub nom.*  Pulliam v. Allen, 104 S. Ct. 1970 (1984). In affirming the district court's decision, the Supreme Court implicitly authorized injunctions aimed directly at federal judges.  *Id.* at 1982; *see also*  Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 456 F.2d 1339, 1346-47 (2d Cir. 1972) (on remand) (maintaining that it would be incongruous and confusing to develop different practices and standards for federal and state officials committing civil rights violations).

[162]   *See*  42 U.S.C. § 1988 (1982).

[163]   Pub. L. No. 96-481, 94 Stat. 2325 (1980) (codified at 5 U.S.C. § 504 (1982); 28 U.S.C. § 2412 (1982)). Section 2412(b) states:

Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys . . . to the prevailing party in a civil action brought by or against the United States or any agency and any official of the United States acting in his or her official capacity in any court having jurisdiction of such action.  The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

28 U.S.C. § 2412(b) (1982).

[164]   The United States, its agencies, branches, departments, officers, and employees once enjoyed sovereign immunity as litigators in the federal courts, which in turn led to certain abuses of their power.  *See* 1 M. DERFNER & A. WOLF, COURT AWARDED ATTORNEY FEES § 5.03[12] (1984).  By enacting the EAJA, Congress sought to overcome the federal government's absolute sovereign immunity.  *Id.* For a discussion of the purpose of the EAJA and the availability of fees under its provisions, see Robertson & Fowler, *Recovering Attorneys' Fees From the Government Under the Equal Access to Justice Act,* 56 TUL. L. REV. 903, 934-44 (1982) (discussing available fees and recoverable expenses under EAJA); Note, *The Award of*

34 Am. U.L. Rev. 523, *553

federal attorney's fees legislation in two ways.  First, rather than protecting particular rights under specific causes of action, Congress intended the EAJA to be a catchall provision designed to safeguard those federally protected rights not already protected by other federal attorney's fees legislation.  [165] Second, attorney's fees **[*554]** under the EAJA are not limited to situations in which the applicant establishes entitlement; rather, in suits under the EAJA, the United States must disprove the applicant's entitlement to an award.  [166] The EAJA's broad applicability has helped to curb governmental abuses of power.  [167]

The EAJA's legislative history demonstrates Congress' intent to make federal officials equally liable for attorney's fees under the EAJA as state officials are liable under section 1988.  A House Report stated that the EAJA reflected Congress' interest in placing the federal government and civil litigants, both private parties and states, on an equal

---

*Attorney's Fees Under the Equal Access to Justice Act,* 11 HOFSTRA L. REV. 307, 310-20 (1982) (discussing proceedings and parties covered by EAJA).

[165]  *See* H.R. REP. NO. 1418, 96th Cong., 2d Sess., *reprinted in* 1980 U.S. CODE CONG. & AD. NEWS 4987.  Examples of attorney's fees legislation that are designed to protect a particular right against a particular litigant and require the applicant to establish entitlement rather than requiring the United States disprove entitlement include the Freedom of Information Act, 5 U.S.C. § 552(a)(4)(E) (1982) (attorney's fees available when fee applicant substantially prevails in § 552 action); Civil Service Reform Act of 1978, 5 U.S.C. § 5596(b)(1)(A)(ii) (1982) (attorney's fees available for civil service personnel actions); Toxic Substances Control Act §§ 19-21, 15 U.S.C. §§ 2618(d), 2619(c)(2), 2620(b)(4)(C) (1982) (attorney's fees available in actions to enforce toxic substances regulations); Tax Reform Act of 1976, 26 U.S.C. § 6110(i)(2)(B) (1982) (attorney's fees available in action to remedy specific IRS wrong doings); Marine Protection, Research, and Sanctuaries Act § 105, 33 U.S.C. § 1415(g)(4) (1982) (attorney's fees available in action against violation of ocean dumping regulations); Safe Drinking Water Act § 1449, 42 U.S.C. § 300j-8(d) (1982) (attorney's fees available in action to enforce drinking water standards); Energy Policy and Conservation Act § 335(d), 42 U.S.C. § 6305(d) (1982) (attorney's fees available in action to enforce Energy Conservation Act). For further examples, see 1 M. DERFNER & A. WOLF, *supra* note 164, § 5.03[12] n.102 (1984).

[166]  *See*  28 U.S.C. § 2412(d) (1982) (attorney's fees awarded to prevailing party other than U.S. unless court finds that position of U.S. was "substantially justified").  All other federal attorney's fees legislation places the burden of establishing entitlement on the prevailing party.  *See supra* note 165 (listing examples of legislation placing entitlement burden on prevailing party). Congress repealed § 2412(d) as of October 1, 1984.  *See* Pub. L. No. 96-481, tit. II, § 204(c), 94 Stat. 2321, 2329 (1980). It is unclear who must bear the burden of proof for attorney's fees awards. Congress placed the burden of proof on the government under § 2412(d) because the government typically had better access to the elements of proof.  H.R. REP. NO. 1418, 96th Cong., 2d Sess. 10-11, *reprinted in* 1980 U.S. CODE CONG. & AD. NEWS 4989.  To show that its actions were substantially justified, the government need only show that its actions were reasonable.  *Id.* at 11, *reprinted in* 1980 U.S. CODE CONG. & AD. NEWS 4989.  The courts generally have deferred to the government's showing of substantial justification, allowing fee awards only when the government's actions were clearly unjustified.  *See, e.g.,*  Underwood v. Pierce, 547 F. Supp. 256, 261-62 (C.D. Cal. 1982) (government position previously rejected by nine other courts); Wolverton v. Schweiker, 533 F. Supp. 420, 425 (D. Idaho 1982) (government position not supported by evidence); Spang v. United States, 533 F. Supp. 220, 226 (W.D. Okla. 1982) (government conceded error on day of trial).  Section 2412(b) states that the government shall be equally liable for fees and expenses as any other litigant under the common law or the terms of any statute that provides for fee awards.  *See* 28 U.S.C. § 2412(b) (1982).  The terms and standards courts applied under the common law and other statutes, however, vary greatly and courts do not uniformly apply the reasonableness standard under which the government is judged.  *See* 1 M. DERFNER & A. WOLF, *supra* note 164, § 10.03[3].  Following precedent under the EAJA, the standard of proof for awarding attorney's fees under the EAJA should remain the same.

[167]  *See* 1 M. DERFNER & A. WOLF, *supra* note 164, § 5.03[12].

footing.  [168] The House Report reflects a congressional intent to make federal officials liable for fees in *Bivens*-type actions to the same extent that state officials are liable under analogous suits brought under section 1983.  [169]

 **[*555]**  In *Pulliam* the Supreme Court affirmed the award of attorney's fees under section 1988 against a state judge who had violated the plaintiff's civil rights.   [170]  After *Pulliam,* state judges who violate a plaintiffs' constitutional rights are not immune from the award of attorney's fees under section 1988.  Similarly, federal judges who violate plaintiff's constitutional rights are not immune from an award of attorney's fees under the EAJA.

CONCLUSION

Traditionally, the common-law doctrine of judicial immunity has protected judges from suits brought by disappointed litigants.  Prior to *Pulliam v. Allen,* the Supreme Court consistently upheld the doctrine by declaring judges absolutely immune from damages for judicial acts within their jurisdiction and absolutely immune from damages and injunctive relief for their legislative acts.

*Pulliam v. Allen* was the first Supreme Court case to reject judicial immunity and hold a judge civilly accountable for her acts.  In *Pulliam* the Court affirmed the award of injunctive and declaratory relief under section 1983, and attorney's fees under section 1988, against a state court judge who, acting within her proper jurisdiction, had violated the plaintiffs' civil rights.

Following *Pulliam,* federal judges that are sued in *Bivens*-type actions for violating a litigant's civil rights should also be liable for  **[*556]**  injunctive and declaratory relief as well as for attorney's fees according to the Equal Access to Justice Act.  The decision in *Pulliam v. Allen* is a major step toward removing the final vestiges of the maxim, "The King can do no wrong," and toward holding government officials accountable for unacceptable conduct.

---

[168] H.R. REP. NO. 1418, 96th Cong., 2d Sess. 8-9, *reprinted in* 1980 U.S. CODE CONG. & AD. NEWS 4987.  The House Report further stated that the U.S. would be liable under § 2412(b) to the same extent as litigants covered by § 1988.  *Id.* at 17, *reprinted in* 1980 U.S. CODE CONG. & AD. NEWS 4996-97.

[169] Further evidence that Congress intended to hold federal officials liable for attorney's fees to the same extent as state officials under § 1988 is provided in the testimony presented in the House hearings on the EAJA.  The testimony recommended that the House change the original language of § 2412(b), which would have held the U.S. liable for fees to the extent of any "private party," to language that read "any other party."  *Award of Attorney's Fees Against the Federal Government: Hearings on S.265 Before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Judiciary Committee,* 96th Cong., 2d Sess. 100 (1980) (statement of Armand G. Derfner, Lawyer's Committee for Civil Rights Under Law).  The change in language, the testimony continued, would achieve the purpose of placing the U.S. and state or local government bodies on a par for purposes of awarding attorney's fees.  *Id.* By incorporating the recommendation into the final version of the Act, Congress demonstrated its intent to hold federal officials liable to the same extent as state officials acting analogously.

Courts have not used the EAJA to award attorney's fees against federal judges, but this is predictable because federal courts prior to *Pulliam* dismissed actions involving federal judges on judicial immunity grounds.  *See supra* note 20 (citing precedent of judicial immunity in suits against federal judges for civil rights abuses).  Courts have used the EAJA, however, to award attorney's fees in other numerous and varied circumstances.  *See, e.g.,* Premachandra v. Mitts, 727 F.2d 717, 721-30 (8th Cir. 1984) (en banc) (federal official who violated plaintiff's civil rights by wrongfully dismantling plaintiff's medical lab held liable for attorney's fees under the EAJA to same extent as state officials would be liable under § 1988 for analogous violations of constitutional rights); Matthews v. United States, 713 F.2d 677, 682-83 (11th Cir. 1983) (awarding attorney's fees under EAJA because Army Corp of Engineers construction of dock violated regulations governing public recreation area); United States v. 329.73 Acres of Land, 704 F.2d 800, 801 (5th Cir. 1983) (granting attorney's fees under EAJA in eminent domain proceeding); Boudin v. Thomas, 554 F. Supp. 703, 705 (S.D.N.Y. 1982) (awarding attorney's fees under EAJA following successful habeas corpus action against federal warden); Nunes-Correia v. Haig, 543 F. Supp. 812, 813 (D.D.C. 1982) (granting attorney's fees under EAJA in action successfully challenging Dep't of State's alien-spouse regulations); Wolverton v. Schweiker, 533 F. Supp. 420, 426 (D. Idaho 1982) (awarding attorney's fees under EAJA following successful action by social security benefits claimant).

[170]  Pulliam v. Allen, 104 S. Ct. 1970, 1982 (1984).

34 Am. U.L. Rev. 523, *556

American University Law Review
Copyright (c) 1985 The American University Law Review

---

**End of Document**